UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| JIANGSU ALCHA ALUMINUM CO., LTD. AND ALCHA INTERNATIONAL HOLDINGS LTD., | |
| Plaintiffs, | Court No. 22-00290 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, | |
| Defendant-Intervenors. | |

**RULE 56.2 MOTION ON BEHALF OF PLAINTIFFS JIANGSU ALCHA ALUMINUM CO., LTD. AND ALCHA INTERNATIONAL HOLDINGS LTD. FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the U.S. Court of International Trade, Plaintiffs move for judgment on the agency record in this action challenging the factual and legal conclusions of the U.S. Department of Commerce ("the Department") in the final results of the administrative review of the countervailing duty order on common alloy aluminum sheet from the People's Republic of China covering the January 1, 2020 through December 31, 2020 period of review, *Common Alloy Aluminum Sheet From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 54,462 (Sept. 6, 2022) ("*Final Results*"), and associated decision and analysis memoranda.

For the reasons set forth in the attached Memorandum in Support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, the Department's decisions to use facts otherwise available with an adverse inference in assigning Plaintiffs a countervailing duty rate in connection with the Export Buyer's Credit Program was unsupported by substantial evidence and otherwise not in accordance with law.  Moreover, the Department's application of a 17 percent valued-added tax rate to adjust the benchmark for the subsidy program "Government Provision of Primary Aluminum for Less than Adequate Remuneration" is unsupported by substantial evidence and otherwise not in accordance with law.  Plaintiffs respectfully move this Court to so hold, remand this case to the Department to reconsider and revise the decisions in the *Final Results*, and grant such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated:  April 14, 2023

*/s/ Weronika Bukowski*

Daniel Cannistra
Weronika Bukowski

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Tel: 202.624.2902
E-mail: wbukowski@crowell.com

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| JIANGSU ALCHA ALUMINUM CO., LTD. AND ALCHA INTERNATIONAL HOLDINGS LTD.,<br><br>         Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>  and<br><br>ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS,<br><br>        Defendant-Intervenors. | Court No. 22-00290 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS JIANGSU ALCHA ALUMINUM CO., LTD. AND ALCHA INTERNATIONAL HOLDINGS LTD.'S<br>RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Dan Cannistra
Weronika Bukowski


Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Email:  dcannistra@crowell.com


*Counsel to Plaintiffs*

Dated:  April 14, 2023

## TABLE OF CONTENTS

PLAINTIFFS' STATEMENT PURSUANT TO USCIT RULE 56.2(c) ....................................... 1

STATEMENT OF FACTS ............................................................................................... 3

ARGUMENT ................................................................................................................. 8

I.      INTRODUCTION ................................................................................................. 8

II.     SUMMARY OF ARGUMENT ............................................................................... 9

III.    LEGAL FRAMEWORK FOR COUNTERVAILING DUTIES UNDER THE TARIFF
        ACT.................................................................................................................... 11

        A.      Requirements for Imposing Countervailing Duties ............................... 11

        B.      Requirements to Apply Adverse Facts Available ................................. 11

IV.     THE *FINAL RESULTS* WERE CONTRARY TO THE TARIFF ACT AND
        UNSUPPORTED BY SUBSTANTIAL EVIDENCE ...................................... 13

        A.      The Department's Application of a CVD Rate to Alcha in Connection
                with the Export Buyer's Credit Program was Unsupported by Substantial
                Evidence and Otherwise Contrary to Law. ........................................... 13

                1.      The *Final Results* violated 19 U.S.C. § 1677(5)(B) by Failing to
                        Determine Whether a Benefit Was Conferred on to Alcha. .................... 13

                2.      The Department's Application of Adverse Facts Available was
                        Contrary to Law and Inconsistent with Established Precedent................ 16

                3.      The Department's Practice of Requiring Customer Certifications in
                        Order to Proceed with Supplemental Questionnaires or
                        Verification is Unsupported by Substantial Evidence. ........................... 25

        B.      The Department's Use of a 17 Percent VAT Rate to Calculate the
                Benchmark for Primary Aluminum for LTAR was Unsupported by
                Substantial Evidence and Otherwise Contrary to Law. ........................ 27

CONCLUSION............................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Archer Daniels Midland Co. v. United States*,
917 F. Supp. 2d 1331 (Ct. Int'l Trade 2013) .........................................................13

*Both-Well (Taizhou) Steel Fittings, Co. v. United States*,
557 F. Supp. 3d 1327 (Ct. Int'l Trade 2022) .........................................................21

*Changzhou Trina Solar Energy Co. v. United States*,
195 F. Supp. 3d 1334 (Ct Int'l Trade 2016) .........................................................21

*Changzhou Trina Solar Energy Co. v. United States*,
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .....................................................13, 19

*Changzhou Trina Solar Energy Co. v. United States*,
No. 17-198, Slip Op. 19-137, 2019 Ct. Intl. Trade LEXIS 138 (Nov. 8, 2019) ...............24, 25

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012)..........................................................................3

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*,
467 U.S. 837 (1984)........................................................................................3

*Clearon Corp. v. United States*,
359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) .........................................................20

*Clearon Corp. v. United States*,
474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) .........................................................21

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)........................................................................................3

*Cooper (Kunshan) Tire Co., Ltd. v. United States*,
No. 20-00113, Slip Op. 22-137, 2022 Ct. Intl. Trade LEXIS 145 (Dec. 8,
2022). .................................................................................................23, 24

*Cooper Kunshan Tire Co. v. United States*,
539 F. Supp. 3d 1316 (Ct Int'l Trade 2021) .........................................................23

*Dalian Meisen Woodworking Co. v. United States*,
No. 20-00110, ECF No. 86 (Aug. 5, 2022)..........................................................26

*Dalian Meisen Woodworking Co. v. United States*,
No. 20-00110, Slip Op. 20-110, 2022 Ct. Intl. Trade LEXIS 52 (May 12,
2022) .................................................................................................21

iii

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120, 132 (2000)...........................................................................3

*Fine Furniture (Shanghai) Ltd. v. United States*,
  865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012), *aff'd*, 748 F.3d 1365 (Fed. Cir.
  2014) .....................................................................................................20, 29

*Fujian Yinfeng Imp & Exp Trading Co. v. United States*,
  No. 21-00088, Slip Op. 22-107, 2022 Ct. Intl. Trade LEXIS 106 (Sept. 13,
  2022) .............................................................................................................22

*Guizhou Tyre Co. v. United States*,
  348 F. Supp. 3d 1261 (Court Int'l Trade 2018) ................................19, 21

*Guizhou Tyre Co. v. United States*,
  389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) ..........................................21

*Guizhou Tyre Co. v. United States*,
  399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) ....................................19, 21

*Guizhou Tyre Co. v. United States*,
  415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ...............................18, 21, 24

*Guizhou Tyre Co. v. United States*,
  447 F. Supp. 3d 1373 (Ct. Int'l Trade 2020) ..........................................21

*Hartford Fire Ins. Co. v. United States*,
  772 F.3d 1281 (Fed. Cir. 2014)...................................................................3

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003)................................................................19

*Risen Energy Co., Ltd. v. United States*,
  No. 19-00153, ECF No. 94 (Oct. 7, 2022).................................................26

*Risen Energy Co. v. United States*,
  570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) .....................................17, 21

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011)...................................................................3

*Shandong Rongxin Imp. & Exp. Co,. Ltd. v. United States*,
  335 F. Supp. 1365, 1370 (Ct Int'l Trade 2019) .......................................30

*SKF USA, Inc. v. United States*,
  537 F.3d 1373 (Fed. Cir. 2008)...................................................................3

