**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| JIANGSU ALCHA ALUMINUM CO., LTD., AND ALCHA INTERNATIONAL HOLDINGS LTD., <br><br>             Plaintiffs, <br><br>     v. <br><br> UNITED STATES, <br><br>             Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, <br><br>             Defendant-Intervenors. | Court No. 22-00290 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Of Counsel:

DAVID RICHARDSON
Senior Counsel
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

EMMA E. BOND
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-305-2034 | emma.e.bond@usdoj.gov
*Attorneys for Defendants*

July 10, 2023

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ............................................................ iii

RULE 56.2 STATEMENT ...............................................................2

    I.      The Administrative Determination Under Review ................................2

    II.    Issues Presented For Review ...............................................2

STATEMENT OF FACTS ...............................................................3

    I.     After Initiating The Administrative Review, Commerce Issues A Questionnaire To The Government Of China ............................................3

         A.     Questions Regarding Export Buyer's Credits ...........................4

         B.     Questions Regarding The Government's Providing Primary Aluminum For Less Than Adequate Remuneration .......................................6

    II.    The Government Of China Fails To Respond To The Questionnaire ..................6

    III.   Alcha Responds To The Respondent-Specific Portion Of The Questionnaire, But A Gap Remains On The Record ..............................................7

         A.     Alcha's Responses Regarding Export Buyer's Credits ........................7

         B.     Alcha's Responses Regarding Purchases Of Primary Aluminum ..............8

    IV.   Commerce Issues The Preliminary Results .........................................8

         A.     Commerce Applies Facts Available With An Adverse Inference With Respect To The Export Buyer's Credit Program ......................................9

         B.     Commerce Applies The 17 Percent VAT Rate For The Benchmark For Primary Aluminum ................................................... 10

    V.    Commerce Issues The Final Results .................................................. 11

SUMMARY OF THE ARGUMENT ......................................................12

ARGUMENT ......................................................................13

    I.     Standard Of Review ...........................................................13

II.   Commerce's Application Of Adverse Facts Available With Respect To The
      Export Buyer's Credit Program Is Lawful And Supported By Substantial
      Evidence ...........................................................................................................14

      A.    Commerce's Application Of Adverse Facts Available Against The
            Government Of China Is Supported By Substantial Evidence And In
            Accordance With Law ............................................................................15

      B.    Substantial Evidence Supports The Application Of Adverse Facts
            Available Against The Government Of China Despite The Collateral
            Impact On Alcha ....................................................................................18

      C.    Commerce Was Not Required To Credit Alcha's Claims Of Non-Use Of
            The Export Buyer's Credit Program ......................................................20

      D.    Commerce's Analysis Accords With Prior Cases Analyzing The
            Application Of Adverse Facts Available To The Export Buyer's Credit
            Program ..................................................................................................23

            i.    Substantial Evidence Supports Commerce's Findings That
                  Information Is Missing From The Record Necessary To Verify
                  Non-Use ........................................................................................25

            ii.   Commerce Explained How The Missing Information Was
                  Necessary To Verify Non-Use ....................................................26

                  a.    Commerce Reasonably Explained Why The Information
                        Requested From The Government Of China Was Necessary
                        To Verify Non-Use ...........................................................27

                  b.    Alcha Failed To Submit Customer Certifications .............30

            iii.  Substantial Evidence Supports Commerce's Finding That The
                  Information On The Record Could Not Fill The Gap ..................33

III.  Commerce's Application Of The 17 Percent VAT Rate To Calculate The
      Benchmark For Determining Whether The Government Of China Provided
      Primary Aluminum Inputs For Less Than Adequate Remuneration Is Lawful And
      Supported By Substantial Record Evidence .........................................................39

      A.    Background ..........................................................................................39

      B.    Substantial Evidence Supports Commerce's Use Of The 17 Percent VAT
            Rate ......................................................................................................41

CONCLUSION .......................................................................................................43

# **TABLE OF AUTHORITIES**

**CASES**                                                                 **PAGE(S)**

*American Alloys, Inc. v. United States*,
    30 F.3d 1469 (Fed. Cir. 1994).................................................................. 21, 26

*AMS Assocs., Inc. v. United States*,
    719 F.3d 1376 (Fed. Cir. 2013)....................................................................... 33

*Archer Daniels Midland Co. v. United States*,
    917 F.Supp.2d 1331 (Ct. Int'l Trade 2013) .................................................. 36

*Carpenter Tech. Corp. v. United States*,
    30 C.I.T. 1373 (2006) ..................................................................................... 43

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
    17-00246, 2019 WL 6124908 (Ct. Int'l Trade Nov. 18, 2019) ...................... 36

*Changzhou  Trina Solar Energy Co. v. United States,*
    352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ....................................... 23, 29, 31

*Changzhou Trina Solar Energy Co. v. United States*,
    255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) .................................................. 30

*Changzhou Trina Solar Energy Co., Ltd. v. United States (Changzhou Trina, 2016)*,
    195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ........................................... 17, 20

*Clearon Corp. v. United States,*
    359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ........................................... 23, 31

*Clearon Corp. v. United States*,
    474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) ........................................... 26, 31

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007)....................................................................... 13

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)......................................................................................... 13

*Cooper (Kunshan) Tire Co., Ltd. v. United States (Cooper Tire I)*,
    539 F. Supp. 3d 1316 (Ct. Int'l Trade 2021) ............................... 18, 24, 26, 32

*Cooper (Kunshan) Tire Co., Ltd. v. United States (Cooper Tire II)*,
    610 F. Supp. 3d 1287 (Ct. Int'l Trade 2022) ........................................... passim

*Corus Staal BV v. United St*ates,
    502 F.3d 1370 (Fed. Cir. 2007)........................................................................ 42

*Dalian Meisen Woodworking Co. v. United States,*
    20-00110, 2022 WL 1598896 (Ct. Int'l Trade May 12, 2022)......................... 31

*Fine Furniture (Shanghai) Ltd. v. United States,*
    748 F.3d 1365 (Fed. Cir. 2014)................................................................. passim

*Fujian Yinfeng Imp & Exp Trading Co., Ltd. v. United States,*
    No. 21-00088, 2022 WL 4180886 (Ct. Int'l Trade Sept. 13, 2022) ........... 29, 30

*Fujitsu Gen. Ltd. v. United States,*
    88 F. 3d 1034 (Fed. Cir. 1996)............................................................ 13, 14, 36

*Goodluck India Ltd. v. United States,*
    11 F.4th 1335 (Fed. Cir. 2021) ............................................................... 21, 26

*GPX Int'l Tire Corp. v. United States,*
    37 C.I.T. 19 (Jan. 7, 2013) .............................................................. 21, 36, 38

*Guizhou Tyre Co. v. United States,*
    523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ........................................... 23, 24

*Guizhou Tyre Co., v. United States,*
    415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019) ..................................... 26, 31, 32

*Guizhou Tyre  Co. v. United States,*
    399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) ........................................... 23, 31

*Guizhou Tyre Co. v. United States,*
    389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) ................................................. 31

*Guizhou Tyre Co. v. United States,*
    348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ........................................... 29, 30

*Hyundai Elec. & Energy Sys. Co. v. United States,*
    15 F.4th 1078 (Fed. Cir. 2021) ..................................................... 21, 26, 32, 33

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015)........................................................... 13, 42

*Jiangsu Zhongii Lamination Materials Co. v. United States,*
    405 F. Supp. 3d 1317 (Ct Int'l Trade 2019) ........................................... 23, 24

*KYD, Inc. v. United States*,
    607 F.3d 760 (Fed. Cir. 2010)..................................................................... 18, 19

*Nan Ya Plastics Corp. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016)..................................................... 25, 33, 34, 37

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)............................................................... 15

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009)............................................................... 13

*PSC VSMPO-Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012)................................................................ 36

*Risen Energy Co. v. United States*,
    2023 Ct. Intl. Trade LEXIS 52 (Apr. 11, 2023)..................................... 39

*Risen Energy Co. v. United States*,
    570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ......................................... 30

*Steel Fittings, Co. v. United States*,
    557 F. Supp. 3d 1327 (Ct. Int'l Trade 2022) .................................... 30, 31

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996)................................................................ 13

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)............................................................................... 13

*United States v. Zenith Radio Corp.*,
    562 F.2d 1209 (C.C.P.A. 1977) ............................................................. 14

*Woodford v. Ngo*,
    548 U.S. 81 (2006)................................................................................. 43

*Yama Ribbons & Bows Co. v. United States* (*Yama 2022*),
    611 F. Supp. 3d 1394 (Ct. Int'l Trade 2022) .................................... 23, 33

*Yama Ribbons & Bows Co., Ltd. v. United States*,
    606 F. Supp. 3d 1345 (Ct. Int'l Trade 2022) ......................................... 32

*Yama Ribbons & Bows Co. v. United States* (*Yama 2019*),
    419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019) ......................................... 32

**STATUTES**

19 U.S.C. 1516a ............................................................................................... 13, 43

19 U.S.C. § 1671 ..................................................................................................... 16

19 U.S.C. § 1671(a) .................................................................................................. 3

19 U.S.C. § 1677 .......................................................................................... 15, 16, 17

19 U.S.C. § 1677e ......................................................................... 9, 15, 17, 19, 33

19 U.S.C. § 1677m ........................................................................... 6, 17, 21, 37

19 U.S.C. § 3512(d) ............................................................................................... 19

28 U.S.C. § 2637(d) ............................................................................................... 42

**REGULATIONS**

19 C.F.R. § 351.301 .......................................................................................... 38, 43

19 C.F.R. § 351.303 .......................................................................................... 38, 43

19 C.F.R. § 351.303(g) ......................................................................................... 38

19 C.F.R. § 351.309(c)(2) ...................................................................................... 42

19 C.F.R. § 351.511(a)(2) ................................................................................. 10, 40

**OTHER AUTHORITIES**

*Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2016,*
    83 Fed. Reg. 62841 (Dep't of Commerce December 7, 2018) ........................................ 22

*Chlorinated Isocyanurates PDM), unchanged in Chlorinated Isocyanurates from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016,*
    84 Fed. Reg. 37627 (Dep't of Commerce August 1, 2019) ............................................. 22

*Common Alloy Aluminum Sheet From the People's Republic of China:  Preliminary Affirmative Countervailing Duty (CVD) Determination, Alignment of Final CVD Determination With Final Antidumping Duty Determination, and Preliminary CVD Determination of Critical Circumstances,*
    83 Fed. Reg. 17651 (Dep't of Commerce Apr. 23, 2018) ............................................... 40

*Common Alloy Aluminum Sheet from the People's Republic of China: Countervailing Duty Order*,
  84 Fed. Reg. 2157 (Dep't of Commerce Feb. 6, 2019) ...................................... 3