*Yama Ribbons & Bows Co.*,
   517 F. Supp. 3d 1330 (Ct. Int'l Trade 2021) ............................................................16, 21, 22

*Yama Ribbons and Bows Co. v. United States*,
   419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019) .................................................. *passim*

*Yama Ribbons and Bows*,
   No. 20-00059, Slip Op. 22-157, 2022 Ct. Intl. Trade LEXIS 155 (Dec. 23, 2022) .....................................................................................................................22, 23

**Statutes**

19 U.S.C. § 1516a ........................................................................................................2, 3

19 U.S.C. § 1671 ..............................................................................................................11

19 U.S.C. § 1677 ........................................................................................................11, 14

19 U.S.C. § 1677e ............................................................................................12, 13, 17

19 U.S.C. § 1677m ..........................................................................................................16

28 U.S.C. § 1581 ..............................................................................................................2

**Regulations**

19 C.F.R.§ 351.511 ..........................................................................................................15

**Other Authorities**

*Common Alloy Aluminum Sheet from the People's Republic of China:*
   *Countervailing Duty Order*, 84 Fed. Reg. 2,157 (February 6, 2019) ........................3

USCIT Rule 56.2 ..........................................................................................................1, 22

**PLAINTIFFS' STATEMENT PURSUANT TO USCIT RULE 56.2(c)**

**A.      Administrative Determination to be Reviewed**

Jiangsu Alcha Aluminum Co., Ltd. and its affiliated trading company Alcha International

Holdings Limited (collectively "Plaintiffs" or "Alcha") contest the final results of the U.S.

Department of Commerce ("Commerce" or "the Department") in the second administrative

review of the countervailing duty ("CVD") order on common alloy aluminum sheet from the

People's Republic of China (C-570-074), covering the period January 1, 2020 through December

31, 2020 (the "POR"), and published in the Federal Register as *Common Alloy Aluminum Sheet*

*From the People's Republic of China: Final Results of Countervailing Duty Administrative*

*Review*; 2020, 87 Fed. Reg. 54,462 (Sept. 6, 2022), at Appx14242 ("*Final Results*").  Plaintiffs

challenge the Department's factual and legal conclusions underlying this determination set forth

in several memoranda, including but not limited to its August 30, 2022 *Issues and Decision*

*Memorandum for the Final Results of the Countervailing Duty Administrative Review of*

*Common Alloy Aluminum Sheet from the People's Republic of China; 2020*, at Appx14186

("IDM"), incorporated by reference in the *Final Results*.

**B.      Issues of Law and Fact Presented**

1.  Whether the Department's decision to use facts otherwise available with an adverse

inference in assigning Alcha a 2.57 percent CVD rate under the alleged Export Buyer's Credit

Program is supported by substantial evidence on the record and in accordance with law, given

Alcha's full cooperation and provision of evidence establishing non-use of the program during

the period of review.

2.  Whether the Department's application of a 17 percent value-added tax rate in

calculating the benchmark for the subsidy program "Government Provision of Primary

1

Aluminum for Less than Adequate Remuneration" is unsupported by substantial evidence and otherwise not in accordance with law.

### C. Reasons for Contesting the *Final Results*

Plaintiffs contest the *Final Results* because the Department's factual and legal conclusions are unsupported by substantial evidence on the record and not in accordance with law. Plaintiffs' reasons for contesting the *Final Results* are explained in detail below in the *Argument* section of this Memorandum.

### D. Request for Court Order and Relief Sought

Alcha respectfully requests that the Court rule the Department's finding that Alcha used and benefitted from the Export Buyer's Credit Program unsupported by substantial evidence and not in accordance with the requirements of the Tariff Act of 1930, as amended ("Tariff Act"). Further, Alcha respectfully requests that the Court find the Department's application of a 17 percent valued-added tax ("VAT") rate to adjust the benchmark for the subsidy program "Government Provision of Primary Aluminum for Less than Adequate Remuneration" unsupported by substantial evidence and otherwise not in accordance with law. The Court should remand the *Final Results* to Commerce, instructing the agency to consider all record evidence in accordance with law.

### E. Jurisdiction and Standard of Review

The Court exercises jurisdiction in this matter pursuant to 28 U.S.C. § 1581(c), pursuant to which the Court reviews actions commenced under section 516A of the Tariff Act, 19 U.S.C. § 1516a, as an action contesting a final determination that Commerce issues to conclude an administrative review of a countervailing duty order. *See id.* § 1516a(a)(2)(B). The Court will hold unlawful agency determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1). Substantial evidence

refers to "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

      In applying its standard of review involving the Department's interpretation of a statute,

the Court must do so within the framework established by *Chevron U.S.A. Inc. v. Natural Res.*

*Def. Council*, 467 U.S. 837, 842–43 (1984).  Under *Chevron*, the Court must first ask whether

Congress has directly spoken to the precise question at issue.  If Congress has done so, the

inquiry ends; the Court "must give effect to the unambiguously expressed intent of Congress."

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*,

467 U.S. at 843).  Commerce must act reasonably and may not be arbitrary and capricious.  *See*

*e.g.*, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir.

2012) ("Commerce's decision will be set aside if it is arbitrary and capricious.").  "A clear error

of judgment occurs when an action is arbitrary, fanciful, or clearly unreasonable."  *Hartford Fire*

*Ins. Co. v. United States*, 772 F.3d 1281, 1286 (Fed. Cir. 2014) (quoting *Robert Bosch LLC v.*

*Pylon Mfg. Corp.,* 659 F.3d 1142, 1147–48 (Fed. Cir. 2011)).

## STATEMENT OF FACTS

      On February 6, 2019, Commerce published a CVD order on common alloy aluminum

sheet from the People's Republic of China.  *Common Alloy Aluminum Sheet from the People's*

*Republic of China: Countervailing Duty Order*, 84 Fed. Reg. 2,157 (February 6, 2019).  On

April 1, 2021, Commerce initiated the second administrative review of the CVD order on

common alloy aluminum sheet from the People's Republic of China, covering the period from

January 1, 2020 through December 31, 2020 (the "POR").  *See Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 17,124 (Apr. 1, 2021), at Appx1048.

Commerce selected Alcha as a mandatory respondent in the review.  *Id.* at Appx1059.  Alcha is a

Chinese producer and exporter of subject aluminum common alloy sheet.   Compl. ¶ 4, ECF No. 9 (Nov. 7, 2022).

On May 20, 2021, Commerce issued its Initial CVD Questionnaire to the government of China ("GOC"), instructing the GOC to forward the questionnaire to the mandatory respondents of the review.  Initial CVD Questionnaire, at Appx1062, Appx1070.  On June 3, 2021, Alcha submitted a timely response to the affiliation portion of the Initial CVD Questionnaire.  Alcha Group's Affiliation Questionnaire Response, at Appx1185.  Alcha also responded to the Department's questionnaires on behalf of its cross-owned affiliates, together referred to as the "Alcha Group."  *Id.* at Appx1192–1193.  On July 8, 2021, Alcha submitted its timely response to section III of the Initial CVD Questionnaire.  Alcha Group's Initial Questionnaire Response, at Appx1207 ("IQR").  The GOC did not respond to the Initial CVD Questionnaire.