*Common Alloy Aluminum Sheet From the People's Republic of China: Final Results of Countervailing Duty Administrative Review,*
  87 Fed. Reg. 54462 (Dep't of Commerce Sept. 6, 2022) ................................... 2

*Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China: Final Affirmative Determination*,
  82 Fed. Reg. 8405 (Dep't of Commerce, Jan. 25, 2017) ................................... 5

*Countervailing Duty Investigation of Common Alloy Aluminum Sheet From the People's Republic of China: Final Affirmative Determ.*,
  83 Fed. Reg. 57427 (Dep't of Commerce Nov. 15, 2018) ................................. 3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules; from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*,
  77 Fed. Reg. 63788 (Dep't of Commerce, Oct. 17, 2012)........................................ 22, 37

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
  86 Fed. Reg. 17124 (Dep't of Commerce April 1, 2021) ................................... 3

Uruguay Round Agreements Act (URAA) Statement of Administrative Action (SAA),
  H.R. Doc. No. 103–316, vol. 1, *reprinted in* 1994 U.S.C.C.A.N. 4040 .............. 19, 33, 37

Tax System, State Taxation Administration of the People's Republic of China,
  http://www.chinatax.gov.cn/eng/c101270/c101271/c5157953/content.html ..................42

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| JIANGSU ALCHA ALUMINUM CO., LTD., AND ALCHA INTERNATIONAL HOLDINGS LTD., <br><br>      Plaintiffs, <br><br>      v. <br><br> UNITED STATES, <br><br>      Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, <br><br>      Defendant-Intervenors. | Court No. 22-00290 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully responds to the motion for judgment on the administrative record filed by plaintiffs, Jiangsu Alcha Aluminum Co., Ltd., and Alcha International Holdings Limited (collectively, Alcha). Alcha challenges the final results of the United States Department of Commerce (Commerce) in the second administrative review of the countervailing duty order on common alloy aluminum sheet from the People's Republic of China (China). Specifically, Alcha challenges (1) Commerce's determination to countervail the export buyer's credit program administered by the Export-Import Bank of China (China Ex-Im Bank)

based on the application of facts available with an adverse inference, and (2) Commerce's use of a 17 percent value added tax in calculating a benchmark for determining the benefit from the government's providing primary aluminum for less than adequate remuneration.  As explained below, Alcha's motion should be denied because Commerce's final results are supported by substantial evidence and are otherwise in accordance with law.

## RULE 56.2 STATEMENT

### I.      The Administrative Determination Under Review

Alcha challenges the final results of the second administrative review of the countervailing duty order on common alloy aluminum sheet from China.  *Common Alloy Aluminum Sheet From China: Final Results of Countervailing Duty Administrative Review,* 87 Fed. Reg. 54462 (Dep't of Commerce Sept. 6, 2022) (*Final Results*) (Appx14242), and accompanying Issues and Decision Memorandum (IDM) (Appx14186-14233).[1]  The period of review is January 1, 2020, through December 31, 2020.

### II.     Issues Presented For Review

1.      Whether Commerce's determination to countervail the export buyer's credit program based on the application of facts available with an adverse inference is supported by substantial record evidence and otherwise in accordance with law.

2.      Whether Commerce's use of China's 17 percent value added tax rate in calculating a benchmark for determining the benefit from the government's providing primary aluminum inputs for less than adequate remuneration is supported by substantial evidence and otherwise in accordance with law.

---

[1]  Citations to public documents from the administrative record are identified by the appendix pages 1000 to 14250, while citations to confidential record documents are identified by appendix pages 80000 and above.

## STATEMENT OF FACTS

I     After Initiating The Administrative Review, Commerce Issues A Questionnaire To The
      Government Of China

In February 2019, Commerce published the countervailing duty order on aluminum sheet

from China.  *Common Alloy Aluminum Sheet from China: Countervailing Duty Order*, 84 Fed.

Reg. 2157 (Feb. 6, 2019).  In the final determination in the investigation giving rise to the

countervailing duty order, Commerce found that the export buyer's credit program and

government's providing primary aluminum for less than adequate remuneration were both

countervailable subsidies.  *Countervailing Duty Investigation of Common Alloy Aluminum Sheet*

*From China: Final Affirmative Determ.*, 83 Fed. Reg. 57427 (Dep't of Commerce, Nov. 15,

2018), and accompanying Issues & Decision Mem.

On April 1, 2021, Commerce initiated the second administrative review of the

countervailing duty order on common alloy aluminum sheet from China.  *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 17124, 17133

(April 1, 2021) (Appx1048-50; Appx1057).  Commerce selected Alcha and Yinbang Clad

Material Co., Ltd. (Yinbang) as mandatory respondents for individual examination.[2]

Appx13876.  Because this is a countervailing duty case—and thus, by definition, requires review

of government subsidies, 19 U.S.C. § 1671(a)—Commerce sent a questionnaire to the

government of China with questions for the government and each of the mandatory respondents.

Appx1062.  As the questionnaire explained, "{t}he government is responsible for submitting the

---

[2]  Yinbang Clad Materials Co., Ltd. filed a complaint in Case No. 22-291, but later
voluntarily dismissed the case.  Order of Dismissal, *Yinbang Clad Material Co., Ltd. v. United
States*, CIT No. 22-291, ECF No. 28 (Apr. 13, 2023).

responses for all central, provincial, state, and local governments, as well as any company information requested in the government section of this questionnaire."  Appx1071.

Section II of the questionnaire listed programs that Commerce had previously found to be countervailable, including "Export Buyer's Credits" from the China Ex-Im Bank, Appx1096, and "Government Provision of Primary Aluminum for {Less Than Adequate Remuneration},"  Appx1088.  Commerce asked the government of China to provide information about these programs.  Appx1096-97 (questions regarding "Export Buyer's Credits"); Appx1088-1091 (questions regarding government provision of primary aluminum for less than adequate remuneration).

A.    Questions Regarding Export Buyer's Credits

Commerce asked the government of China to answer questions regarding the export buyer's credit program from the China Ex-Im Bank.  Appx1096-1097.  Commerce had "first investigated" this program after the China Ex-Im Bank's 2010 annual report demonstrated "that the credits provided under this program are 'medium- and long-term loans, and have *preferential, low interest rates.*'"  Appx13906 (emphasis added).  Commerce later learned of "2013 internal guidelines of the China EX-IM Bank," Appx13910, which may have eliminated the USD 2 million contract minimum" associated with the export buyer's credit lending program.  Appx13910 (citation omitted).  Additional information obtained by Commerce "also indicated that the loans associated with the {export buyer's credit} program are not limited to direct disbursements through the China EX-IM Bank," but rather that customers could "open loan accounts for disbursements through . . . other banks."  Appx13911 (citation omitted).

To learn whether the mandatory respondents benefited from this program during the period of review, Commerce asked the government of China for information relating to the use of the export buyer's credit program by specific U.S. customers, including,

> **a.** For the loans outstanding to a respondent's customer, complete the ***Loan Template*** provided at *Section III of this questionnaire.* Please submit your completed worksheet to Commerce in Excel format. You must add fields to the worksheet indicating the name of the respondent's customer, the customer's location (*i.e.*, address), and the type of merchandise purchased (*i.e.*, subject or non-subject merchandise). Submit a separate completed ***Loan Template*** for each customer of a mandatory respondent.

> **b.** Provide a sample buyer's credit application along with the application's approval and the agreement between the respondent's customer and the bank, which establish the terms of the assistance provided under the facility.

> **c.** Report the interest rate(s) established during the {period of review} for the Buyer Credit Facility for all types of financing provided, for all loan terms (*e.g.*, loans ranging from 0 to 180 days and 180 to 270 days, *etc.*), and all denominations (*i.e.*, RMB and foreign currency). Please provide documentation to support your answer.

Appx1096-1097.[3]

Commerce also requested background information necessary to understand the operation of the export buyer's credit program, Appx14206-14207, including a copy of a supplemental questionnaire response from a prior proceeding in which the government of China provided information regarding how the China Ex-Im Bank disbursed export buyer's credits to the U.S.

---

[3] To ensure the government of China had information regarding the U.S. customers of each respondent, Commerce had "requested that each respondent company compile and provide to {the government of China} all customers located in the United States to which it exported during the {period of review}, along with the shipment addresses for these customers." Appx1096.

customer, including through other correspondent banks, Appx1097.[4]  Relatedly, Commerce sought the "original and translated copies of any laws, regulations or other governing documents cited" in this supplemental questionnaire response.  Appx1097.  Commerce also requested "a list of all partner/correspondent banks involved in the disbursement of funds under the Export Buyer's Credit Program."  Appx1097.

Finally, Commerce requested information to corroborate any claims "that no customer of the respondent companies used buyer credits."  Appx1097.  If the government of China made such a claim, Commerce asked it to "explain in detail the steps the government took to determine that no customer used Export Buyer's Credits," and to "identify the documents, databases, accounts etc. that were examined to determine there was no use."  Appx1097.

**B.**    **Questions Regarding The Government's Providing Primary Aluminum for Less Than Adequate Remuneration**

In the part of the questionnaire relevant to the government's providing primary aluminum for less than adequate remuneration, Commerce asked the government of China to "{p}lease state the {value added tax (VAT)} and import tariff rates in effect for primary aluminum in January 1, 2020, through December 31, 2020."  Appx1090.

**II.**    **The Government Of China Fails To Respond To The Questionnaire**

The government of China did not respond to the initial questionnaire.  In fact, the government of China did not participate at all in this segment.  Appx14206.  Although Commerce has a statutory obligation to notify a person submitting a deficient response "of the

---

[4]  Specifically, Commerce requested "a copy of the September 6, 2016, {government of China} 7th Supplemental Response in the Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China."  Appx1097 (emphasis removed); *see Countervailing Duty Investigation of Certain Amorphous Silica Fabric from China: Final Affirmative Determination*, 82 Fed. Reg. 8405 (Dep't of Commerce, Jan. 25, 2017) (*Silica Fabric from China*), and accompanying IDM, at page 12.

nature of the deficiency," 19 U.S.C. § 1677m(d), this obligation does not apply when no response is provided at all.  Because the government of China failed to respond to any part of the questionnaire, Commerce did not send any deficiency notice.

III.   **Alcha Responds To The Respondent-Specific Portion Of The Questionnaire, But A Gap Remains On The Record**

Alcha filed its initial questionnaire response to Section III, the respondent-specific part of the questionnaire, on July 8, 2021.  Appx1207-1208.  This portion of the initial questionnaire requested that mandatory respondents, including Alcha, provide certain information concerning the export buyer's credit program and the primary aluminum for less than adequate remuneration program.  Appx1142-1143, Appx1146-1147.