The Initial CVD Questionnaire requested information related to the Export Buyer's Credit program ("EBC" or "EBC Program") from both the GOC and Alcha.  The EBC Program is alleged as an export-promoting loan program administered by the state-owned Export-Import Bank of China ("EX-IM Bank").  In response to questions on the EBC Program, Alcha stated that neither it nor any of its affiliates received any benefit pursuant to the Export Buyer's Credits Program during the POR.  *Id.* at Appx1239.  Alcha further stated that no Alcha Group companies "provided any kind of assistance to their U.S. customers in obtaining export buyer's credits."  *Id.* Alcha also confirmed that it only had a single U.S. customer throughout the POR and provided information related to that sole U.S. customer.  *Id.* at Appx1239, Appx80066.  Alcha explained that, had its U.S. customer "applied for or used the Export Buyers Credit program, the exporter (Alcha International {Holdings Ltd.}) would have to buy export credit insurance" and the funds "would have been released to the exporter (Alcha International) first in accordance with the

regulations concerning the export buyer's credit." *Id.* at Appx1240.  To support this assertion Alcha appended a copy of the Administrative Measures of the Export Buyer's Credit of the Export-Import Bank of China ("Administrative Measures"), which require the exporter in question to obtain export credit insurance.  *Id.* at Appx1240, Appx2164.  Additionally, Alcha contacted its sole U.S. customer to confirm whether it had used the EBC Program during the POR.  *Id.* at Appx1240.  The customer confirmed that it did not.  *Id.*

With respect to the subsidy program "Government Provision of Primary Aluminum for Less than Adequate Remuneration" ("Provision of Primary Aluminum for LTAR"), Commerce stated that it will not be reevaluating the program's countervailability, but would determine the extent to which Alcha used the program during the POR.  *See id.* at Appx1229.  In response, Alcha confirmed that it purchased primary aluminum during the POR and reported all such purchases.  *Id.* at Appx1229–1230.  Alcha appended a spreadsheet to its section III Initial CVD Questionnaire response with information related to all primary aluminum purchases by the Alcha Group during the POR.  *See id.*  The reported information for all purchases of primary aluminum included the applicable VAT rate for each purchase, which was 13 percent.  *See id.* at Appx81881–81904.

Between October 5, 2021 and March 23, 2022, Commerce issued six supplemental questionnaires to Alcha.  *See* Appx13877, Appx14026.  Alcha provided a timely response to each of the Department's questionnaires.  *See* Appx13877; Appx14031.  None of the supplemental questionnaires included any follow up questions related to the EBC Program, nor did any of the supplemental questionnaires include questions on the VAT information Alcha submitted.

On March 4, 2022, Commerce issued the preliminary results of the review.  *See Common Alloy Aluminum Sheet From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 12,429 (Mar. 4, 2022), at Appx14012 ("*Preliminary Results*").  The preliminary results incorporated by reference the *Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review of Common Alloy Aluminum Sheet from the People's Republic of China; 2020* (Feb. 25, 2022), at Appx13875 ("PDM").

Despite the uncontested factual record evidence that Alcha did not use the EBC Program, Commerce preliminarily found that "the GOC has not cooperated to the best of its ability and," applying facts otherwise available with an adverse inference, "that {Alcha} used and benefitted from this program."  *Id.* at Appx13913.  Commerce preliminarily determined that "the record does not contain information needed to allow Commerce to analyze this program fully" because "the GOC failed to respond to the Initial CVD Questionnaire."  *Id.* at Appx13905.  Commerce further explained that the GOC "is the only party that can answer questions about the internal administration" of the EBC Program.  *Id.* at Appx13906.  Specifically, Commerce pointed to a copy of alleged 2013 revisions to the Administrative Measures and a list of third-party partner and/or correspondent banks as necessary for Commerce to "analyze the program's operation or determine how usage of the program could be properly verified."  *Id.*  Accordingly, Commerce found that the use of adverse facts available with an adverse inference was appropriate and preliminarily determined that the EBC program was a financial contribution and met the benefit and specificity requirements of the Tariff Act.  *Id.* at Appx13912.  Commerce also determined that the use of facts otherwise available with an adverse inference was warranted in determining

Alcha's usage of the EBC program in light of "the GOC's failure to provide the requested information." *Id.* at Appx13913.

With respect to the "Provision of Primary Aluminum for LTAR" program, Commerce found that the market for primary aluminum in China was distorted by government involvement and therefore Commerce would select external benchmark prices. *Id.* at Appx13917. Commerce adjusted the benchmark for this subsidy program to attempt to reflect the price actually paid or that would be paid if the primary aluminum was imported, including by applying a VAT rate. In discussing the applicable VAT rate, Commerce explained that "{b}ecause information regarding VAT . . . would normally be provided by the GOC in response to the Initial CVD Questionnaire," and "the GOC did not respond to {the} Initial CVD Questionnaire in this review, we added . . . VAT to the benchmarks at the rates from the underlying investigation," i.e, 17 percent. *Id.* at Appx13917–13918.

Alcha submitted a case brief in response to the Preliminary Results on April 11, 2022, Appx14107, and a rebuttal brief to the domestic industry's case brief on April 22, 2022, Appx14133, challenging the Department's preliminary results of review.

Commerce published its *Final Results* on June 30, 2022, resulting in an assigned total subsidy rate of 17.80 *ad valorem* to Alcha. See *Final Results*, 87 Fed. Reg. at 54,462, at Appx14243. The *Final Results* continued to determine, based on facts otherwise available with an adverse inference, that Alcha made use of the EBC program and to assign a rate of 2.57 percent *ad valorem* for this program. *See* IDM at Appx14195. Commerce also continued to assign Alcha a 7.81 *ad valorem* rate for the "Provision of Primary Aluminum for LTAR," incorporating the same 17 percent VAT rate. *Id.*

Commerce again found that the GOC failed to cooperate and reiterated that the GOC's failure to respond "prevented Commerce from analyzing the function" of the EBC program. IDM at Appx14206.  Commerce once again explained that:

> The GOC's refusal to respond to Commerce's initial questionnaire, and therefore, failure to provide the 2013 revisions to the *Administrative Measures*, which provide internal guidelines for how this program is administered by the China Ex-Im Bank, and a list of partner/correspondent banks that are used to disperse funds through this program, constitutes withholding necessary information and impeded Commerce's ability to analyze the program's operation or determine how the program could be properly verified.

*Id.* at Appx14210.  In applying adverse facts available to Alcha despite Alcha's cooperation, Commerce stated that "{b}ecause the Alcha Group did not provide non-use certifications from its U.S. customers, we did not take further steps to confirm that its customers did not, in fact, receive export buyer's credits from the China Ex-Im bank." *Id.* at Appx14213.

With respect to the VAT rate applied in calculating the benchmark for purchases of primary aluminum during the POR, Commerce stated that it "disagree{s} that it is inappropriate to use the 17 percent VAT rate provided by the GOC in the underlying investigation to calculate the benefit from this program." *Id.* at Appx14218.  Commerce explained that, "{c}onsistent with the prior administrative review, in which the GOC also failed to participate, Commerce used the VAT rate for imports of primary aluminum provided by the GOC in the investigation to calculate the primary aluminum benchmark." *Id.*

## ARGUMENT

### I.    INTRODUCTION

The Department's *Final Results* are unsupported by substantial evidence and not in accordance with law.  This brief identifies errors in the Department's findings with respect to two subsidy programs in the underlying review: the EBC Program and the Provision of Primary Aluminum for LTAR.

This brief will demonstrate that (1) Commerce violated the Tariff Act because it failed to make an affirmative finding that Alcha benefitted from the EBC Program by ignoring record evidence, (2) Commerce failed to meet the legal requirements to apply "facts otherwise available" with an "adverse inference" to Alcha, (3) the Department's recent practice of requiring non-use certifications from U.S. customers is unsupported by substantial evidence and otherwise contrary to law, and (4) the Department's use of a VAT rate from the underlying investigation was unsupported by substantial evidence and otherwise contrary to law.