A.   Alcha's Responses Regarding Export Buyer's Credits

In Section III, Commerce asked respondents, including Alcha, to provide "a list of all the customers to which {it} exported during the {period of review}, along with the shipment addresses for these customers."  Appx1146.  Commerce also asked Alcha to "discuss in detail the role {it} plays in assisting {its} customers in obtaining buyer credits."  Appx1146.  Finally, Commerce requested specific information if Alcha "claim{s} that none of {its} customers used buyer credits during the {period of review}."  Appx1147.  If Alcha made such a claim, Commerce asked it to "please explain in detail the steps {it} took to determine that no customers used the Buyer Credit Facility."  Appx1147.

Alcha responded to these questions, but gaps remained on the record because the government of China failed to respond.  Regarding the export buyer's credit program, Alcha reported that it had only one U.S. customer during the period of review.  Appx1239; Appx80066.  Alcha stated that it "did not receive the benefit under the Export Buyer's Credits program" during the period of review, nor did it "provide{} any kind of assistance to {its} U.S. customers

in obtaining export buyer's credits." Appx1239-1240. Alcha claimed that in the event of a customer applying for such a credit, the exporter, Alcha International Holdings Limited, would have had "to buy export credit insurance" and "the fund would have been released" to Alcha International Holdings Limited first, neither of which occurred. Appx1239-1240.

Finally, Alcha stated that it had asked its "U.S. customers whether they had used the Export Buyers Credit during the {period of review}," and that "{t}he customers confirmed that they did not." Appx1240. Alcha did not include any certification from its U.S. customer regarding non-use of the export buyer's credit program. *See* Appx1240.

B.    Alcha's Responses Regarding Purchases Of Primary Aluminum

Commerce also requested Alcha to report all of its purchases of primary aluminum during the period of review. Appx1142; Appx1229. In response, Alcha provided an Excel template showing that affiliates that purchased primary aluminum during the period of review paid a VAT rate of 13 percent on their primary aluminum purchases. Appx81884, Appx81887, Appx81890 (records from Jiangsu Alcha); Appx81896, Appx81898, Appx81900, Appx81902, Appx81904 (records from affiliate labeled as Baotou Alcha); *see also* Appx1230 (narrative response). Alcha's submission of the Excel spreadsheet reflected the VAT rate actually paid on its domestic purchases, but did not provide information demonstrating that the 13 percent VAT rate was generally applicable under Chinese law to imported primary aluminum. *See* Appx14004 (stating that Alcha reported purchasing "domestically produced primary aluminum").[5]

---

[5] Commerce issued several supplemental questions, including, in the second supplemental questionnaire, questions regarding the primary aluminum for less than adequate remuneration program. Appx2252. However, none of the questions involved the VAT rates or export buyers credit program.

IV.    Commerce Issues The Preliminary Results

In the preliminary results, Commerce calculated an overall countervailable subsidy rate of 17.33 percent, *ad valorem*.  Appx14013.  This rate included the benefits that Commerce found were provided to Alcha by the export buyer's credit program, Appx13905-13914, and the provision of primary aluminum for less than adequate remuneration, Appx13887-13888, *see also* Appx14004 (Preliminary Calculation Memorandum).

A.    Commerce Applies Facts Available With An Adverse Inference With Respect To The Export Buyer's Credit Program

Commerce preliminarily used an adverse inference when selecting among the facts otherwise available on the record in determining that respondents "used and benefited from" the export buyer's credit program.  Appx13913.  In reaching this preliminary decision, Commerce applied the statutory standard for facts available with an adverse inference (adverse facts available).  First, Commerce resorted to "facts otherwise available" pursuant to 19 U.S.C. § 1677e(a)(2)(A) and (C), because the government of China was "an interested party or any other person" that "(A) withh{eld} information that has been requested by {Commerce}," and "(C) significantly impede{d} a proceeding under this subtitle."  Appx13912.  Further, pursuant to 19 U.S.C. § 1677e(b), Commerce found that application of an adverse inference was "warranted" because the government of China failed to provide information requested in the questionnaire, and thus "failed to cooperate by not acting to the best of its ability."  Appx13913.  "Specifically, the {government of China} has not provided complete information concerning the administration and operation of the program, including how loans are disbursed (*e.g.*, the 2013 Revisions), such as through intermediate or correspondent banks{.}"  Appx13913 (also stating the government of China had withheld information regarding whether the China Ex-Im Bank "employs threshold criteria, such as minimum USD 2 million contract value").  "This

9

information is necessary to understand fully how the {export buyer's credit} program operates and is, therefore, critical to Commerce's ability to verify the operation of the program" and the accuracy of "the respondent's claimed non-use of this program."  Appx13913.

Commerce acknowledged Alcha's "claims of non-use" of the export buyer's credit program, Appx13913, but explained that gaps remained in the record.  "{T}he only party that can answer questions about the internal administration of {the export buyer's credit} program" is the government of China, which "withheld necessary information requested by Commerce and impeded Commerce's ability to analyze the program's operation."  Appx13906.  Accordingly, the government of China's failure to cooperate prevented Commerce from verifying Alcha's claims of non-use.  Appx13905-13914.

Commerce preliminarily applied an adverse facts available "rate of 2.57 percent *ad valorem*, which was the highest rate calculated for a similar/comparable program in this proceeding, namely the Policy Loans to the Aluminum Sheet Industry Program."  Appx13914.

B.    Commerce Applies The 17 Percent VAT Rate For The Benchmark For Primary Aluminum

To determine the benefit from government provision of primary aluminum at less than fair value, Commerce selected benchmarks for "world market" prices.  Appx13887 (citing 19 C.F.R. § 351.511(a)(2)(ii)) (determining that the market within China for primary aluminum "is distorted").  In determining these benchmarks, Commerce relied on "a data submission from the domestic industry for Commerce" containing "United Nations International Trade Statistics Database (Comtrade) data specific to several tariff numbers for primary aluminum."  Appx13887.  Because the government of China did not provide the official VAT rates for primary aluminum, Commerce used the 17 percent rate reported by the government of China in

the investigation, Appx14005 & n.42, which was placed on the record by Alcha, *see* Appx14218 & n.161 (citing Appx83778-83779).

V.     Commerce Issues The Final Results

After the preliminary results, Alcha and the petitioners filed case and rebuttal briefs commenting on the preliminary determination with respect to Alcha.  Appx14107-14125 (Alcha case brief); Appx14074-14090 (petitioners' case brief); Appx14133-14144 (Alcha rebuttal brief); Appx14145-14176 (petitioners' rebuttal brief).[6]  On August 30, 2022, Commerce issued the *Final Results*, Appx14242-14243, and its accompanying IDM, Appx14186-14233.

In the final results, Commerce calculated a countervailing subsidy rate of 17.80 percent *ad valorem* for Alcha.  Appx14243.  Commerce continued to include subsidy rates for the export buyer's credit program and the primary aluminum for less than adequate remuneration program.  Appx14195-14196.  As to the export buyer's credit program, Commerce "made no changes" to the methodology used in the preliminary results, and continued to calculate a countervailable subsidy rate of 2.57 percent *ad valorem*.  Appx14196.  With respect to Alcha's purchase of government-provided primary aluminum for less than adequate remuneration, Commerce made certain changes that resulted in a "net countervailable subsidy rate of 7.81 percent *ad valorem*" for Alcha.  Appx14195; Appx14237-38.  As relevant to this case, Commerce continued to use the 17 percent VAT rate from the preliminary results to determine the benchmark for the primary aluminum for less than adequate remuneration program.  Appx14218-14219.

Alcha then filed this case challenging the Final Results.  Compl., ECF No. 9 (Nov. 7, 2022).   Alcha challenges Commerce's determination that it benefited from the export buyer's

---

[6]  Yinbang also submitted separate case briefs.  Appx14091-14106.  The government of China did not participate.

credit program and its use of the 17 percent VAT rate to determine the benchmark for primary

aluminum for less than adequate remuneration.  *Id.* at ¶¶ 12-17.

## SUMMARY OF THE ARGUMENT

Commerce's determination to apply an adverse inference when selecting among the facts

otherwise available on the record with respect to Alcha's use of the export buyer's credit

program is supported by substantial evidence and in accordance with law.  The government of

China refused to participate in the proceeding and wholly failed to answer Commerce's detailed

questions regarding (among other things) the operation of the program, use of the program, and

how to verify claims of non-use.  This refusal to cooperate supports the application of facts

available with an adverse inference, which permissibly had a collateral impact on Alcha.

Although Alcha claims that Commerce should have credited its claims of non-use—despite

being unsubstantiated by any customer certifications—Commerce reasonably explained that gaps

in the record resulting from the Chinese government's non-cooperation prevented Commerce

from verifying non-use.  Substantial evidence supports these findings.  In similar cases, this

Court has sustained Commerce's application of adverse facts available, and should do so in this

case.

Substantial evidence also supports Commerce's use of a 17 percent VAT rate to

determine the benchmark for primary aluminum in determining the benefit for the government

provision of primary aluminum for less than adequate remuneration.  Commerce had previously

applied the 17 percent rate in the investigation based on information submitted by the

government of China.  The 17 percent rate was submitted by Alcha on the record in this review,

and was the only rate offered as a benchmark for imports of primary aluminum in this

proceeding.  Commerce was not required to use the 13 percent rate proposed by Alcha, when

Alcha failed to present evidence to Commerce that the Chinese government had altered the 17

percent rate, and when the 13 percent rate was submitted only as the rate actually paid on

domestic purchases, not as a benchmark reflecting the required rate.

## ARGUMENT

## I.    Standard of Review

In reviewing Commerce's antidumping or countervailing duty determinations, "the Court

of International Trade must sustain 'any determination, finding or conclusion found' by

Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in

accordance with law.'"  *Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996)

(quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  "The specific factual findings on which {Commerce}

relies in applying its interpretation are conclusive unless unsupported by substantial evidence."

*United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" amounts to

"more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir.

2009).  Substantial evidence is also "less than the weight of the evidence, and the possibility of

drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding

from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607,

620 (1966).  An agency decision may not be overturned "simply because the reviewing court

would have reached a different conclusion based on the same record."  *Cleo Inc. v. United States*,

501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

"{W}hen a statute fails to make clear 'any Congressionally mandated procedure or

methodology for assessment of the statutory tests,' Commerce 'may perform its duties in the way

it believes most suitable.'"  *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir.

2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)).

"Antidumping and countervailing duty determinations involve complex economic and

accounting decisions of a technical nature, for which agencies possess far greater expertise than

courts." *Fujitsu*, 88 F.3d at 1039 (citing *United States v. Zenith Radio Corp.*, 562 F.2d 1209,

1216 (C.C.P.A. 1977), *aff'd*, 437 U.S. 443 (1978).  When exercising such technical expertise to

select and to apply methodologies to implement the dictates of the trade statute, Commerce

receives "tremendous deference" that is "both greater than and distinct from that accorded the

agency in interpreting the statutes it administers."  *Id*.