## II.  SUMMARY OF ARGUMENT

This Court has of late adjudicated several cases related to this export-promoting program. In a majority of these cases, this Court has rightfully identified many issues with the Department's findings.  Alcha raises many of the same issues in the underlying review that the Court has identified in prior proceedings.  Ultimately, Commerce can only impose a countervailing duty to redress the EBC program if it finds that a financial contribution was provided to Alcha and a benefit was thereby conferred.  There is no evidence on the record supporting the Department's finding that Alcha used, and therefore benefitted from, the EBC Program.

Furthermore, the Department's application of "facts otherwise available" and an "adverse inference," together "adverse facts available," to Alcha in connection with the EBC Program in the underlying review is unsupported by substantial evidence and otherwise contrary to law.  In order to apply adverse facts available, Commerce must not only identify a gap in the record created by a party's lack of full cooperation, but it must also determine whether any other information on the record could fill that gap that would render adverse facts available unnecessary and inappropriate.  In the underlying review, Commerce failed to properly apply

adverse facts available, making the finding that Alcha benefitted from the EBC Program unsound.  Commerce applied adverse facts available to the GOC in analyzing the EBC Program because the GOC did not provide information allegedly necessary to develop a complete understanding of the program's operation.  Commerce then extended its application of adverse facts available to Alcha, a cooperating party, and determined that the company benefitted from the EBC Program.  Although Commerce purported to identify missing information in an effort to justify using adverse facts available, nothing identified creates a material gap in the issue of whether Alcha used the EBC Program.  On that point the record is clear: all of the evidence submitted to Commerce supports a finding that Alcha did not benefit from the EBC program.  Commerce cannot turn away from the complete record evidence supporting a finding of non-use and instead resort to adverse facts available to impute that Alcha benefitted from the program.

The record evidences verifiable information demonstrating that Alcha did not use the EBC program during the period of review.  Had Commerce attempted to verify Alcha's claims, the Department would have been met with a relatively straight forward process as Alcha only had a single U.S. customer during the POR.  The Department's application of adverse facts available with respect to the EBC Program is therefore unlawful – as repeatedly found by the Court in similar circumstances.  Alcha was prepared to verify and provide whatever information Commerce required to support its non-use claims.  It was never given the chance to do so.

Finally, Commerce ignored evidence Alcha submitted on the record indicating the actual VAT rate that was applied to its purchases of primary aluminum during the POR, and instead, used a VAT rate from the underlying investigation that was significantly higher.  This was unsupported by substantial evidence and otherwise contrary to law.

Thus, for all these reasons, the *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law.

## III. LEGAL FRAMEWORK FOR COUNTERVAILING DUTIES UNDER THE TARIFF ACT

### A. Requirements for Imposing Countervailing Duties

Section 701(a) of the Tariff Act directs generally that Commerce is to import a countervailing duty if: (1) Commerce determines that the government of a country, or any public entity within that country, "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the U.S. International Trade Commission determines that an industry in the United States is materially injured or threatened with material injury by reason of the subsidized imports. 19 U.S.C. § 1671(a).

A "countervailable subsidy" generally exists where a governmental authority provides a financial contribution to a person and a benefit is thereby conferred, and the subsidy is specific. *Id.* § 1677(5), (5A).

### B. Requirements to Apply Adverse Facts Available

When invoking both sections 776(a) and (b) of the Tariff Act, 19 U.S.C. § 1677e(a), (b), Commerce applies what it terms "adverse facts available," or "AFA." Commerce may apply AFA in certain circumstances satisfying certain criteria.

Under 19 U.S.C. § 1677e(a), Commerce is directed to use "the facts otherwise available" in specifically-defined circumstances:

(a) In general. If—

(1) necessary information is not available on the record, or

(2) an interested party or any other person—

11

(A) withholds information that has been requested by {Commerce} under this subtitle,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

{Commerce} shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

Subsection 1677e(a) has several layers and multiple uses of the disjunctive. Notably, paragraphs (1) and (2) are in the alternative, joined by the word "or," meaning that Commerce is instructed to use facts otherwise available only if either necessary information is not available or the circumstances in paragraph (2) apply. *See id.*

The second step in the "adverse facts available" analysis focuses on whether "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce. 19 U.S.C. § 1677e(b)(1). If Commerce finds such a failure to cooperate, the Department "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1)(A).

The Court has held that "Commerce must tread carefully when its use of an adverse inference would injure a cooperating party" because Commerce must provide respondents with a "meaningful opportunity" to submit factual evidence that weighs in their favor. *See Yama Ribbons and Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1347, 1356 (Ct. Int'l Trade 2019); *see also Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1325 (Ct. Int'l Trade 2018) ("Commerce may apply AFA even if the collateral effect is to 'adversely

12

impact a cooperating party.'  Commerce, however, should 'seek to avoid such impact if relevant information exists elsewhere on the record.'" (*quoting Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013))).  While Commerce found that the GOC did not cooperate in the review in question, it made no such findings with respect to Alcha.

## IV.  THE *FINAL RESULTS* WERE CONTRARY TO THE TARIFF ACT AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.  The Department's Application of a CVD Rate to Alcha in Connection with the Export Buyer's Credit Program was Unsupported by Substantial Evidence and Otherwise Contrary to Law.

Commerce made a number of errors in determining that, based on adverse facts available, Alcha used and benefitted from the EBC Program.  These include (1) improperly finding that Alcha benefitted from the EBC Program by ignoring record evidence, (2) failing to meet the legal requirements to apply "facts otherwise available" with an "adverse inference" to Alcha, and (3) requiring a non-use certification Alcha's U.S. customer in a manner unsupported by substantial evidence and otherwise contrary to law.

#### 1.  The *Final Results* violated 19 U.S.C. § 1677(5)(B) by Failing to Determine Whether a Benefit Was Conferred on to Alcha.

In the underlying review, Commerce improperly ignored record evidence to reach a finding that Alcha benefitted from the EBC Program.  The Tariff Act provides for the imposition of a countervailing duty only if a benefit is "conferred" upon a person as a result of a financial contribution.  19 U.S.C. § 1677(5)(B).  Commerce therefore can only impose a countervailing duty to redress the EBC program if it affirmatively finds that a financial contribution was provided to Alcha and a benefit was thereby conferred.  *See id.*

In its response to the Initial CVD Questionnaire, Alcha (1) submitted to Commerce information related to its sole U.S. customer, (2) unequivocally confirmed that Alcha did not

benefit from the EBC Program, (3) confirmed that its U.S. customer did not use the EBC

program, and (4) explained that it would be impossible for Alcha's U.S. customer to use the

program without Alcha's knowledge.  IQR at Appx1239–1240.  Alcha also appended a copy of

the Administrative Measures to its questionnaire response which confirmed that it would be

impossible for any of Alcha's customers to use the program without Alcha's knowledge.  *See id.*

at Appx1240.  Commerce is not free to ignore this evidence.  When viewed in the entirety, the

record established by Alcha shows that no benefit was conferred.  Simply put, Commerce made a

finding of benefit in spite of the fact that every piece of evidence indicated that Alcha did not use

the EBC Program.  However, in finding that Alcha benefitted from the EBC Program,

Commerce determined that "the record of this review does not support a finding of non-use

regarding the EBC program" and that "necessary information is missing from the record from

both the GOC and the Alcha Group."  IDM at Appx14200.