## II.     Commerce's Application Of Adverse Facts Available With Respect To The Export Buyer's Credit Program Is Lawful And Supported By Substantial Evidence

Substantial evidence supports Commerce's determination to countervail the export

buyer's credit program based on the application of adverse facts available.  Alcha argues that

Commerce's finding is unsupported by substantial evidence and contrary to law.  Alcha Br. at

13-27.  As discussed below, however, the government of China's refusal to participate in the

review supports Commerce's application of adverse facts available with respect to financial

contribution, specificity, benefit, and use of the program.  Appx14200; Appx14213.  Although

Alcha claims that its customer did not use the export buyer's credit program, Commerce

explained that these claims were incomplete and unverifiable.  Appx14200-14214.  Substantial

evidence supports Commerce's finding that gaps in the record resulting from the Chinese

government's refusal to cooperate prevented verification of Alcha's claims of non-use.

Moreover, the cases relied upon by Alcha are distinguishable because each of them was based on

a record that included customer certifications of non-use or at least partial participation by the

government of China—neither of which is present in this case.  Alcha's remaining arguments are

unpersuasive, and Commerce's application of adverse facts available should be sustained.

A.    Commerce's Application Of Adverse Facts Available Against The Government
      Of China Is Supported By Substantial Evidence And In Accordance With Law

Substantial evidence supports Commerce's application of adverse facts available due to

the government of China's failure to respond to the questionnaire regarding the export buyer's

credit program.

Commerce applies facts otherwise available if "necessary information is not available on

the record," 19 U.S.C. § 1677e(a)(1), or if an interested party:  (a) withholds information

requested by Commerce, (b) fails to provide the information in the form or in the manner

requested, (c) significantly impedes the proceedings, or (d) provides information that cannot be

verified.  19 U.S.C. § 1677e(a)(2)(A)-(D).  Commerce may apply an adverse inference in

selecting among the facts otherwise available when it "finds that an interested party has failed to

cooperate by not acting to the best of its ability to comply with {Commerce's} request for

information."  19 U.S.C. § 1677e(b).  An interested party fails to act to the best of its ability

when it does not exert "maximum effort to provide Commerce with full and complete answers to

all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed.

Cir. 2003).

Substantial evidence supports Commerce's application of adverse facts available "in

determining financial contribution, benefit, and specificity of the {export buyer's credit}

program, as well as usage of the program."  Appx14213.  A countervailable "subsidy exists when

(1) a foreign government provides a financial contribution (2) to a specific industry and (3) a

recipient within the industry receives a benefit as a result of that contribution."  *Fine Furniture*

*(Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C.

§ 1677(5)(B)); *see also* 19 U.S.C. § 1677(5A) (regarding specificity).  In countervailing duty

proceedings, Commerce requests information from the government respondent regarding "the

first two factors of the statutory requirement"—"regarding whether the government provides a financial contribution and whether that contribution is specific to an industry." *Fine Furniture*, 748 F.3d at 1370 (citing 19 U.S.C. § 1677(5)). Commerce also requires information from a government respondent regarding the "third criterion," "whether a particular respondent received a benefit from an alleged subsidy."[7] *See Fine Furniture*, 748 F.3d at 1370 (stating Commerce sometimes requests such information).

In the underlying proceeding, Commerce requested information from the government of China about the export buyer's credit program regarding each of these criteria. Appx1096-1097. Commerce's initial questionnaire to the government of China sought information regarding the operation of the export buyer's credit program, whether Alcha's U.S. customers used the program, and how to verify any claims of non-use. Appx1096-1097. Unlike most programs, moreover, the export buyer's credit "is provided to someone other than the respondent," Alcha Br. at 24, so Commerce asked the government of China for information covering *all* areas required by statute, including use of the program, financial contribution, specificity, and benefit. Appx1096-1097.

"{O}n its face, the statute authorizes Commerce to apply adverse inferences when an interested party, including a foreign government, fails to provide requested information" on any of these requested criteria. *Fine Furniture*, 748 F.3d at 1371. The government of China provided no response to Commerce's questions, Appx1096-1097, and refused to participate at all in this administrative review, *see* Appx14207. The Chinese government thus withheld requested information pursuant to 1677e(a)(2)(A) by failing to respond to the questionnaire, and

---

[7] There is no dispute that the fourth criterion—that the subsidy is provided by the "government of a country or any public entity"—is satisfied with respect to the export buyer's credit program. *See* 19 U.S.C. §§ 1671, 1677(5).

significantly impeded the proceeding pursuant to section 1677e(a)(2)(C).  The government of China also "failed to cooperate to the best of its ability" with Commerce's request for information pursuant to section 1677e(b).  Appx14200.[8]

Applying adverse facts available in similar circumstances, this Court sustained Commerce's decision to use an "inference adverse to the {government of China's} interest, to make the factual finding that . . . the {Chinese} companies in this proceeding had benefited from the Export Buyer's Credit Program" during the period of investigation, at a rate found in a prior proceeding.  *Changzhou Trina Solar Energy Co., Ltd. v. United States* (*Changzhou Trina 2016*), 195 F. Supp. 3d 1334, 1355 (Ct. Int'l Trade 2016).  In this proceeding, likewise, Commerce reasonably applied an inference adverse to the government of China, finding that Alcha's U.S. customer used the export buyer's credit program and thereby provided a financial contribution and a benefit to respondents, including Alcha.  Appx14213-14214.  Consistent with 19 U.S.C. § 1677e(b)(2), Commerce applied the highest rate for a similar program in this proceeding of 2.57 percent, Appx13914; Appx14196.

Alcha argues that a countervailing duty may be imposed only "if a benefit is 'conferred' upon a person as a result of a financial contribution."  Alcha Br. at 13 (citing 19 U.S.C. § 1677(5)(B)); *see also id.* at 26-27 (arguing a benefit was not conferred on Alcha "based on the information submitted on the record").  As explained above, however, that standard was satisfied because Commerce found as adverse facts available that Alcha used and benefited from the program.  Appx14213; *see also* Appx13913.  The government of China's refusal to answer questions regarding the use or non-use of the program by the respondents' U.S. customers, *see*

---

[8]  Because the Chinese government provided *no* response (rather than a "deficient" response), Commerce was not required to provide notice of a deficiency pursuant to 19 U.S.C. § 1677m(d).

Appx1097, supports Commerce's adverse inference that Alcha used and benefited from this program.  *See* Appx14213; Appx13913 (citation omitted).

Alcha also argues that Commerce has put it "in the position of proving a negative." Alcha Br. at 14.  But it is the government of China's refusal to cooperate—not any action by Commerce—that placed Alcha in this position.  Appx14213-14214.  As Commerce explained, the government of China is the only entity with the ability to explain "the internal administration" of the export buyer's credit program.  Appx14213.  The government of China's consistent refusal to cooperate in export buyer's credit proceedings thus "frustrates Commerce's ability to investigate" and "places exporters in a difficult and impracticable position."  *Cooper (Kunshan) Tire Co., Ltd. v. United States* (*Cooper Tire II*), 610 F. Supp. 3d 1287, 1312 (Ct. Int'l Trade 2022).[9]

B.     Substantial Evidence Supports The Application Of Adverse Facts Available
       <u>Against The Government Of China Despite The Collateral Impact On Alcha</u>

The application of adverse facts available against the government of China was justified despite the collateral impact on Alcha.  The "collateral impact on a cooperating party does not render the application of adverse inferences in a {countervailing duty} investigation improper." *Fine Furniture*, 748 F.3d at 1372-73 (citing *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010)).  The key question in such cases is whether the adverse inference "has the potential to encourage cooperation from" the party against whom it is imposed, in this case, the Chinese government.  *Id.* (citing *KYD*, 607 F.3d at 768).  In one case, the Federal Circuit sustained an adverse facts available rate that would impact a cooperating importer because the rate had "the

---

[9]  In *Cooper Tire*, the Court sustained-in-part Commerce's analysis regarding the export buyer's credit program in 2021, *Cooper (Kunshan) Tire Co., Ltd. v. United States* (*Cooper Tire I*), 539 F. Supp. 3d 1316, 1328 (Ct. Int'l Trade 2021), and then, after remand, sustained Commerce's analysis in its entirety, *Cooper Tire II*, 610 F. Supp. 3d at 1308.

potential to encourage cooperation from" the non-cooperating party.  *KYD*, 607 F.3d at 768.  In another case, likewise, the Federal Circuit sustained an adverse facts available rate against the government of China despite the collateral impact on a cooperating respondent, because "a remedy that collaterally reaches {the cooperating respondent} has the potential to encourage the government of China to cooperate so as not to hurt its overall industry."  *Fine Furniture*, 748 F.3d at 1372-73.

"Although it is unfortunate that cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions, this result is not contrary to the statute or its purposes{.}"  *Id.* at 1373.  The focus on deterrence against the non-cooperating party is consistent with the statutory scheme and the Uruguay Round Agreements Act (URAA) Statement of Administrative Action (SAA), which "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {URAA}."  19 U.S.C. § 3512(d); *see also Fine Furniture*, 748 F.3d at 1372-73.  As described in the SAA, "{t}he purpose of 19 U.S.C. § 1677e(b) . . . is to encourage future cooperation by 'ensur{ing} that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"  *Fine Furniture*, 748 F.3d at 1372-73 (quoting SAA at 870, H.R. Doc. No. 103–316, vol. 1, at 870, *reprinted in* 1994 U.S.C.C.A.N. 4040).  Although the Court in *Fine Furniture* mentioned that "Commerce did not apply adverse inferences to substitute for any information that was actually submitted by the cooperating respondents," *Fine Furniture*, 748 F.3d at 1372, the Federal Circuit's reasoning applies equally in this case, in which the relevant information submitted by Alcha was unverifiable and incomplete.  Appx14204-14214; *see also* Sections II.C, II.D (discussing Commerce's detailed findings that Alcha's claims of non-use were not verifiable)

19

In *Changzhou Trina 2016*, for example, Commerce applied adverse facts available against the government of China when China refused to allow verification of its claim that it had "confirmed" non-use of the export buyer's credit program with the China Ex-Im Bank. 195 F. Supp. 3d 1334, 1354 (Ct. Int'l Trade 2016). Commerce applied an adverse inference to find that respondents "have used and benefited from" the program. *Id.* The Court sustained this determination over the respondent's argument that Commerce had impermissibly ignored evidence of non-use placed on the record by respondent. As the Court explained, "only the {government of China}, and in particular the {China Ex-Im Bank}, could provide and verify the information needed to determine whether a benefit was conferred" under the program. *Id.* at 1355. Alcha is incorrect that *Changzhou Trina 2016* is distinguishable because, in this case, Commerce did not "attempt verification." Alcha Br. at 21. To the contrary, the dispositive consideration in *Changzhou Trina 2016* was that the government of China—"the sole party with access to the necessary information"—"failed to act to the best of its ability." *Changzhou 2016*, 195 F. Supp. 3d at 1355. As in *Changzhou Trina 2016*, therefore, the Court should sustain the application of adverse facts available despite the collateral impact on a cooperative respondent.