Moreover, Commerce preliminarily determined that, based on AFA, the Alcha Group

"used and benefitted from {the EBC Program}, despite its claims that it has no knowledge as to

whether its U.S. customers applied for export buyer's credits."  PDM at Appx13913.  Commerce

did not revise this finding in the *Final Results*.  IDM at Appx14191 ("We have made no changes

with respect to our applicable of facts available of AFA in these final results").  This is a

misstatement of the evidence Alcha submitted on the record.  In its Initial CVD Questionnaire

response, Alcha stated conclusively that its sole U.S. customer did not use the EBC program and

Alcha successfully contacted its customer to confirm this point.  IQR at Appx1239–1240.

In this case and in other EBC-related cases, Commerce increasingly has put respondents

in the position of proving a negative, in contrast to the Department's general practice for other

subsidy programs.  For example, for an input for less than adequate remuneration ("LTAR")

under 19 C.F.R.§ 351.511, Commerce permits respondents to state that they did not use the program in question.  In such instances, an allegation will be made that respondents purchase certain inputs for LTAR.  If the respondent does not purchase those inputs, it can simply say that it does not use the program.  Commerce does not require the company to report every input it does purchase to show that it does not purchase certain target inputs.

Moreover, if Commerce had any concerns with Alcha's responses, it could have issued supplemental questionnaires or attempted to verify the information.  Indeed, as certified in the questionnaire responses, Alcha expressly declared its understanding and willingness to subject to verification.  IQR at Appx1209 ("I am aware that the information contained in this submission may be subject to verification.").  It appears that Commerce decided not to do so, at least in part, because Alcha did not provide a customer certification from its sole U.S. customer.  *See* IDM at Appx14213.

In *Yama Ribbons and Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019), this Court found that Commerce acted contrary to law by failing to provide a respondent the opportunity to verify its claims even when the respondent did not submit customer certifications.  The Court explained:

> Defendant-intervenor argues that Yama should have obtained certifications of non-use from each of its customers, but the absence of such certifications is not a justification allowing Commerce to ignore the record evidence that existed.  There is no basis in the record upon which it reasonably could be presumed or speculated-as Commerce apparently did-that a Yama customer could have obtained or participated in a loan under the Export Buyer's Credit Program about which both (1) the EX-IM Bank had no record and (2) Yama and the customer itself were unaware.

*Id.* at 1355 (citation omitted).  Here, as in *Yama*, Alcha provided evidence that it and its customer did not use the EBC Program.  Like in *Yama*, by ignoring this evidence, Commerce failed to provide Alcha a "meaningful opportunity" to submit factual evidence that weighs in their favor.

15

*See id.* at 1356; *see also Yama Ribbons & Bows Co.*, 517 F. Supp. 3d 1325, 1330 (Ct. Int'l Trade 2021) ("{T}he record evidence does not support a finding that the information Commerce lacked as a result of non-cooperation by the Chinese government prevented Commerce from relying upon or verifying the information {the respondent} provided."). The Department's choice not to verify nor further investigate Alcha's assertions, along with the requirement that its finding must be based on substantial evidence on the record, should have resulted in a finding of non-use in the *Final Results*.

Commerce has an obligation to notify a party of a deficiency and to provide the party, when practicable, "an opportunity to remedy or explain the deficiency," before applying AFA. 19 U.S.C. § 1677m(d). By immediately inferring that Alcha used the EBC Program, Commerce violated this obligation. If Commerce wanted to receive a certification from Alcha's U.S. customer, it could have requested it. Alcha fully cooperated and stood ready to verify its assertions of non-use. It did not get the opportunity to do so. All in all, had Commerce attempted to verify Alcha's claims of non-use in the underlying proceeding, it would have been met with very straightforward verification procedure.

In sum, because the *Final Results* concluded that Alcha used the EBC Program despite all record evidence indicating that it did not, and because Commerce failed to attempt to issue any supplemental questionnaires or verify Alcha's responses on the EBC Program, the *Final Results* are unsupported by substantial evidence and otherwise contrary to law.

### 2.   The Department's Application of Adverse Facts Available was Contrary to Law and Inconsistent with Established Precedent.

Instead of making the requisite finding of whether Alcha benefitted from the EBC Program, Commerce ignored record evidence and unlawfully reached a conclusion that Alcha used the EBC Program through an improper application of sections 776(a) and (b) of the Tariff

Act.  *See* 19 U.S.C. § 1677e(a), (b).  Alcha timely submitted all materials requested by
Commerce and answered each of the Department's questions.  Conversely, there is no evidence
on the record indicating Alcha made use of the EBC Program.

   To date, the Court of International Trade has issued over 15 opinions casting doubt on the
Department's determinations concerning the EBC Program.  In a majority of these cases, this
Court has taken issue with the Department's application of AFA in light of the GOC's failure to
provide certain operational information related to the EBC Program, including: (1) alleged 2013
revisions to the EBC program, and (2) a list of all third-party banks that are involved in the
program.  Commerce has in past proceedings refused to attempt to verify any claims of non-use
when this operational information has not been provided by the GOC, regardless of whether
respondents provide unequivocal and unrebutted evidence that they did not use the EBC
Program.  In certain decisions, the Court has expressed frustration with Commerce for
continuing this practice despite growing adverse precedent.  *See, e.g., Risen Energy Co. v.
United States*, 570 F. Supp. 3d 1369, 1373 (Ct. Int'l Trade 2022).  The number of decisions
striking down the Department's application of AFA to find respondents benefitted from the EBC
program continues to mount.  This litigation is the latest in a long line of cases where Commerce
continues to persistently apply AFA in connection with the EBC Program in a manner that is
unsupported by substantial evidence and not in accordance with law.

   While this case presents a somewhat different situation than certain precedent because the
GOC did not respond to the Initial CVD Questionnaire at all, upon review of the Department's
reasoning as to why the GOC's non-response made it impossible to verify Alcha's non-use
claims, it is apparent the Department's reasoning is exactly the same as in other EBC Program
cases where the GOC did in fact respond, but failed to provide certain requested information.

Here, Commerce pointed to (1) the alleged 2013 revisions to the Administrative Measures of the EBC Program, and (2) a list of partner/correspondent banks used to disperse program funds as the necessary information which created "gaps" in the record.  As stated by Commerce, the "GOC's refusal to respond to Commerce's initial questionnaire, and therefore failure to provide revisions to the *Administrative Measures*, which provide internal guidelines for how this program is administered by the China Ex-Im Bank," and "a list of partner/correspondent banks that are used to disperse funds through this program, constitutes withholding necessary information and impeded Commerce's ability to analyze the program's operation or determine how the program could be properly verified."  IDM at Appx14210.  This is no different than the Department's reasoning for applying AFA in EBC Program-related cases when the GOC did provide a response to the Initial CVD Questionnaire Response.  *See., e.g.*, *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335, 1340 (Ct. Int'l Trade 2019) ("As in nearly every recent administrative review of this Program, Commerce has requested information surrounding two 2013 revisions to the EBCP that now purportedly 'limit{ed} the provision of Export Buyer's Credits to business contracts exceeding USD {two} million,' and "use{d} third-party banks to disburse/settle Export Buyer's Credits.'").

Like it has done in several prior proceedings, Commerce conflates the operation of the EBC Program with the program's use when explaining why it requires the 2013 revisions to the Administrative Measures and a list of partner/correspondent banks.  *See., e.g., Guizhou Tyre Co. v. United* States, 348 F. Supp. 3d 1261, 1271 (Ct. Int'l Trade 2018) ("Commerce improperly conflates the program's operation with its use"); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2018) ("Commerce, however, did not explain why the GOC's failure to explain this program was necessary to assess claims of non-use and

why other information accessible to respondents was insufficient.").  The Department's asserted

misgivings with the lack of response from the GOC was irrelevant to the question at hand;

namely, whether Alcha's U.S. customer received export buyer's credits through the program.