C.     Commerce Was Not Required To Credit Alcha's Claims Of Non-Use Of The Export Buyer's Credit Program

Alcha does not dispute that the government of China's refusal to participate supports the application of adverse facts available against China, but nonetheless insists that Commerce "improperly ignored record evidence to reach a finding that Alcha benefited from the {export buyer's credit program}." Alcha Br. at 13. As Commerce explained, however, the Chinese government's refusal to cooperate resulted in gaps in the record rendering Alcha's questionnaire response incomplete and unverifiable. *See, e.g.*, Appx14213-14214.

This Court has stated that Commerce is "expected to consider" record evidence from a cooperating exporter or producer that fills the gaps "created by the lack of cooperation by the government." *GPX Int'l Tire Corp. v. United States*, 37 C.I.T. 19, 58-59 (Jan. 7, 2013). Nevertheless, Commerce is not required to accept information that is incomplete or unverifiable. *See Hyundai Elec. & Energy Sys. Co., Ltd. v. United States*, 15 F.4th 1078, 1089 (Fed. Cir. 2021) (citing 19 U.S.C. § 1677m(e)) (holding verification was not required when "the information is so incomplete as to be unreliable").  "Commerce is not obligated to conduct verification when, for example, the information cannot be verified, the information is so incomplete as to be unreliable, or the interested party has not acted to the best of its ability to meet Commerce's requirements." *Id.* (citing 19 U.S.C. § 1677m(e)).  Moreover, Commerce's assessment of whether information is incomplete or unverifiable is entitled to deference because "the statute gives Commerce wide latitude in its verification procedures."  *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021) (quoting *Am. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994)).

In this review, Commerce reasonably found that the information submitted by Alcha—an unsupported claim of non-use—was unverifiable and incomplete due to the government of China's noncooperation.  Appx14200-14214.  The "'completeness' test is an essential element of Commerce's verification methodology," requiring that "a complete picture of relevant information" is before the verification team, "by tying relevant books and records to audited financial statements or tax returns."  Appx14203.  Commerce's verification methods "are comparable to those of an auditor attempting to confirm usage or claimed non-usage by examining books and records that can be traced to audited financial statements, or other official company documents, such as tax returns, which provide a credible and complete picture of a

company's financial activity" for the relevant period.  Appx14202-14203 (citations omitted).

"Absent the requested information" that the Chinese government refused to provide, "and

without a full understanding of the involvement of third-party banks," Commerce found that

claims of non-use "are not verifiable" in a manner consistent with Commerce's longstanding

verification methods.  Appx14210.[10]

Applying these principles, substantial evidence supports Commerce's finding that the

government of China's non-cooperation prevented verification of Alcha's claims of non-use.

Absent the information withheld by the government of China, Commerce "would be unable to

confirm usage or claimed non-use by examining books and records which can be reconciled to

audited financial statements or other documents, such as tax returns."  Appx14210 (citation

omitted).  For example, without the requested "bank disbursement information, Commerce could

not tie any loan amounts to banks participating in this program in the company respondent's U.S.

customers' books and records, and therefore could not verify the claims of non-use."

Appx14210.  "A review of ancillary documents, such as applications, correspondence, emails,

etc., is insufficient for Commerce to verify any bank disbursement or loan amount pertaining to

the company respondent, its customers."  Apx14210.  As this Court held in another recent case,

Commerce "was not required to consider {Alcha's} information determinative" in such

circumstances.  *Yama Ribbons & Bows Co. v. United States* (*Yama 2022*), 611 F. Supp. 3d 1394,

---

[10]  *See* Appx14210 (citing, *e.g.*, *Chlorinated Isocyanurates from China: Preliminary Results of Countervailing Duty Administrative Review; 2016*, 83 Fed. Reg. 62841 (December 7, 2018), and accompanying PDM, at 16-17 (*Chlorinated Isocyanurates PDM*), *unchanged in Chlorinated Isocyanurates from China: Final Results of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 37627 (August 1, 2019)); *see also* Appx14201 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules; from China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 FR 63788 (October 17, 2012), and accompanying IDM, at 9 and Comment 18).

1402 (Ct. Int'l Trade 2022).  Alcha contends that *Yama 2022* is distinguishable because the respondent in that case argued for consideration of responses submitted by the government of China that were not specific to the period of review.  Alcha Br. at 22.  In this case, however, the government of China failed to respond at all.  This case thus presents as strong—or stronger— support for applying adverse facts available as *Yama 2022*.

Furthermore, although certain decisions by this Court have found that "customer certifications of non-use" could fill a gap from the government of China's refusal to cooperate, *see, e.g.*, *Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312, 1361 (Ct. Int'l Trade 2021) (citations omitted), Alcha did not submit non-use certifications by its U.S. customer. Appx14213; *see also* Section II.D.ii (discussing the importance of customer certifications in prior cases).

> D.    Commerce's Analysis Accords With Prior Cases Analyzing The Application Of Adverse Facts Available To The Export Buyer's Credit Program

Not only is Commerce's determination consistent with the statute and Federal Circuit precedent, but its analysis accords with the framework that this Court has developed to review the application of an adverse inference with respect to the export buyer's credit program.  This Court has applied three factors in reviewing Commerce's application of an "adverse inference that a cooperating party benefited from the {export buyer's credit program} based on the {government of China's} failure to cooperate." *Cooper Tire II*, 610 F. Supp. 3d at 1304 (citations omitted).[11]  First, Commerce must "define the gap in the record by explaining exactly

---

[11]   *See also id.* (citing *Jiangsu Zhongii Lamination Materials Co. v. United States,* 405 F. Supp. 3d 1317, 1333 (Ct Int'l Trade 2019) *(citing Changzhou  Trina Solar Energy Co. v. United States,* 352 F. Supp. 3d 1316, 1326-27 (Ct. Int'l Trade 2018): *Guizhou Tyre  Co. v. United States,* 399 F. Supp. 3d 1346, 1352-53 (Ct. Int'l Trade 2019)*: Clearon Corp. v. United States,* 359 F. Supp. 3d 1344, 1360 (Ct. Int'l Trade 2019)); *Guizhou Tyre Co. v. United States,* 523 F. Supp. 3d 1312, 1361 (Ct. Int'l Trade 2021) *(quoting Jiangsu Zhongii Lamination Materials Co. v. United*

what information is missing from the record necessary to verify non-use." *Id.* Second, Commerce must "establish how the withheld information creates this gap by explaining why the information the {government of China} refused to give was necessary to verify claims of non-use." *Id.* Finally, Commerce must "show that only the withheld information can fill the gap by explaining why other information on the record or accessible by respondents, is insufficient or impossible to verify." *Cooper Tire II*, 610 F. Supp. 3d at 1304.

In *Cooper Tire*, for example, this Court sustained Commerce's determination to apply adverse facts available to a cooperating respondent's use of the export buyer's credit program when the government of China refused to provide requested information and no non-use certifications were filed. *Cooper Tire II*, 610 F. Supp. 3d at 1287. The Court found that Commerce satisfied each of the three factors. First, Commerce defined the gap in the record by explaining that, among other gaps in the record, the government of China had refused to provide information regarding "whether loans are disbursed under the program through partner/correspondent banks and, if so, the identities for those banks." *Cooper Tire I*, 539 F. Supp. 3d at 1328. Second, "Commerce explained the necessity" of the requested information relating to loan disbursement and partner and correspondent banks, to enable "Commerce's verification of non-use in this case." *Cooper Tire II*, 610 F. Supp. 3d at 1308. Finally, the Court sustained Commerce's explanation that "only the withheld information can fill the gap," highlighting the respondents' obligation to develop the record and the respondent's failure to submit non-use certifications. *Id*. at 1316-1317 (citing, *e.g.*, *Nan Ya Plastics Corp., Ltd. v.*

---

*States,* 405 F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2019)); *Cooper Tire I,* 539 F. Supp. 3d at 1327).

*United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016) (noting that the burden is on the interested parties to create the record)).

As in *Cooper Tire*, Commerce's analysis of the three factors supports Commerce's findings that Alcha's claims of non-use were not verifiable due to the government of China's lack of cooperation.  Each of the three factors is addressed below.

      i.    Substantial Evidence Supports Commerce's Findings That Information Is Missing From The Record Necessary To Verify Non-Use

Substantial evidence supports Commerce's finding that the government of China's non-cooperation resulted in multiple significant gaps of information necessary to verify Alcha's claims of non-use.  First, the Chinese government refused to provide information concerning the operation and function of the export buyer's credit program, Appx14206, Appx14211, including information how to verify claims of non-use, Appx1097.  Second, the government of China refused to provide "a sample application and other documents making up the 'paper trail' of a direct or indirect export credit."  Appx14209; *see also* Appx14207.

Third, the Chinese government failed to provide information regarding all "laws, regulations or other governing documents cited by the {government of China} in the Export Buyer's Credit Supplemental Questionnaire Response," as requested in the initial questionnaire.  Appx1097; *see also* Appx14204 (explaining 2013 changes in the export buyer's credit program).  The requested laws include the 2013 amendments that included suspected changes to the program, such as the removal of a $2 million minimum business contract requirement, Appx14204-14205, and the availability of loan disbursements through banks other than the China Ex-Im Bank, Appx14205; *see also* Appx14207-14210.  Thus, as in *Cooper Tire*, the Chinese government's non-cooperation resulted in a gap in this record regarding the $2 million minimum and banks eligible for loan disbursement.  *See Cooper Tire I*, 539 F. Supp. 3d at 1328.