Commerce may not resort to facts otherwise available by disregarding information on the

record as it did here.  The use of facts otherwise available is only appropriate to fill gaps when

Commerce must rely on other sources of information to complete the factual record.  *Nippon*

*Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  There is no ambiguity or

uncertainty in Alcha's statements of non-use, *see Guizhou Tye Co.*, 348 F. Supp. 3d at 1270–71,

and therefore no "gaps" in the record what would allow Commerce to resort to other facts

available, let alone an adverse inference, *see* 19 U.S.C. § 1677e(a), (b).  This is especially true in

cases where AFA is being applied against a cooperative respondent like Alcha.  *Yama*, 419 F.

Supp. 3d at 1347.

While the application of AFA to a non-cooperating government in a countervailing duty

investigation or review may adversely impact a cooperating party, Commerce may not apply

AFA to substitute for any information that was actually submitted by cooperating respondents.

*See Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1262 (Ct. Int'l Trade

2012) ("Where the respondents have placed evidence on the record consistent with the

Department's regulations . . . Commerce would be expected to consider such evidence"), *aff'd*,

748 F.3d 1365, 1372 (Fed. Cir. 2014) ("Commerce did not apply adverse inferences to substitute

for any information that was actually submitted by the cooperating respondents.").

This Court has recognized this distinction, and the Department's application of AFA in

similar cases involving the EBC Program has been rejected by this Court.  In a large majority of

opinions issued involving the EBC Program, when cooperative respondents have provided

evidence of non-use, the Court has rejected the Department's attempts to apply AFA due to the

GOC's refusal to provide operational information.  For example, in *Clearon Corp. v. United*

*States*, 359 F. Supp. 3d 1344, 1360 (Ct. Int'l Trade 2019), the Court remanded to Commerce

holding that the Department's use of AFA was unsustainable because Commerce failed in

explaining its determination that the EBC Program data allegedly missing met the statutory

requirement of necessity that must be satisfied before Commerce may apply AFA.  In *Yama*

*Ribbons & Bows Co. v. United States*, 419 F. Supp 3d 1341 (Ct. Int'l Trade 2019), the Court held

that Commerce erred when it applied AFA to a respondent which stated that it did not use the

EBC program, even when that respondent had not provided customer non-use certifications.

Commerce has been slow to adhere to the Court's opinions in cases involving the EBC

Program, and the number of cases finding the Department's determinations unsupported by

substantial evidence or contrary to law continue to grow.[1]  Commerce once more recycles the

---

[1] *See, e.g., Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, Slip Op. 20-110, 2022 Ct. Intl. Trade LEXIS 52, at *28 (May 12, 2022) (remanding to Commerce and ordering that Commerce either attempt to verify respondent's claims of non-use or find that respondent did not use the EBC Program); *Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 557 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2022) (remanding to Commerce stating that "if Commerce wishes to continue using facts available with an adverse inference, it must attempt to verify non-use certifications."); *Yama Ribbons & Bows Co. v. United States*, 517 F. Supp. 3d 1325, 1340 (Ct Int'l Trade 2021) (finding that Commerce ignored uncontradicted record evidence that the EBC Program did not benefit respondent); *Clearon Corp. v. United States*, 474 F. Supp. 3d 1339, 1354 (Ct. Int'l Trade 2020) (remanding to Commerce and ordering that Commerce either attempt to verify respondent's claims of non-use or find that respondent did not use the EBC Program); *Guizhou Tyre Co. v. United States*, 447 F. Supp. 3d 1373, 1376 (Ct. Int'l Trade 2020) (sustaining the Department's conclusion "that the factual record in this case indicates that there was no use of the {EBC Program} by {respondent}."); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335, 1343 (Ct. Int'l Trade 2019) (remanding to Commerce and explaining that its decision to apply AFA was unlawful); *Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2019) ("{T}he Department's decision to apply AFA as to the PRC's Export Buyer's Credit Program based on an alleged lack of cooperation was unlawful because Commerce demonstrated no gap in the record, the respondents submitted evidence of non-use of the Program, and the Department's findings of unverifiability of necessary information {were}

same arguments regarding GOC non-cooperation and inability to verify despite the mounting

adverse case law; a situation this Court has described as "untenable and inequitable." *Risen*,

570 F. Supp. 3d at 1373.

      While there are cases in which the Court upheld the Department's application of facts

otherwise available in connection with the EBC Program, the facts before the Court in many of

those cases were distinguishable to the ones at hand.  In *Changzhou Trina Solar Energy Co. v.*

*United States*, 195 F. Supp. 3d 1334 (Ct Int'l Trade 2016), the Court sustained the Department's

use of AFA when Commerce actually went to China and attempted verification but was denied

access to the EX-IM Bank's records.  The Court upheld the Department's reasoning that:

> Absent a well-documented understanding of how an exporter would be involved
> in the application of its customer for an export buyer credit and what records the
> exporter might retain, we would have no way of knowing whether the records we
> review at a company verification necessarily include any applications or
> compliance records that an exporter might have from its participation in the
> provision of export credits to its buyers.

*Id.* at 1355 (citations and quotations omitted).  Unlike in *Changzhou*, Commerce did not actually

attempt verification in the underlying review.

      *Fujian Yinfeng Imp & Exp Trading Co. v. United States*, No. 21-00088, Slip Op. 22-107,

2022 Ct. Intl. Trade LEXIS 106, at*10 , *20–21 (Sept. 13, 2022), appears to go against most case

law on the EBC Program by denying a respondent's Rule 56.2 motion and sustaining the

Department's finding that the GOC failed to provide the necessary information to determine

---

unsupported by record evidence."); *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346,
1353 (Ct. Int'l Trade 2019) ("Commerce has failed to demonstrate why the 2013 {EBC
program} rule change is relevant to verifying claims of non-use, and how that constitutes a 'gap'
in the record."); *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (Court Int'l
Trade 2018) (remanding to Commerce, noting that although "information as to the functioning of
the {EBC} Program was missing, this finding was rendered immaterial by responses from both
{respondent and the GOC} as to the Program's use.  This defect proves fatal to Commerce's
imposition of AFA.").

whether the EBC Program was used, even when respondent reported no receipt of EBC Program benefits and submitted certifications of non-use.  Unlike in the underlying review, the respondent in *Yinfeng* appears to have had numerous U.S. customers such that the information requested from the GOC could have arguably aided in limiting the scope of verification.  *Id.* at *6.

In *Yama Ribbons and Bows*, No. 20-00059, Slip Op. 22-157, 2022 Ct. Intl. Trade LEXIS 155 (Dec. 23, 2022), the GOC re-submitted its questionnaire responses from a prior review along with a one-page cover letter from respondent's counsel instead of provided POR-specific information.  *Id.* at *10.  The Court emphasized that the GOC's responses to EBC Program-related questions "would have provided responsive, and probative, information had it pertained to measures the Chinese government undertook during the calendar year 2017 {i.e., the POR}."  *Id.* at *15.  The respondent in *Yama* attempted to argue that the Court should rely on non-POR specific responses provided by the government.  *See id.* at *12.  Here, Alcha argues that the Department's reasoning for why necessary information was missing is exactly that same as that in other EBC program-related cases and is entirely focused on the program's operation, not its use.  Further, unlike the sole U.S. customer at hand, the respondent in *Yama* appeared to have a number of U.S. customers during the POR.  *Id.* at *13.