Alcha claims it filled this gap by appending "a copy of the Administrative Measures to its questionnaire response."  Alcha Br. at 14 (citing Appx1240).  The cited portion of Alcha's questionnaire references Exhibit 31, which was a business license for one of the Alcha affiliates that did not incorporate any Chinese regulation.  *See* Appx81726-81728 (Exhibit 31 labeled "Alcha Materials Business License").  The referenced material actually appears at Exhibit 50.  *See* Appx81982-81990.  Regardless, Alcha's submission is an inadequate substitute for current information about the program from the Chinese government.  For example, the submission does not reference the 2013 revisions to the export buyer's credit program, which provide "internal guidelines for how this program is administered by the China Ex-Im Bank."  *See* Appx14210 (discussing the 2013 revisions).  As Commerce explained, the government of China "is the only party that can answer questions about the internal administration of this program."  Appx14210.

ii.   Commerce Explained How The Missing Information Was Necessary To Verify Non-Use

As in *Cooper Tire II*, Commerce reasonably explained why each type of missing information was necessary to verify non-use by Alcha's customer.  Appx14206-14214.  "{T}he statute{s} give{ } Commerce wide latitude in its verification procedures," *Goodluck India*, 11 F.4th at 1343 (quoting *Am. Alloys*, 30 F.3d at 1475), and Commerce's assessment that it cannot conduct verification without "more detailed" information is subject to deferential "reasonableness" review, *Hyundai*, 15 F.4th at 1089.[12]  As discussed below, Commerce plainly satisfied this deferential standard.  Moreover, the decisions cited by Alcha are distinguishable because none of them presented a case, like this one, in which the respondent failed to submit

---

[12]   The Federal Circuit's reasoning in *Hyundai Electric* supersedes this Court's reasoning in *Guizhou Tyre* and *Clearon* that "Commerce must attempt verification in order to conclude that a gap exists related to that inquiry."  *See Clearon Corp. v. United States*, 474 F. Supp. 3d 1339, 1352–53 (Ct. Int'l Trade 2020) (quoting *Guizhou Tyre*, 415 F. Supp. 3d at 1343).

customer non-use certifications and the government of China wholly failed to participate in the proceeding.

a.    Commerce Reasonably Explained Why The Information Requested From The Government Of China Was Necessary To Verify Non-Use

Commerce explained that without understanding how the program is operated, it "would not know what indicia to look for in searching for usage or even what records, databases, or supporting documentation" would be necessary "to conduct the verifications."  Appx14211.  "{W}ithout a complete set of laws, regulations, application and approval documents, and administrative measures, Commerce would not even know what books and records the China Ex-Im Bank maintains in the ordinary course of its operations."  Appx14211.  It is unreasonable to expect Commerce to verify claims of non-use "with no idea of what documents to look for or what other indicia there might be within a company's loan documentation regarding involvement with the China Ex-Im Bank."  Appx14212.

As the Federal Circuit has explained, the government respondent is normally "in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients."  *Fine Furniture*, 748 F.3d at 1368 (citation and internal quotation marks omitted).  Information from the Chinese government is particularly critical when assessing the export buyer's credit program.  Unlike many subsidy programs that are provided from the government to the company respondent—and thus may be evaluated and verified based on the respondents' own records—export buyer's credits are provided to the buyer, i.e., to the U.S. customer of the merchandise.  *See* Appx14201.  Furthermore, "evidence indicate{d} that under the {export buyer's credit} program, credits are not direct transactions from the China Ex-Im Bank to the U.S. customers of the respondent exporters; rather, there can be intermediary banks

involved, the identities of which the {the government of China} has refused to provide to Commerce."  Appx14208.  Given this "complicated structure of loan disbursements," Commerce's "complete understanding of how this program is administered is necessary" to enable verification of claims of non-use.  Appx14205 (citation omitted).

As to the missing information regarding "sample applications" and other documents needed for a "paper trail" associated with export credits, Commerce reasonably explained how the absence of this information prevented verification of non-use.  Appx14209.  Attempting verification without such information would prevent Commerce from verifying "which loans were normal loans versus {export buyer's credit} program loans," due to Commerce's "lack of understanding of what underlying documentation to expect to review, and whether/how that documentation would indicate China Ex-Im Bank involvement."  Appx14209.  "In effect, companies could provide Commerce with incomplete loan documentation without Commerce understanding that the loan documentation was incomplete."  Appx14209.

Commerce further explained that the government of China's refusal to provide information concerning the 2013 amendments—including the $2 million minimum and identity of cooperating banks—prevented Commerce from obtaining a "'roadmap' for the verifiers." Appx14209.  "{I}f the program is no longer limited to USD 2 million contracts, this increases the difficulty of verifying loans without any such parameters."  Appx14207.  Further, without understanding how money is disbursed in the program or which banks disburse it, Commerce would not know what banks or transactions to look for in the customer records.  Appx14209.  Absent record evidence concerning disbursement of credits under the program, Commerce could not "tie any loan amounts to banks participating in this program in the company respondent's

U.S. customer's books and records," and thus "could not verify the claims of non-use." Appx14210.

Alcha argues that, by "explaining why it requires the 2013 revisions to the Administrative Measures and a list of partner/correspondent banks," Commerce "conflates the operation of the {export buyer's credit program} with the program's use."  Alcha Br. at 18 (citing *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1271 (Ct. Int'l Trade 2018); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2018)).  However, Commerce did not conflate program operation with non-use, but instead explained why an understanding of the program operation is necessary to *verify* Alcha's blanket and unsupported claims of non-use.  Appx14213.  Commerce specifically asked the government of China for information regarding how to confirm non-use, Appx1097, and received no response.

In another recent case, this Court sustained Commerce's determination that the government of China had failed to provide necessary information to determine whether the respondent used the program.  *See Fujian Yinfeng Imp & Exp Trading Co., Ltd. v. United States*, No. 21-00088, 2022 WL 4180886 (Ct. Int'l Trade Sept. 13, 2022).  "Commerce reasonably explained that absent the {export buyer's credit program} information it requested from the Chinese government," attempting to verify whether the respondent's U.S. customers received the credit (and thus benefited from the subsidies) "amounted to 'looking for a needle in a haystack with the added uncertainty that Commerce might not even be able to identify the needle when it was found.'"  *Id.* (citation omitted).  The same analysis applies in this case.  *See* Appx14210, Appx14212.

Alcha argues that *Fujian Yinfeng* is an outlier amongst the bulk of the cases decided by this Court.  Alcha Br. at 21-22.  That is incorrect.  Instead, the Court in *Fujian Yinfeng* explained

that Commerce's "thorough explanation of exactly why the missing information was necessary to verify {export buyer's credit program} non-use distinguishes this case from other cases where this court has held that Commerce failed to properly explain the need for the absent information." 2022 WL 4180886 at *6. The same is true in this case. *See* Appx14200-14214.

b.    <u>Alcha Failed To Submit Customer Certifications</u>

Alcha's failure to submit non-use certifications for its U.S. customer further supports Commerce's finding that Alcha's claim of non-use was not verifiable. *See* Appx14213. "{T}his Court has recognized that the lack of customer certifications is an important distinction in cases where it has upheld Commerce's application of {adverse facts available} to the {export buyer's credit} program." *Cooper II*, 610 F. Supp. 3d 1287, 1317–18 (Ct. Int'l Trade 2022) (citing, *e.g.*, *Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312, 1318 (Ct. Int'l Trade 2017)). Past cases remanding Commerce's determinations have also highlighted the importance of non-use certifications. This Court's decision in *Both-Well (Taizhou) Steel Fittings, Co. v. United States*, for example, hinged on the Court's assessment that "the U.S. customers' non-use certifications themselves suggest that the customers must have information that could be used to verify the non-use certifications." 557 F. Supp. 3d 1327, 1330 (Ct. Int'l Trade 2022).

Indeed, in nearly every case relied upon by Alcha, the respondents offered customer declarations or other detailed documentary evidence to support their claims of non-use. *See, e.g.*, *Risen Energy Co., Ltd. v. United States*, 570 F. Supp. 3d 1369, 1373 (Ct. Int'l Trade 2022) (stating that both respondents "provided customer declarations certifying non-use of the {export buyer's credit program}"); *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1270 (Ct. Int'l Trade 2018) (explaining that the record contained "signed declarations from {plaintiffs'} U.S. customers certifying non-use," which was "corroborated by {the government

of China's} statements"), *reviewing after remand in* 399 F. Supp. 3d 1346, 1353 (Ct. Int'l Trade.

2019), *and remand results sustained in* 415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019); *Guizhou*

*Tyre Co., Ltd. v. United States*, 389 F. Supp. 3d 1315, 1318 (Ct. Int'l Trade 2019), (stating that

"Guizhou submitted declarations from its U.S. customers confirming non-use" and the

government of China also responded confirming that "none of Guizhou's customers used the

Program"), *reviewing after remand in* 415 F. Supp. 3d 1335, 1340 (Ct. Int'l Trade 2019), *and*

*remand results sustained in* 447 F. Supp. 3d 1373, 1376 (Ct. Int'l Trade 2020); *Dalian Meisen*

*Woodworking Co. v. United States*, 20-00110, 2022 WL 1598896, at *8 (Ct. Int'l Trade May 12,

2022) (stating that "both respondents certified that their customers did not take advantage of the

program and supported this certification with declarations"); *Both-Well (Taizhou) Steel Fittings,*

*Co.*, 557 F. Supp. 3d at 1330 (stating that "Both-Well included a list of its customers and non-use

certifications from all its U.S. customers certifying that they did not finance any purchases from

Both-Well using the {export buyer's credit program} in its response"); *Clearon Corp. v. United*

*States*, 359 F. Supp. 3d 1344, 1347 (Ct. Int'l Trade 2019) (stating that the respondent

"submit{ted} a total of forty-four declarations of non-use by its U.S. and non-U.S. customers

during the course of the review proceeding"), *reviewing after remand* 474 F. Supp. 3d 1339 (Ct.

Int'l Trade 2020), *and remand results sustained in* 474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020);

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1324 (Ct. Int'l

Trade 2018) (stating that respondent companies "submitted affiliate and customer certifications

of non-use applicable to the period of review stating that U.S.-based customers had not

benefitted from the {export buyer's credit program}.").

Alcha highlights one case in which the respondent did not submit customer certifications.

Alcha Br. at 15 (citing *Yama Ribbons & Bows Co. v. United States* (*Yama 2019*), 419 F. Supp. 3d

1341, 1356 (Ct. Int'l Trade 2019), *remand results sustained in Yama Ribbons & Bows Co., Ltd. v. United States*, 606 F. Supp. 3d 1345, 1350 (Ct. Int'l Trade 2022)).  But in *Yama 2019*, the record included additional evidence of non-use; specifically, the government of China responded to questionnaires, stating "that none of the U.S. customers" used export buyer's credits from the China Ex-Im Bank during the period of review and explaining the steps undertaken to confirm this non-use.  *Yama 2019*, 419 F. Supp. 3d at 1356.  In this case, by contrast, the government of China wholly refused to participate in the review.

    In short, this case is distinguishable from those relied upon by Alcha, and instead aligns with *Cooper Tire II*, in which the respondent company likewise failed to provide customer certifications of non-use.  *Cooper Tire II*, 610 F. Supp. 3d at 1298.  If anything, this case presents an even broader informational gap than the one presented in *Cooper*, in which the government of China provided incomplete responses to Commerce's questionnaires.  *Cooper Tire I*, 539 F. Supp. 3d at 1329.  In this case, China failed to respond to the questionnaire at all.