The Court has also sustained the Department's application of AFA to the EBC Program when respondent did not provide non-use certifications.  *See Cooper (Kunshan) Tire Co., Ltd. v. United States*, No. 20-00113, Slip Op. 22-137, 2022, Ct. Intl. Trade LEXIS 145 (Dec. 8, 2022); *Cooper Kunshan Tire Co. v. United States*, 539 F. Supp. 3d 1316 (Ct Int'l Trade 2021).  We respectfully disagree with the reasoning of the opinions issued in *Cooper* in sustaining the Department's findings that the respondent benefitted from and used the EBC program.

Here, to justify its application of AFA in light of not receiving operational documents related to the EBC Program, Commerce speculates about how verification of non-use might be onerous or impossible without additional information pertaining to the EBC program. Commerce explained that "{g}iven the complicated structure of loan disbursements which can involve various banks for this program, Commerce's complete understanding of how this program is administered is necessary to verify claims of non-use." IDM at Appx14207. The Department's concern, again, relates to two familiar issues. First, Commerce claims that the 2013 revisions to the Administrative Measures of the program would help Commerce fully understand the operation of the program, specifically, whether the China EX-IM Bank limits the provision of export buyer's credits to business contracts exceeding $2 million. IDM at Appx14210. Second, Commerce explains certain information from prior proceedings indicated that "under the EBC program, credits are not direct transactions from the China Ex-Im Bank to the U.S. customers of respondent exporters; rather, there can be intermediary banks involved" and therefore requested from the GOC a list of intermediary banks that used the program. *Id.* at Appx14208. Based on this reasoning, Commerce found that "we cannot know the banks that could have disbursed export buyer's credits to a company respondents' customers," *id.* at Appx14211, and that "if the program is no longer limited to USD 2 million contracts, this increases the difficulty of verifying loans," *id.* at 14207.

Such speculation is legally insufficient. As this Court observed previously in a similar case: "{U}ntil the Department actually *attempts* verification and adequately confronts these (purportedly) insurmountable challenges, there is little for the Department to hang its hat on when it continues to find a gap in the record." *Guizhou Tyre*, 415 F. Supp. 3d at 1405 (internal quotations omitted).

Commerce has also failed to explain why it would be unable to obtain the information necessary from Alcha, who has demonstrated its willingness to cooperate throughout the proceeding.  Verification of Alcha's non-use claims would have been a straightforward exercise and unimpacted by the perceived lack of documents on the EBC program's operation.  First, the Department's concerns about the removal of the $2 million threshold is unwarranted in cases where only a single U.S. customer exists.  *Cooper Kunshan Tire Co.*, 2022 Ct. Intl. Trade LEXIS at *47 ("If Cooper Tire exported to only one U.S. customer, CTRC, which was already a party to the action, as the record supports and the Government concedes, the need for the threshold requirement to limit appropriately Commerce's inquiry would not appear to be necessary.").  Second, with respect to lacking a list of third-party banks, as long as Commerce is able to access the importer and exporter's records, "it appears that Commerce could cross-reference the records to see if any funds appeared to originate from the EX-IM banks, even if the funds went through an intermediary bank at some point."  *Changzhou Trina Solar Energy Co. v. United States*, No. 17-198, Slip Op. 19-137, 2019 Ct. Intl. Trade LEXIS 138, at *10 (Nov. 8, 2019).  This would be particularly straightforward in this case because Alcha only has a single U.S. customer.  *See id.* at *10–11.

Finally, Alcha already provided a great deal of financial information on the record.  In every countervailing duty investigation and review, an enormous amount of information is already requested by Commerce, including financial statements, tax returns, trial balances, loan agreements to analyze loan programs.  There is no dispute that the EBC Program is a loan program providing loans at allegedly preferential rates to importers in other countries to purchase Chinese products which must then be paid back in accordance with the loan contract.  Other than the fact that the loan is provided to someone other than the respondent, this loan program is no

different than other loan programs that Commerce has verified in the past: it involves principal

and interest payments.  Commerce cannot claim that the documentation needed to analyze the

EBC Program creates an excessive burden when it routinely demands the same information from

respondents in other contexts.  Information on the EBC Program would simply add to the list of

loan programs that Commerce is otherwise examining.

### 3.    The Department's Practice of Requiring Customer Certifications in Order to Proceed with Supplemental Questionnaires or Verification is Unsupported by Substantial Evidence.

In the *Final Results*, Commerce found that:

> Because the Alcha Group did not provide non-use certifications from its U.S.
> customers, we did not take any further steps to confirm that its customers did not, in
> fact, receive export buyer's credits from the China Ex-Im Bank.  Accordingly,
> we find that the Alcha Group did not sufficiently support its claim of non-use of
> the EBC program.

IDM at Appx14213.  It is admittedly unclear whether the reason Commerce refused to verify

Alcha's responses or issue supplemental questionnaires was because Alcha did not provide a

certification from its single U.S. customer in its response to the Initial CVD Questionnaire, or

because the GOC did not respond to the questionnaire.  *Compare* IDM at Appx14213 ("Because

the Alcha Group did not provide non-use certifications from its U.S. customers, we did not take

further steps") *with* IDM at Appx14213 ("{W}e have no way of verifying declarative statements

of non-use without the GOC providing use with the requested documents which would allow us

to properly examine claims of non-use.")  Nonetheless, presuming that the reason Commerce

decided not to proceed with verification or additional questionnaires was that Alcha did not

provide a non-use certification from its only U.S. customer in response to the Initial CVD

Questionnaire, such a finding is inconsistent with the requirements of the Tariff Act and

unsupported by substantial evidence.

The Department's refusal to proceed with verification or additional questionnaires because non-use certifications did not accompany the Initial CVD Questionnaire response is a recent change in practice.  Commerce describes this new practice generally as follows:

> Commerce continues to apply AFA for the GOC's failure to cooperate, but that — when the full universe of a respondent's U.S. customers voluntarily supplies certifications of non-use — Commerce has determined to take additional steps toward ultimate verification of such certifications, despite the GOC's continued refusal to provide certain information.  Specifically, we may issue supplemental questions seeking complete lending information from the U.S. customers and then take steps to verify the customers' responses where the voluntary information provided covers the full universe of financing for all of a respondent's U.S. customers, which allows Commerce to meaningfully conduct its tracing and completeness tests at verification.

Remand Results at 14, *Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, ECF No. 86 (Aug. 5, 2022) (continuing to find Commerce is un-able to verify non-use of EBC program after reopening the record because respondents did not provide complete information of financial activities for all of their U.S. customers); *see also* Remand Results, *Risen Energy Co., Ltd. v. United States*, No. 20-03192, ECF No. 94 (Oct. 7, 2022) (finding that Commerce was able to verify non-use of the EBC Program for a respondent that provided certifications from all customers, but not for a respondent that provided certifications from half its customers).  In sum, Commerce has taken a two-step approach: a respondent first must provide certifications of non-use for all of its U.S. customers, and only then will Commerce attempt to verify claims of non-use or issue additional questionnaires.

In practice Commerce appears to only consider any evidence of non-use if non-use certifications from all U.S. customers are provided in response to initial questionnaires.  This approach is flawed and does not remedy the issues this Court has identified with the Department's determinations in EBC Program-related cases.  First, the Department's methodology violates the Tariff Act because Commerce still would have failed to determine

whether a benefit was conferred on Alcha based on the information submitted on the record. Second, the practice deprives a cooperating respondent of the opportunity to verify the information it already placed on the record.