    Alcha next argues that, until Commerce "actually *attempts* verification, . . . there is little for the Department to hang its hat on when it continues to find a gap in the record."  Alcha Br. at 23 (quoting *Guizhou Tyre*, 415 F. Supp. 3d at 1405).  To the extent Alcha argues that Commerce must attempt verification *before* it may identify gaps in the record, the Federal Circuit recently rejected such reasoning.  *Hyundai*, 15 F.4th at 1089–90.  In *Hyundai*, the Federal Circuit affirmed as "reasonable" Commerce's decision to cancel verification when the respondent failed to provide the "detailed information" requested by Commerce.  *Id.*  "When necessary information is absent, Commerce need not conduct a verification in an attempt to obtain the missing information."  *Id.* (citing *AMS Assocs., Inc. v. United States*, 719 F.3d 1376, 1380 (Fed.

Cir. 2013)).  Commerce is entitled to deference in determining when such information is necessary.  *Id.* (affirming Commerce's "sound reasons for seeking more detailed information").

Despite all of the informational gaps identified by Commerce in this review, Alcha claims that no record evidence indicates that "Alcha made use of the {export buyer's credit program}."  Alcha Br. at 17.  This argument ignores the adverse inference resulting from the Chinese government's refusal to provide basic information about the program.  *See* Section II.A; *see also Yama 2022*, 611 F. Supp. 3d at 1402 (explaining that Commerce was not required to find claims of non-use "determinative" in light of adverse inference).  Requiring Commerce to accept incomplete and unverifiable information in such circumstances could result in the government of China obtaining "a more favorable result by failing to cooperate than if it had cooperated fully"—contrary to the statutory scheme. 19 U.S.C. § 1677e(b).  *Nan Ya*, 810 F.3d at 1348 (quoting SAA at 870, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199).

       iii.    Substantial Evidence Supports Commerce's Finding That The Information On The Record Could Not Fill The Gap

Finally, as in *Cooper Tire II*, Commerce reasonably explained "that only the withheld information can fill the gap in the record in this case because no other information on the record is sufficient or possible to verify."  *Cooper Tire II*, 610 F. Supp. 3d at 1311.  Alcha argues that Commerce "failed to explain why it would be unable to obtain the information necessary from Alcha, who has demonstrated its willingness to cooperate throughout the proceeding."  Alcha Br. at 24.  Commerce explained, however, that the government of China possesses information—as the administrator of the program—that Alcha simply would not have.  Commerce found that "{t}he {government of China} is the only party that can answer questions concerning the internal administration of the program."  Appx14210.  The China Ex-Im Bank, "as the lender, is the primary entity which possesses the supporting information and documentation that are

33

necessary for Commerce to fully understand the operation of the program, which is prerequisite to Commerce's ability to verify the accuracy of {respondent's claimed non-use} of the program." Appx14210.

In the context of the export buyer's credit, moreover, Alcha concedes that "the loan is provided to someone other than the respondent." *See* Alcha Br. at 24. Thus, not only is the government of China the only party with direct information regarding the operation of the program but it is also the only respondent before Commerce that—absent additional information about the operation of the program—could verify any export buyer's credit transaction. *See* Appx14210.

Moreover, in determining whether "only the withheld information could fill the gap," the Court in *Cooper Tire II* started with the understanding that "the {government of China} has been consistently nonresponsive and uncooperative in {export buyer's credit program} investigations." *Cooper Tire II*, 610 F. Supp. 3d at 1311. This "frustrates Commerce's ability to investigate, places exporters in a difficult and impracticable position and creates issues, such as the ones present in this case, regarding Commerce's consideration of other information on the record." *Cooper Tire II*, 610 F. Supp. 3d at 1311.

The Court in *Cooper Tire II* also discussed the importance of Commerce's developing practice regarding customer certifications and the background principle that "the burden of creating an adequate record lies with interested parties and not with Commerce." *Id.* at 1313-1314 (quoting *Nan Ya*, 810 F.3d at 1337-38). The Court explained that Commerce had found non-use in certain record-specific circumstances when respondents provided "extensive documentation" of non-use, *id.* (citation omitted), or provided further questionnaires if respondents provided complete customer certifications of non-use, *id.* at 1314-1315 (citations

omitted).  In *Cooper Tire II*, as in this case, the respondents "did not provide customer

certifications of non-use."  *Id.* at 1311, 1316.  Thus, as in *Cooper Tire*, "Commerce's approach

supports its determination to continue to apply {adverse facts available} in this case because the

respondents failed to provide information that is sufficient to fill the gap in the record or that

would prompt the issuance of additional questionnaires to the respondents."  *Id.* at 1316.

     Alcha raises five remaining challenges to Commerce's findings, none of which is

persuasive.  First, Alcha contends that Commerce's verification concerns are unwarranted

because Alcha "only has a single U.S. customer" and because Alcha provided "a great deal of

financial information."  Alcha Br. at 24 (citations omitted).  As explained in *Cooper Tire II*,

however, failure to provide a non-use certification when a respondent has "just one U.S.

customer" can actually support Commerce's concerns regarding verification.  *Cooper Tire II*,

610 F. Supp. 3d at 1318.  In *Cooper Tire II*, the respondent had "just one U.S. customer, . . . for

which it would have been particularly easy to provide more information as to the claims

pertaining to non-use of the {export buyer's credit program}."  *Id.*  That the respondent in

*Cooper Tire* "did not provide any such information" about its U.S. customer "support{ed}"

Commerce's determination.  *Id.*  Likewise, Alcha's failure to submit the non-use certification for

even a single U.S. customer undermines Alcha's claims that Commerce could have obtained

necessary information from Alcha's customer.  *See* Alcha Br. at 24.  Moreover, Alcha's

reference to "financial statements, tax returns, loan agreements" and the like—without any

citation to the record—does not demonstrate that the record contained such detailed financial

statements about Alcha's customer.  *See* Alcha Br. at 24.

     Second, Alcha argues that "it appears that Commerce could cross-reference the records to

see if any funds appeared to originate from the EX-IM Bank, even if the funds went through an

intermediary bank at some point." *See* Alcha Br. at 24 (quoting *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 17-00246, 2019 WL 6124908, at \*3 (Ct. Int'l Trade Nov. 18, 2019)). But Commerce explained in detail why such cross-referencing was not possible given the missing information regarding which banks served as intermediaries, the paper trail created by such transactions, and other information necessary to verify non-use. Appx14204-14214. Such "complex economic and accounting decisions of a technical nature" are within the particular "expertise" of Commerce and merit deference. *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (*Fujitsu*, 88 F.3d at 1039).

Third, according to Alcha, Commerce must accept Alcha's claims of non-use because "Commerce permits respondents to state that they did not use the program in question" for other subsidy programs. Alcha Br. at 14-15; *see also id.* at 24-25 (arguing Commerce "routinely demands the same information from respondents in other contexts"). But unlike many other subsidy programs in which the respondent would have "information pertaining to the existence and amount of the benefit conferred by the program," *Archer Daniels Midland Co. v. United States*, 917 F.Supp.2d 1331, 1342 (Ct. Int'l Trade 2013), an export buyer's credit "is provided to someone other than the respondent," Alcha Br. at 24.[13] As Commerce explained in a prior proceeding, "even if the respondent company might have some knowledge of loans provided to its customers through its involvement in the application process, such information is not of the type Commerce would examine to verify that the claim of non-use at issue was complete and accurate." Appx14202 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules; from China: Final Affirmative Countervailing Duty Determination and Final*

---

[13]  To the extent Alcha argues that the operation of the export buyer credit program would be reflected in its financial statements, the government of China failed to submit any information on the record to support such a conclusion, despite being asked. *See* Appx1097.

*Affirmative Critical Circumstances Determination*, 77 Fed. Reg. 63788 (Dep't of Commerce, Oct. 17, 2012), and accompanying IDM, at 9 and Comment 18).

Fourth, Alcha claims that if Commerce had concerns about Alcha's responses, it should have sent supplemental questionnaires or verified the information.  Alcha Br. at 15-16.  As explained in *Cooper Tire II*, however, "a respondent is {not} entitled to receive a request from Commerce to provide customer certifications of non-use or other financial information."  610 F. Supp. 3d at 1316.  Commerce was not required to provide a supplemental questionnaire to the government of China, which wholly failed to respond to the initial questionnaire.  *See* Section II.A.  Nor was Commerce required to undergo section 1677m(d) deficiency procedures with respect to Alcha's responses, in applying adverse facts available due to *the government of China's* non-cooperation.  *See* 19 U.S.C. § 1677m(d) (applying when "a response to a request for information . . . does not comply with the request").  Commerce was not required to issue additional questionnaires or undergo "unreasonably onerous examination" of records to fill the gap left by the government of China's non-cooperation.  *See* Appx14208-14209.  Again, requiring Commerce to take such steps to remedy the consequences of a government respondent's non-cooperation would fly in the face of the SAA's guidance that adverse inferences are necessary to ensure that non-cooperating parties cannot achieve "a more favorable result by failing to cooperate than if it had cooperated fully."  *Nan Ya*, 810 F.3d at 1348 (quoting SAA at 870, *reprinted in* 1994 U.S.C.C.A.N. at 4199).

Fifth, Alcha challenges Commerce's "practice of requiring customer certifications before proceeding with supplemental questionnaires or verification."  Alcha Br. at 25-27; *see also id.* at 26 (citing Remand Results at 14, *Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, ECF No. 86 (Aug. 5, 2022); Remand Results, *Risen Energy Co., Ltd. v. United States*,

No. 20-03192, ECF No. 94 (Oct. 7, 2022)).  Alcha's summary is not a fully accurate reflection of Commerce's current practice, which is to accept and to analyze any information on any issue submitted on the record of a proceeding that is submitted in proper form and in a timely manner. 19 C.F.R. §§ 351.301, 351.303.  Alcha did not submit any customer certification of non-use or other financial documentation from the customer, such as a balance sheet or lending agreements, as had been found sufficient to warrant further questions or verification in other proceedings.[14] *See Cooper Tire II*, 610 F. Supp. 3d at 1313-1315 (citations omitted).[15]  As in *Cooper Tire*, the niceties of Commerce's practice when a respondent does provide customer certifications are not relevant in this case, because Alcha failed to submit any customer certification of non-use. *Cooper Tire II*, 610 F. Supp. 3d at 1316.  Finally, this case is plainly distinguishable from *Risen Energy Co. v. United States*, cited by Alcha, in which a respondent submitted "certifications from customers constituting roughly 95 percent" of the relevant sales.  Alcha Br. at 27 (citing Slip Op. 23-48, 2023 Ct. Intl. Trade LEXIS 52, at *11 (Apr. 11, 2023)).  Unlike the respondent in *Risen Energy*, Alcha failed to submit *any* customer certification of non-use.