Indeed, this practice has already been called into question. The Court in *Risen* recently ruled that the Department's finding that the respondent provided insufficient information in order to find non-use of the EBC Program was unsupported by substantial evidence. *See Risen Energy Co. v. United States*, No. 20-03912, Slip. Op. 23-48, 2023 Ct. Intl. Trade LEXIS 52, at *11 (Apr. 11, 2023). According to the Court, "Commerce cannot reasonably conclude that Risen did not supply information that rendered the missing date from the GOC irrelevant and essentially eliminated any gap in the record" when the respondent provided certifications from customers constituting roughly 95 percent of its POR sales. *Id.* at *5, *13. [2]

For all the reasons stated above, the Court should remand the Department's finding that Alcha used and benefitted from the EBC Program.

### B. The Department's Use of a 17 Percent VAT Rate to Calculate the Benchmark for Primary Aluminum for LTAR was Unsupported by Substantial Evidence and Otherwise Contrary to Law.

In the underlying review, the Department applied a 17 percent VAT rate to calculate the benchmark for the subsidy program "Provision of Primary Aluminum for LTAR." *See* IDM at Appx14217. The use of this rate is unsupported by substantial evidence and otherwise contrary to law.

In its submissions Alcha provided information related to all of its primary aluminum purchases during the POR. Alcha also reported that a 13 percent VAT rate was applied to all of

---

[2] The Court has yet to rule on whether the remand in *Dalian Meisen Woodworking Co. v. United States* is supported by substantial evidence and lawful.

these purchases.  IQR at Appx1229–1230; Appx81881–Appx81904.  Commerce preliminarily found that "{b}ecause information regarding VAT . . . rates would normally be provided by the GOC in response to the Initial CVD Questionnaire, and the GOC did not respond to {the} Initial CVD Questionnaire in this review," Commerce used the VAT rate that the GOC reported in the underlying investigation, i.e, 17 percent.  PDM at Appx13917–13918.

In its case brief submitted before the agency, Alcha argued that applying the 17 percent VAT rate was inappropriate and based on AFA.  Alcha Case Brief at Appx14117–14118.  Instead, Alcha urged the Department to use the 13 percent VAT rate that Alcha had reported for all purchases of primary aluminum during the POR.  *Id.*

The Department's findings with respect to the VAT rate in the *Final Results* remained unchanged.  IDM at Appx14217.  Commerce stated that it "disagree{s} that it is inappropriate to use the 17 percent VAT rate provided by the GOC in the underlying investigation to calculate the benefit for this program" and "disagree{s} with the Alcha Group's premise that the 17 percent rate provided by the GOC is based on AFA."  *Id.*  Commerce explained that, "{c}onsistent with the prior administrative review, in which the GOC also failed to participate, Commerce used the VAT rate for imports of primary aluminum provided by the GOC in the investigation to calculate the primary aluminum benchmark."  IDM at Appx14218.  Commerce explained that although Alcha "reported paying a different VAT rate on its purchases of primary aluminum, the GOC did not report the relevant VAT and import tariff rates in effect for primary aluminum during the POR."  *Id.*  Commerce also stated that Alcha "provided no explanation for why the VAT rate for certain purchases during the POR differed from the VAT rate provided in the GOC's response in the investigation."  *Id.*

While the Department argues that the 17 percent VAT rate was not based on AFA, it, in effect, was. Usually, when Commerce uses facts available rather than AFA, it uses neutral facts that do not impact the calculation of the countervailing subsidy rate either favorably or negatively. The 17 percent rate was pulled from the underlying investigation and is substantially higher than the rate reported by Alcha. In order to reach this conclusion, Commerce again ignored evidence that Alcha placed on the record in order to apply an adverse inference (in the form of a higher VAT rate) on a cooperating respondent.

As stated above, the application of AFA to a non-cooperating government in a countervailing duty investigation or review may adversely impact a cooperating party. However, Commerce may not apply adverse inference to substitute for any information that was actually submitted by cooperating respondents. *See Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1262 (2012) *aff'd*, 748 F.3d 1365, 1372 (Fed. Cir. 2014). Indeed, in *Fine Furniture*, this Court noted that:

> Where the respondents have placed evidence on the record consistent with the Department's regulations for calculating benchmarks, see 19 C.F.R. § 351.511(a)(2), Commerce would be expected to consider such evidence. Furthermore, if an alternative benchmark meeting such criteria were available on the record and did not adversely affect a cooperative party, such a benchmark would be superior to one which does adversely affect a cooperative party.

*Id.* Here, Alcha provided POR-specific information showing the VAT rate applied to its purchases of primary aluminum. IQR at Appx1229–1230; Appx81883–Appx81904.

Even assuming, *arguendo*, the Department's finding is based on neutral rather than adverse facts available, Commerce still had an obligation to provide Alcha the opportunity supplement the information it provided. When Commerce is to choose among neutral facts available, "the guiding principle for choosing what facts to apply is accuracy in the given case." *Shandong Rongxin Imp. & Exp. Co,. Ltd. v. United States*, 335 F. Supp. 1365, 1370 (Ct Int'l

29

Trade 2019).  The 13 percent figure that Alcha provided was the only information on the record that was POR-specific.  Nonetheless, Commerce explained that "the Alcha Group did not provide any documents demonstrating that the GOC had changed the 17 percent VAT rate nor any documentation, other than a spreadsheet, that their inputs were subject to a lesser VAT rate." IDM at Appx14219.  Alcha would have provided any additional documentation if it had been provided the meaningful opportunity to do so.  Information related to China's VAT rate is publicly available and readily accessible.  *See., e.g.*, *Tax System*, STATE TAXATION ADMINISTRATION OF THE PEOPLE'S REPUBLIC OF CHINA, http://www.chinatax.gov.cn/eng/c101270/c101271/c5157953/content.html (last visited Apr. 13, 2023).  In 2018, the government of China adjusted its VAT rates to "form a three-level VAT rate schedule of 16%, 10% and 6%," then, in 2019, "{t}he original 16% and 10% VAT rates were adjusted to 13% and 9% respectively to form the current three-level VAT rate schedule of 13%, 9% and 6%."  *Id.*  Alcha reported the highest possible VAT rate for 2020, 13 percent.

The information Alcha provided on its VAT rate would have been easily verifiable, and Alcha had shown throughout the review that it is ready and willing to cooperate and provide any additional documentation requested by Commerce.  The Court should therefore remand this finding to Commerce and instruct the Department to reconsider Alcha's reported 13 percent VAT rate.

## <u>CONCLUSION</u>

For the reasons discussed in this brief, the Court should rule in accordance with the argument contained herein.  Thus, Alcha respectfully requests this Court to remand this case to Commerce with the appropriate instructions.

Respectfully submitted,

*/s/ Weronika Bukowski*
Daniel Cannistra
Weronika Bukowski

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Email:  dcannistra@crowell.com

*Counsel to Plaintiffs*

31

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| JIANGSU ALCHA ALUMINUM CO., LTD. and ALCHA INTERNATIONAL HOLDINGS LTD., | |
| Plaintiffs, | Court No. 22-00290 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, | |
| Defendant-Intervenors. | |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to U.S. Court of International Trade Rule 2(b)(2) of the Court's Standard

Chambers Procedures, undersigned counsel for Plaintiffs Jiangsu Alcha Aluminum Co., Ltd. and

Alcha International Holdings Ltd., certifies this brief complies with the Court's type-volume

limitation rules.  This brief contains no more than 9,605 words and therefore does not exceed

14,000 words.  This brief also complies with all typeface and margin requirements.

Respectfully submitted,

*/s/ Weronika Bukowski*
Weronika Bukowski

*Counsel to Plaintiffs*