---

[14]  Commerce instructed that all questionnaire responses must include "the required *certification of factual information*."  Appx1076 (emphasis added).  "Providers of information and the person(s) submitting it, if different . . . must certify that they have read the submission and that the information submitted is accurate and complete.  Commerce cannot accept questionnaire responses that do not contain signed certifications."  Appx1076; *see also* Appx1076 n.4 (citing 19 C.F.R. § 351.303(g); 78 Fed. Reg. 42,678 (Dep't of Commerce, July 17, 2013)) (discussing regulation requiring "the appropriate company, government, and representative certifications (as applicable)").  Despite this certification requirement, Alcha did not include a customer certification of non-use.

[15]  Alcha argues that Commerce misstated the facts in the preliminary results by indicating that Alcha had "no knowledge" whether its U.S. customers applied for export buyer's credits.  Alcha Br. at 14 (citing Appx13913).  In the final results, however, Commerce correctly referenced Alcha's response that "none of its U.S. customers used {the export buyer's credit} program."  Appx14212-14213; *see also* Appx1239-1240 (Alcha's questionnaire response).

**III.    Commerce's Application Of The 17 Percent VAT Rate To Calculate The Benchmark For Determining Whether The Government Of China Provided Primary Aluminum Inputs For Less Than Adequate Remuneration Is Lawful And Supported By Substantial Record Evidence**

In the *Final Results*, Commerce used the 17 percent VAT rate for primary aluminum to calculate the benchmark for determining whether the government of China provided primary aluminum inputs for less than adequate remuneration.  Appx14218-14219.  Alcha argues that Commerce should have applied the 13 percent rate that it reported was paid on primary aluminum purchases.  Alcha Br. at 27-30.  As demonstrated below, Commerce's use of the 17 percent rate is supported by substantial record evidence and otherwise in accordance with law.

A.    Background

In the underlying investigation, Commerce found the program for government provision of primary aluminum for less than adequate remuneration to be countervailable, Appx1088, and was "not reevaluating the countervailability of this program" in this review.  Appx1142; Appx1229.  Nonetheless, Commerce requested information to "determine the extent to which {Alcha} used this program during this review period."  Appx1142.  To calculate the benefit resulting from the government of China's providing primary aluminum for less than adequate remuneration, Commerce applied a "tier two" analysis pursuant to 19 C.F.R. § 351.511(a)(2)(ii), by seeking "to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  *Id.*; *see also* Appx13887.

In conducting this analysis, Commerce relied on "a data submission from the domestic industry" containing "United Nations International Trade Statistics Database (Comtrade) data specific to several tariff numbers for primary aluminum."  Appx13887.  "To calculate the benefit during each month of the {period of review, Commerce} calculated monthly, weighted-average

benchmark prices based on Comtrade data for {Harmonized Tariff Schedule} subheadings 7601.10 and 7601.20." Appx14004.  Commerce "adjusted the benchmark price to include delivery charges, import duties, and VAT pursuant to 19 {C.F.R. §} 351.511(a)(2)(iv)."[16] Appx13917.  Because the government of China did not provide the official VAT rates for primary aluminum, Commerce used the 17 percent rate reported by the government of China in the investigation.  Appx14005 & n.42; Appx83778-83779; *see also* Appx14195, Appx14217-14219 (IDM reflecting no change with respect to the 17 percent VAT rate).  The 17 percent rate was placed on the record in this proceeding by Alcha.  Appx83778-83779.[17]

B.    Substantial Evidence Supports Commerce's Use Of The 17 Percent VAT Rate

Alcha challenges the use of the 17 percent rate, arguing that it amounts to an application of adverse facts available, and that the 13 percent VAT rate included in Alcha's Excel spreadsheet of primary aluminum purchases is more accurate.  Alcha Br. at 29-30.  Both

---

[16] Section 351.511(a)(2)(iv) provides that "{i}n measuring adequate remuneration under paragraph . . . (a)(2)(ii) of this section," Commerce "will adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product," including "delivery charges and import duties."  19 C.F.R. § 351.511(a)(2)(iv).

[17] Alcha placed on the record of this review the calculations for the first administrative review, the review immediately preceding the review at issue, in an Excel spreadsheet.  The relevant section of the spread sheet included the following sentence:

> Because we did not receive a questionnaire response from the government of China, we have used . . . VAT rate from the China Aluminum Sheet CVD Investigation."  *See Common Alloy Aluminum Sheet From the People's Republic of China:  Preliminary Affirmative Countervailing Duty (CVD) Determination, Alignment of Final CVD Determination With Final Antidumping Duty Determination, and Preliminary CVD Determination of Critical Circumstances*, 83 FR 17651 (April 23, 2018), and accompanying preliminary determination memorandum at 50 (unchanged in final).

Appx83779.  The spreadsheet used the 17 percent VAT rate for the primary aluminum calculations in the first administrative review.  Appx83778-83779.  Because of the limited size of these two charts, which fit on a single page each, Commerce was able to convert these Excel spreadsheets to PDF for inclusion in the joint appendix.  *See* Appx83778-83779.

arguments are incorrect.  First, the 17 percent rate was not based on the application of any adverse inference; Commerce makes no reference to using an adverse inference in determining to use the 17 percent VAT rate.  Appx14219.  Instead, as Commerce explained in the final results, "the 17 percent VAT rate . . . was provided by the {government of China} in the underlying investigation and is on the record of this administrative review."  Appx14219 (citation omitted); Appx14218.  Because the 17 percent rate reflects the last official government VAT rate for primary aluminum on the record, Commerce reasonably used it as facts available. Appx14218-14219.

Alcha nevertheless claims that Commerce was required to use the 13 percent rate reported in an Excel spreadsheet for Alcha's domestic purchases of primary aluminum during the period of review.  *See* Appx14004 (stating that Alcha reported purchasing "domestically produced primary aluminum"); Appx81884, Appx81887, Appx81890 (records from Jiangsu Alcha); Appx81896, Appx81898, Appx81900, Appx81902, Appx81904 (records from affiliate labeled as Baotou Alcha) (all reflecting payment of a VAT rate of 13% on primary aluminum purchases).  As Commerce explained, however, when constructing a benchmark from world market prices under section 351.511(a)(2)(ii), section 351.511(a)(2)(iv) directs Commerce to "'adjust the comparison price to reflect the price that a firm actually paid or would pay if it *imported* the product,' including delivery charges and import duties."  Appx14219 (quoting 19 C.F.R. § 351.511(a)(2)(iv)) (emphasis in IDM).  "As long as VAT and import duties are reflective of what an importer—and not necessarily the respondent specifically—would have paid, then it is appropriate to include the VAT and duties in {the} benchmark."  Appx14219. Alcha failed to "provide a convincing argument that justifies" a VAT rate other than 17 percent "for *imports* of primary aluminum."  Appx14219 (emphasis in IDM).  Thus, Commerce was not

required to use Alcha's reported 13 percent rate, and instead reasonably used the 17 percent rate, which is the only evidence on record reflecting the benchmark VAT amount for imports of primary aluminum.

Finally, Alcha has failed to exhaust its current argument that the Chinese government changed its VAT rate to 13 percent, based on newly submitted information from a website. Alcha Br. at 30 (citing Tax System, State Taxation Administration of the People's Republic of China).[18]  "{A}bsent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal BV v. United S*tates, 502 F.3d 1370, 1379 (Fed. Cir. 2007); 28 U.S.C. § 2637(d).  "The case brief must present all arguments that continue in the submitter's view to be relevant to {Commerce's} final determination." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1366 (Fed. Cir. 2015) (quoting 19 C.F.R. § 351.309(c)(2)).

Despite this exhaustion requirement, Alcha "did not provide any documents {before Commerce} demonstrating that the {government of China} had changed the 17 percent VAT rate{.}" Appx14219.  In its case brief, Alcha relied upon only its Excel spreadsheet reflecting the rate it actually paid for domestic purchases of primary aluminum during the period of review. *See* Appx83577 (citing Appx81881-81904).  Alcha failed to present to Commerce the information from the website on which it now relies, thereby denying Commerce the first opportunity to address that information.  *See Carpenter Tech. Corp. v. United States*, 30 C.I.T. 1373, 1374–75 (2006) (citing *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (explaining that exhaustion "allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review," thereby "advancing the twin purposes of protecting

---

[18]  Citing http://www.chinatax.gov.cn/eng/c101270/c101271/c5157953/content.html.

administrative agency authority and promoting judicial efficiency").  Alcha thus failed to exhaust

its administrative remedies with respect to any claim that the newly submitted website reflects

the official Chinese VAT rate for imports during the relevant period.

Alcha's reliance on an extra-record website is impermissible for the additional reason that

it relies on evidence outside of the administrative record, contrary to the Court's statutory

standard of review.[19]  To be considered on the administrative record, Commerce requires that

parties submit PDF copies of webpages so that they can become a static part of the

administrative record.  *See generally*, 19 C.F.R. § 351.303.  Commerce also imposes time limits

on the submission of new factual information.  19 C.F.R. § 351.301(c).  The information in this

website has not been vetted through the administrative process, and neither Commerce nor the

other interested parties had the opportunity to test the veracity of this data or address it in the

final results.  Alcha had the opportunity to place this information on the record in this proceeding

in a timely fashion but failed to do so.

In sum, the only benchmark VAT rate on the record for imports of primary aluminum is

the government of China's reported 17 percent VAT rate from the investigation, and Commerce

reasonably used that rate in establishing a benchmark for primary aluminum.  Appx14219.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain the final results.

---

[19]  The statute, in relevant part, defines the administrative record under review for Commerce's countervailing duty determinations as "a copy of all information presented to or obtained by . . . , the administering authority{Commerce} . . . *during the course of the administrative proceeding . . .*".  19 U.S.C. 1516a(b)(2)(A) (emphasis added).

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

/s/ Emma E. Bond
EMMA E. BOND
DAVID RICHARDSON
Senior Counsel
Office of the Chief Counsel
    for Trade Enforcement & Compliance
U.S. Department of Commerce

Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480
Washington, DC 20044
(202) 305-2034
Email: emma.e.bond@usdoj.gov

July 10, 2023

Attorneys for Defendant

44

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 12,875 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Emma E. Bond

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| JIANGSU ALCHA ALUMINUM CO., LTD., AND ALCHA INTERNATIONAL HOLDINGS LTD., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) )  Court No. 22-00290 |
| UNITED STATES, | ) ) |
| Defendant, | ) ) ) |
| and | ) ) |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, | ) ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the agency record filed by plaintiffs, all responses thereto, the administrative record, and other pertinent papers, it is hereby

ORDERED that the motion is DENIED; and it is further

ORDERED that the Department of Commerce's final results in this matter are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____, 2023
      New York, NY                                                _____
                                                               JUDGE