## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

———————————————————————
)
**JIANGSU ALCHA ALUMINUM CO., LTD.,** )
**and ALCHA INTERNATIONAL HOLDINGS** )
**LIMITED,** )
)
        **Plaintiffs,** )
)
   **v.** )    **Court No. 22-00290**
)
**UNITED STATES,** )
)
        **Defendant,** )
)
   **and** )
)
**ALUMINUM ASSOCIATION COMMON** )
**ALLOY ALUMINUM SHEET TRADE** )
**ENFORCEMENT WORKING GROUP and** )
**ITS INDIVIDUAL MEMBERS,** )
)
        **Defendant-Intervenors.** )
———————————————————————)

### DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

**JOHN M. HERRMANN**
**PAUL C. ROSENTHAL**
**JOSHUA R. MOREY**
**MALIHA KHAN**
**KELLEY DRYE & WARREN LLP**
**3050 K Street, N.W., Suite 400**
**Washington, DC 20007**
**(202) 342-8400**

**Counsel to Defendant-Intervenors**

Dated:  August 21, 2023

**Table of Contents**

**Page**

I.  STATEMENT PURSUANT TO RULE 56.2 ......................................................................1

II. ISSUES PRESENTED ON APPEAL AND SUMMARY OF ARGUMENT ...................................................................................................................2

    1.  Did Commerce properly apply adverse facts available with respect to the Export Buyer's Credit Program? ...........................................2

    2.  Did Commerce properly apply a 17 percent value-added tax rate in calculating the benchmark for the Chinese government's provision of primary aluminum for less than adequate remuneration? ...................................................................................3

III. STANDARD OF REVIEW ..........................................................................................3

IV. STATEMENT OF FACTS ...........................................................................................3

V.  ARGUMENT ...............................................................................................................3

    A.  Commerce's Decision to Apply Adverse Facts Available With Respect to the Export Buyer's Credit Program Is Supported by Substantial Evidence and in Accordance With Law ...................................3

        1.  Legal Standard and Agency Precedent .......................................4

        2.  Commerce's Application of Adverse Facts Available With Respect to the Export Buyer's Credit Program Was Warranted Due to the Government of China's Withholding Necessary Information .................................................................8

    B.  Commerce's Decision to Apply a 17 Percent Value-Added Tax Rate in Calculating the Benchmark for the Government of China's Provision of Primary Aluminum for Less Than Adequate Remuneration Is Supported by Substantial Evidence and Otherwise in Accordance with Law ...............................................................14

        1.  Legal Standard and Agency Precedent .....................................14

        2.  Commerce Correctly Used the 17 Percent Value-Added Tax Rate Provided by the Government of China ......................................15

VI. CONCLUSION ..........................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Beijing Tianhai Indus. Co. v. United States,
   52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) ...........................................................15

Branco Peres Citrus v. United States,
   173 F. Supp. 2d 1363,1376 (Ct. Int'l Trade 2001) ...................................................5

Canadian Solar, Inc. v. United States,
   23 F.4th 1372 (Fed. Cir. 2022) ............................................................................7, 8

Carpenter Tech. Corp. v. United States,
   519 F. Supp. 3d 1340 (Ct. Int'l Trade 2021) ...........................................................6

Clearon Corp. v. United States,
   474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) ........................................................7, 9

Cooper Kunshan Tire Co. v. United States,
   539 F. Supp. 3d 1316 (Ct. Int'l Trade 2021), aff'd upon remand, Cooper
   Kunshan Tire Co., Ltd. v. United States, 610 F. Supp. 3d 1287 (Ct. Int'l Trade
   2022) ..................................................................................................................8

Corinth Pipeworks Pipe Indus. SA v. United States,
   Slip Op. 23-65, 2023 Ct. Intl Trade LEXIS 66 (Apr. 28, 2023) ...............................6

Fine Furniture (Shanghai) Ltd. v. United States,
   748 F.3d 1365 (Fed. Cir. 2014)............................................................................16

Fine Furniture (Shanghai) Ltd. v. United States,
   865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012) ("Fine Furniture") ............................17

Fujian Yinfeng Imp & Exp Trading Co. v. United States,
   Slip Op. 22-107, 2022 Ct. Intl. Trade LEXIS 106 (Sept. 13, 2022) .........................8

Guizhou Tyre Co., Ltd. v. United States,
   389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) .........................................................15

Hyundai Steel Co. v. United States,
   319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) .........................................................17

Mid Continent Nail Corp. v. United States,
   949 F. Supp. 2d 1247 (Ct. Int'l Trade 2013) .........................................................17

Nan Ya Plastics Corp. v. United States,
   810 F.3d 1333 (Fed. Cir. 2016)............................................................................13

Nippon Steel Corp. v. United States,
337 F.3d 1373 (Fed. Cir. 2003)........................................................................5, 6

Shandong Huarong Gen. Group Corp. v. United States,
27 CIT 1568, 2003 Ct. Int'l Trade LEXIS 153 (2003) ..............................................5

Tianjin Mach. Imp. & Exp. Corp. v. United States,
353 F. Supp. 2d 1294 (Ct. Int'l Trade 2004), aff'd without op. 2005 U.S. App.
LEXIS 23,082 (Fed. Cir. Oct. 11, 2005).................................................................6

Özdemir Boru San. ve Tic. Ltd. Sti. v. United States,
273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ....................................................6, 7

## Statutes and Regulations

19 C.F.R. § 351.511(a)(2)(ii) ...........................................................................15

19 C.F.R. § 351.511(a)(2)(iv) ..........................................................................15

19 U.S.C. § 1677(5)(E)(iv) ..............................................................................14

19 U.S.C. § 1677e(a)(1)-(2)...........................................................................4, 8

19 U.S.C. § 1677e(b)(1)(B) ...............................................................................7

19 U.S.C. § 1677e(d) .........................................................................................7

19 U.S.C. § 1677m(e) ........................................................................................5

Tariff Act of 1930 Section 776(a)(1)-(2) .............................................................4

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362, 384
(2015)..............................................................................................................7

## Legislative

Statement of Administrative Action accompanying the Uruguay Round
Agreements Act, H.R. Doc. No. 316, 103d Cong., 2d Session (1994),
reprinted in 1994 U.S.C.C.A.N. 4040...................................................................6

## Administrative Determinations

Common Alloy Aluminum Sheet From the People's Republic of China: Final
Results of Countervailing Duty Administrative Review; 2020, 87 Fed. Reg.
54,462 (Dep't Commerce Sept. 6, 2022) ("Final Results") and the
accompanying Issues and Decision Memorandum for the Final Results of the
Countervailing Duty Administrative Review of Common Alloy Aluminum
Sheet from the People's Republic of China; 2020 (Dep't Commerce Aug. 30,
2022) ("IDM") ............................................................................................ passim

Countervailing Duty Investigation of Chlorinated Isocyanurates from the People's
    Republic of China: Issues and Decision Memorandum for the Final
    Determination (Dep't Commerce Sept. 8, 2014) ("Chlorinated Isocyanurates
    from China") ....................................................................................................10, 11

Issues and Decision Memorandum for the Final Determination in the
    Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells,
    Whether or Not Assembled Into Modules, from the People's Republic of
    China (Dep't Commerce Oct 9, 2012) ("Solar Cells from China").........................10

Issues and Decision Memorandum for the Final Results of the 2017-2018
    Countervailing Duty Administrative Review of Cast Iron Soil Pipe Fittings
    from the People's Republic of China (Dep't Commerce Jan. 27, 2021) .................................15

Issues and Decision Memorandum for the Final Results of the Countervailing
    Duty Administrative Review: Citric Acid and Certain Citrate Salts; 2012
    (Dep't Commerce Dec. 22, 2014) ("Citric Acid from China") ...................................11, 12, 13

Notice of Final Determination of Sales at Less Than Fair Value: Static Random
    Access Memory Semiconductors from Taiwan, 63 Fed. Reg. 8,909, (Dep't
    Commerce Feb. 23, 1998)...........................................................................................6

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("CIT") and this Court's Scheduling Order dated January 27, 2023 (ECF No. 26), Defendant-Intervenors, the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members, Arconic Corporation; Commonwealth Rolled Products Inc.; Constellium Rolled Products Ravenswood, LLC; Jupiter Aluminum Company; JW Aluminum Company; and Novelis Corporation ("Defendant-Intervenors"), submit this brief in response to the Motion for Judgment on the Agency Record and Memorandum in Support (ECF No. 29) (hereinafter, "Alcha Br.") filed on behalf of Plaintiffs Jiangsu Alcha Aluminum Co., Ltd. and Alcha International Holdings Limited (collectively, "Plaintiffs" or "Alcha"). This brief seeks to supplement arguments made by Defendant United States in its response brief and to avoid repetition of points already addressed by Defendant. See Defendant's Response in Opposition to Plaintiffs' Motion for Judgment On the Agency Record (ECF No. 31) (hereinafter, "Def. Br.").

## I.     STATEMENT PURSUANT TO RULE 56.2

The administrative determination challenged by Alcha is the final results of the United States Department of Commerce's ("Commerce") first administrative review of the countervailing duty order on common alloy aluminum sheet from the People's Republic of China ("China"). See Common Alloy Aluminum Sheet From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020, 87 Fed. Reg. 54,462 (Dep't Commerce Sept. 6, 2022) (hereinafter, "Final Results") (PR 173) (Appx14242-14243),[1] Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative

---

[1]     Documents in the administrative record are cited by their confidential and/or public record number (i.e., "(CR __)" and "(PR __)") provided in the Index to the Administrative Record filed with the Court on December 19, 2022 (ECF No. 20).

<u>Review of Common Alloy Aluminum Sheet from the People's Republic of China; 2020</u> (Dep't

Commerce Aug. 30, 2022) (hereinafter, "<u>IDM</u>") (PR 170) (Appx14186-14233).

## II.    <u>ISSUES PRESENTED ON APPEAL AND SUMMARY OF ARGUMENT</u>

Plaintiffs challenge two aspects of the <u>Final Results</u>.   <u>See</u> Alcha Br. at 9-11 (ECF No.

29).  For the reasons that follow, this Court should reject each of Plaintiffs' arguments.

### 1.    <u>Did Commerce properly apply adverse facts available with respect to the Export Buyer's Credit Program?</u>

Yes.  Alcha's challenge to Commerce's application of adverse facts available ("AFA")

with respect to the Export Buyer's Credit Program ("EBCP") fails for the following reasons.

First, necessary information about the operation and administration of the EBCP is missing from

the record of the underlying proceeding because the Government of the People's Republic of

China ("GOC"), the only party with access to that information, withheld information relevant to

Commerce's analysis of the program that was specifically requested by the agency.  The GOC's

refusal to provide information required by Commerce to analyze the EBCP created gaps in the

record warranting application of facts available.  Furthermore, by failing to respond to any of

Commerce's inquiries seeking information needed for its analysis, the GOC failed to cooperate

to the best of its ability and significantly impeded Commerce's conduct of the proceeding,

warranting the agency's use of adverse inferences in the application of facts available.  Second,

there was no information on the record that Commerce could use to fill the gap created by the

GOC's failure to cooperate because Alcha failed to provide any evidence to substantiate its

purported non-use of the program.  Thus, Commerce was unable to verify Alcha's claims and

properly relied on adverse facts available in determining a program-specific margin for the

EBCP in the <u>Final Results</u>.

2. **Did Commerce properly apply a 17 percent value-added tax rate in calculating the benchmark for the Chinese government's provision of primary aluminum for less than adequate remuneration?**

Yes.  Alcha's challenge to Commerce's use of a 17 percent value-added tax ("VAT") rate in the benchmark calculation of the government provision of primary aluminum for less than adequate remuneration ("LTAR") fails because Commerce correctly relied on the only VAT rate on the record of the underlying proceeding.  Alcha failed to substantiate that the 13 percent rate that it argued Commerce should have used instead was a reliable rate.

## III.   STANDARD OF REVIEW

Defendant-Intervenors incorporate by reference the Defendant's recitation of the standard of review applicable in this action.  See Def. Br. at 13-14 (addressing the standard of review) (ECF No. 31).

## IV.   STATEMENT OF FACTS

Defendant-Intervenors incorporate by reference the Defendant's recitation of the applicable facts.  See Def. Br. at 3-12 (reciting the facts relevant to the issues before this Court) (ECF No. 31).

## V.   ARGUMENT

A. **Commerce's Decision to Apply Adverse Facts Available With Respect to the Export Buyer's Credit Program Is Supported by Substantial Evidence and in Accordance With Law**

In addition to the arguments presented below, Defendant-Intervenors support and incorporate by reference the points made in Defendant's response brief.  See generally Def. Br. at 13-38 (ECF No. 31).  In the IDM accompanying the Final Results, Commerce explained that (1) information concerning the operation and administration of the EBCP is missing from the record; (2) the missing information was necessary to verify Alcha's claims of non-use; (3) agency officials specifically requested the missing information from the GOC; and (4) the GOC,

the only party with access to this necessary information, withheld the information requested by

the agency.  Commerce explained that the GOC's failure to provide the necessary information

created gaps in the record that could not be filled by any other record information, warranting

application of facts available – and that the GOC's complete failure to respond to Commerce's

inquiries demonstrated a failure to cooperate to the best of its ability, warranting the application

of adverse inferences.  Therefore, Commerce appropriately explained its finding that application

of adverse facts available was warranted with respect to the EBCP.

1.      **Legal Standard and Agency Precedent**

Section 776(a)(1)-(2) of the Tariff Act of 1930, as amended, (the "Act"), requires

Commerce to resort to facts available if (1) necessary information is not available on the record

or (2) an interested party:

(A)      withholds information that has been requested by Commerce;

(B)      fails to provide such information by the deadlines established, or in the
form and manner requested;

(C)      significantly impedes a proceeding; or

(D)      provides information that cannot be verified.

See 19 U.S.C. § 1677e(a)(1)-(2).  Furthermore, if Commerce determines "that an interested party

has failed to cooperate by not acting to the best of its ability to comply with a request for

information," the agency "may use an inference that is adverse to the interests of that party in

selecting from among the facts otherwise available."  Id. § 1677e(b)(1).

Despite the existence of any deficiency, Commerce must consider the submitted

information if it: (1) was submitted by the established deadline, (2) "can be verified," (3) "is not

so incomplete that it cannot" be used, (4) demonstrates the interested party acted "to the best of

its ability" in submitting the information and meeting applicable requirements, and (5) "can be used without undue difficulties."  19 U.S.C. § 1677m(e).

If, however, a party's remedy of or explanation for a deficiency is untimely or insufficient and does not satisfy any one of the five requirements necessary for consideration, the statute authorizes Commerce to "disregard all or part of the original and subsequent responses." Id. § 1677m(d).

In addressing this provision of the statute, the Court has found that:

> {S}ection 1677m(e) is, on its face, inapplicable in situations where … a party has failed to "demonstrate { } that it acted to the best of its ability in providing the information and meeting the requirements established by {Commerce} with respect to the information."

Branco Peres Citrus v. United States, 173 F. Supp. 2d 1363,1376 n.7 (Ct. Int'l Trade 2001); see also Shandong Huarong Gen. Group Corp. v. United States, 27 CIT 1568, 1581-82, 2003 Ct. Int'l Trade LEXIS 153 at *31-32 (2003).

The United States Court of Appeals for the Federal Circuit ("CAFC") has held that a party's compliance with the statute's "best of its ability" standard is determined by assessing whether the party has put forth its maximum effort to provide Commerce with "full and complete" answers to all inquiries in a proceeding.  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  This includes providing complete, accurate, and timely responses to Commerce's requests for information.  See id.  Moreover, Commerce need not identify intentional non-cooperation on the part of the respondent before relying on an adverse inference in applying facts available.  See, e.g., Corinth Pipeworks Pipe Indus. SA v. United States, Slip Op. 23-65 at 22, 2023 Ct. Intl Trade LEXIS 66 at *28 (Apr. 28, 2023) ("Intent is irrelevant when determining whether a respondent has cooperated to the best of its ability.")

(citing <u>Nippon Steel</u>, 337 F.3d at 1383); <u>Tianjin Mach. Imp. & Exp. Corp. v. United States</u>, 353 F. Supp. 2d 1294, 1305 (Ct. Int'l Trade 2004), <u>aff'd without op.</u> 2005 U.S. App. LEXIS 23,082 (Fed. Cir. Oct. 11, 2005).  While intentional conduct like "deliberate concealment or inaccurate reporting" "surely evinces a failure to cooperate," conduct marked by "inattentiveness and carelessness" is similarly censured under the statute's adverse facts available provision.  <u>Nippon Steel</u>, 337 F.3d at 1382-83; <u>see also</u> <u>Tianjin Machinery</u>, 353 F. Supp. 2d at 1305.

The statutory purpose of the adverse facts available provision is to ensure "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 316, 103d Cong., 2d Session (1994) at 870, <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4201.  In selecting among possible sources of information, Commerce's practice is to select such information that is:

> sufficiently adverse so as to effectuate the statutory purposes of the adverse facts available rule to induce respondents to provide the Department with complete and accurate information in a timely manner.

<u>Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors from Taiwan</u>, 63 Fed. Reg. 8,909, 8,932 (Dep't Commerce Feb. 23, 1998); <u>see also</u> <u>Özdemir Boru San. ve Tic. Ltd. Sti. v. United States</u>, 273 F. Supp. 3d 1225, 1245 (Ct. Int'l Trade 2017); <u>Carpenter Tech. Corp. v. United States</u>, 519 F. Supp. 3d 1340, 1347 (Ct. Int'l Trade 2021).  Moreover, the statute provides that Commerce

> is not required to determine, or make any adjustments to, a countervailable subsidy rate . . . based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.

19 U.S.C. § 1677e(b)(1)(B).  The Court has noted that

> under the plain text of 19 U.S.C. § 1677e(d), added to the statute by the TPEA {Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362, 384 (2015), at § 502(1)}, Commerce has broad discretion to 'use a countervailing subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country' and to 'apply any of the countervailable subsidy rates or dumping margins specified under that paragraph, including the highest such rate or margin.'"

Özdemir Boru San. ve Tic. Ltd. Sti., 273 F. Supp. 3d at 1244.

The courts have affirmed Commerce's use of adverse facts available in countervailing duty proceedings "where a foreign government is the primary possessor of information about, e.g., governmental loan programs even when it has an adverse impact on a cooperative respondent." Clearon Corp. v. United States, 474 F. Supp. 3d 1339, 1343 (Ct. Int'l Trade 2020) (citing Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1371, 1373 (Fed. Cir. 2014)). In Canadian Solar, Inc., the CAFC sustained a CIT decision affirming Commerce's finding that Canadian Solar received a regionally-specific electricity subsidy. In addressing Commerce's reliance on adverse facts available, the CAFC stated:

> To understand whether Canadian Solar received electricity subsidies, Commerce sent questionnaires to the government of China. Among other things, Commerce requested provincial price proposals, descriptions of how the National Development and Reform Commission (NDRC) is involved in electricity price-setting, and an explanation of how electricity pricing is responsive to market variables. The parties do not dispute that the government of China declined to provide complete responses to Commerce's inquiries. Because, in Commerce's view, the government of China "failed to cooperate by not acting to the best of its ability to comply" with Commerce's request and because the requested information was "key to {Commerce's} understanding of the {government of China's} role in establishing electricity prices at the local provincial level," Commerce applied adverse facts available to conclude that Canadian Solar received a countervailable subsidy through below-market electricity prices.

Canadian Solar, Inc. v. United States, 23 F.4th 1372, 1376 (Fed. Cir. 2022) (internal citations omitted).

The courts have also affirmed Commerce's finding of a benefit conferred on a respondent based on adverse facts available as a result of the government's failure to cooperate.  In Cooper Tire II, the CIT affirmed Commerce's finding on remand that the respondents used and benefitted from the EBCP based on adverse facts available due to the GOC's failure to respond to Commerce's requests for information.  See Cooper Kunshan Tire Co. v. United States, 539 F. Supp. 3d 1316, 1324, 1327 (Ct. Int'l Trade 2021) ("Cooper Tire I"), aff'd upon remand, Cooper Kunshan Tire Co., Ltd. v. United States, 610 F. Supp. 3d 1287 (Ct. Int'l Trade 2022) ("Cooper Tire II"); see also Fujian Yinfeng Imp & Exp Trading Co. v. United States, Slip Op. 22-107 at 11-15, 2022 Ct. Intl. Trade LEXIS 106 at *10-15 (Sept. 13, 2022) (affirming Commerce's application of adverse facts available to the respondent based on the Chinese government's failure to provide information about its EBCP).

**2.      Commerce's Application of Adverse Facts Available With Respect to the Export Buyer's Credit Program Was Warranted Due to the Government of China's Withholding Necessary Information**

In the underlying administrative proceedings, Commerce appropriately found that application of adverse facts available was warranted with respect to the EBCP.  Commerce's application of facts available is warranted when necessary information is not available on the record or an interested party withholds information requested by the agency.  See 19 U.S.C. § 1677e(a)(1)-(2).  Additionally, use of adverse inferences is warranted when an interested party fails to cooperate by not acting to the best of its ability to comply with a request for information. Id. § 1677e(b)(1).   In the underlying proceeding, Commerce explained why both factors warranting the application of facts available were satisfied.  Commerce also explained that the GOC's complete failure to respond to any of Commerce's requests for information regarding the EBCP warranted the use of adverse inferences.

In conducting countervailing duty proceedings, Commerce requests information from the relevant government authorities regarding the operation of government subsidy programs relevant to the production of subject merchandise.  In the underlying proceedings at issue here, Commerce requested information from the GOC regarding numerous subsidies, including the EBCP – a state-subsidized loan program administered by the Export-Import Bank of China ("China Ex-Im Bank").  See Commerce's May 20, 2021 Letter to the GOC re: Administrative Review of the Countervailing Duty Order on Common Alloy Aluminum Sheet from the People's Republic of China: Countervailing Duty Questionnaire, at II-14 - II-15, III-15 - III-16 ("Initial Questionnaire") (PR 15) (Appx1062-1170); see also Clearon Corp., 474 F. Supp. 3d at 1343 (internal citation omitted).  Under the EBCP, the GOC provides credit at preferential rates to foreign purchasers of goods exported by Chinese companies.  See Clearon Corp., 474 F. Supp. 3d at 1343.

In its initial questionnaire, Commerce requested that the GOC provide a description of the program and the application process; program eligibility criteria; program usage data; a description of the agencies and types of records maintained for administration of the program; translated copies of the laws and regulations pertaining to the program; identities of any third-party banks involved in the disbursement of buyer's credits through the program; and copies of internal guidelines believed to have revised certain aspects of the EBCP in 2013.  See Initial Questionnaire at II-14 - II-15 (PR 15) (Appx1062-1170).  The GOC did not respond to any of Commerce's questions and, thus, failed to meet the standard of participating to the best of its ability.

In its issues and decision memorandum, Commerce explained the evolution of its understanding of the operation of the EBCP based on information provided by the GOC in other

proceedings.  See IDM at Comment 1 (PR 170) (Appx14186-14233).  Commerce explained that it first investigated and found the EBCP to be countervailable in the less-than-fair-value investigation of Solar Cells from China, based (among other things) on the China Ex-Im Bank's 2010 annual report which demonstrated that the credits provided under this program are medium- to long-term loans with preferential rates.  See id. (citing Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, at Comment 18 (Dep't Commerce Oct 9, 2012) ("Solar Cells from China")).  While the GOC did respond to Commerce's questionnaires in the solar cell investigation, it failed to provide any of the information Commerce requested about the EBCP. See id.  Commerce's understanding of the EBCP at that point was that "loans were provided directly from the China Ex-Im Bank to the borrowers (i.e., a respondent's customers) with no involvement of third parties, such as exporters or third-party banks."  Id.  Based on that understanding, Commerce made clear "that the only way to establish non-use of the program was through the GOC and not the respondents."  Id.

Commerce also explained that a couple of years after the Solar Cells from China investigation, in the less-than-fair-value investigation of Chlorinated Isocyanurates from China, Commerce was presented with the first instance of respondents submitting certified statements from customers claiming non-use of the EBCP.  See id. (citing Countervailing Duty Investigation of Chlorinated Isocyanurates from the People's Republic of China: Issues and Decision Memorandum for the Final Determination, at 14-15 (Dep't Commerce Sept. 8, 2014) ("Chlorinated Isocyanurates from China")).  In that investigation, Commerce found that because the respondents' customers were participating, "verification of non-use appeared to be possible

through examining the financial statements and books and records of the U.S. customers for evidence of loans provided directly from the China Ex-Im Bank to the U.S. customers." Id. Therefore, even though Commerce was unable to conduct a verification of non-use at the China Ex-Im Bank, it was able to conduct verification of the customers' accounting and financial records and confirm that no loans were received under this program.  See id.

Shortly after Commerce completed that investigation, in the 2012 administrative review of the countervailing duty order on Citric Acid from China,

> Commerce began to gain a better understanding of how the China Ex-Im Bank issued disbursement of funds and the corresponding timeline; however, Commerce's attempts to verify the program's details and statements from the GOC concerning the operation and use of the program were thwarted by the GOC.

Id. (citing Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review: Citric Acid and Certain Citrate Salts; 2012, at Comment 6 (Dep't Commerce Dec. 22, 2014) ("Citric Acid from China")).

In subsequent proceedings, based on new information obtained in the Citric Acid from China administrative review, Commerce asked the GOC to explain certain changes to the EBCP, including the 2013 change that "eliminated the $2 million minimum business contract requirement."  Id.  The GOC provided insufficient responses to Commerce's questions and refused to provide a copy of the 2013 internal guidelines of the China Ex-Im Bank.  Id. Consequently, Commerce found that the GOC withheld critical information about how the program now operates and that the GOC's responses were incomplete and unverifiable.  Id. Additionally, Commerce explained that because it now had "information on the record that demonstrates the GOC updated certain measures of the program," for which it failed to provide details, Commerce could no longer "rely on declarations from customers claiming non-use of the program."  Id.

-11-

After explaining the evolution of its understanding of the operation of the EBCP, Commerce explained in the underlying proceeding why it was necessary that the GOC, as "the only party that can answer questions about the internal administration of this program," provide information requested by Commerce regarding the EBCP. Id. Specifically, Commerce explained that without the necessary information from the GOC about the operation of the program, Commerce was unable to verify non-use of the EBCP by analyzing the U.S. customers' books and records. See id. Commerce provided a detailed explanation of why there was a gap in the record, stating:

> In short, because the GOC failed to provide Commerce with information necessary to identify a paper trail of a direct or indirect export credit from the China Ex-Im Bank, we would not know what to look for behind each loan in attempting to identify which loan was provided by the China Ex-Im Bank via a correspondent bank under the EBC program. This necessary information is missing from the record because such disbursement information is only known by the originating bank, the China Ex-Im Bank, which is a government-controlled bank. Without cooperation from the China Ex-Im Bank and/or the GOC, we cannot know the banks that could have disbursed export buyer's credits to the company respondent's customers. Therefore, there are gaps in the record because the GOC refused to provide the requisite disbursement information.

> Additionally, Commerce finds that it is not possible to determine whether export buyer's credits were received with respect to the export of aluminum sheet because the potential recipients of export buyer's credits are not limited to the mandatory respondents' customers, as such credits may be received by other third-party banks and institutions. . . Essentially, Commerce is unable to verify in a meaningful manner what little information there is on the record indicating non-use, pursuant to section 776(a)(2)(D) of the Act, with the exporters, U.S. customers, or at the China Ex-Im Bank itself given the refusal of the GOC to provide requested information regarding this program related to the POR, including, for example, a complete list of correspondent/partner/intermediate banks.

Id.  Commerce also addressed why the information requested from the GOC was necessary to determine non-use of the EBCP and explained that because Alcha did not provide non-use certificates from its U.S. customers, Commerce did not take further steps to confirm that Alcha's customers did not, in fact, receive export buyer's credits.  See id.

Commerce, therefore, sufficiently explained why necessary information was not available on the record and why the GOC's act of withholding this necessary information created a gap in the record that was not filled with any other information provided by Alcha.  Notably, the CAFC has held that "the burden of creating an adequate record lies with interested parties and not with Commerce."  Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016) (alterations in original) (quoting QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citations omitted)); see also Cooper II, 610 F. Supp. 3d at 1317.  Thus, because neither the GOC nor Alcha provided the Department with information necessary to establish that the EBCP was not used during the period of review, Commerce reasonably relied on facts available with an adverse inference.

Based on these circumstances, this Court should affirm Commerce's finding that the GOC's failure to provide necessary information about the EBCP created a gap in the record that prevented Commerce from verifying non-use of the EBCP by the respondent's U.S. customer and warranted application of facts available.  Moreover, because the GOC completely failed to respond to Commerce's requests for information relevant to the operation of the EBCP, this Court should affirm Commerce's finding that application of adverse inferences is warranted.

**B.** **Commerce's Decision to Apply a 17 Percent Value-Added Tax Rate in Calculating the Benchmark for the Government of China's Provision of Primary Aluminum for Less Than Adequate Remuneration Is Supported by Substantial Evidence and Otherwise in Accordance with Law**

In addition to the arguments presented below, Defendant-Intervenors support and incorporate by reference the points made in Defendant's response brief.  See generally Def. Br. at 39-43 (ECF No. 31).  In the underlying administrative proceedings, Commerce used a 17 percent VAT rate in calculating the benchmark for the Government of China's provision of primary aluminum for LTAR.  See IDM at Comment 2 (PR 170) (Appx14186-14233).  Alcha argues that Commerce's use of the 17 percent VAT rate provided by the GOC in the investigation of Common Alloy Aluminum Sheet from China was based on AFA, and that Commerce should have used the 13 percent VAT rate that Alcha actually reported paying.  See Alcha Br. at 27-30 (ECF 29).  Alcha's arguments are wrong and should be rejected by this Court.

### 1. Legal Standard and Agency Precedent

In accordance with section 771(5)(E)(iv) of the Act, Commerce evaluates the adequacy of remuneration based on the prevailing market condition in the country subject to investigation or review.  See 19 U.S.C. § 1677(5)(E)(iv).  Further, while Commerce typically seeks to measure the adequacy of remuneration by comparing the government price with a market-determined price from actual transactions in the country, Commerce has recognized that a foreign government's involvement in the domestic market can result in a significant distortion that necessitates the use of world market prices.  See, e.g., Guizhou Tyre Co., Ltd. v. United States, 389 F. Supp. 3d 1315, 1324 (Ct. Int'l Trade 2019) (internal citations omitted); see also 19 C.F.R. § 351.511(a)(2)(ii).  These world market prices are used as benchmarks for evaluating whether a government provided a good for LTAR.

Pursuant to 19 C.F.R. § 351.511(a)(2)(iv), Commerce adjusts benchmark prices to include delivery charges and import duties that an importer would pay in order to arrive at the "delivered price" for a particular good.  The CIT has previously found that the inclusion of VAT in such a calculation is appropriate.  See Beijing Tianhai Indus. Co. v. United States, 52 F. Supp. 3d 1351, 1372-75 (Ct. Int'l Trade 2015).  Commerce's practice is to use the VAT rate provided by the governing authority responsible for setting the VAT rate.  See, e.g., Issues and Decision Memorandum for the Final Results of the 2017-2018 Countervailing Duty Administrative Review of Cast Iron Soil Pipe Fittings from the People's Republic of China, at Comment 1 (Dep't Commerce Jan. 27, 2021) ("Wor-Biz provided no explanation for why the VAT rate for certain purchases during the POR differed from the VAT rate provided in the GOC's response.  Accordingly, we are continuing to use the VAT rate for ferrous scrap provided by the GOC in the benchmark for the ferrous scrap for LTAR program benefit calculation because the GOC is the authority responsible for setting the VAT rate...").

### 2. Commerce Correctly Used the 17 Percent Value-Added Tax Rate Provided by the Government of China

In its issues and decision memorandum, Commerce explained that it used the 17 percent VAT rate provided by the GOC in the underlying investigation because the "GOC is the authority responsible for setting the VAT rate and it has impeded our ability to analyze this program by not responding to the questions regarding this program in the Initial CVD Questionnaire."   IDM at Comment 2 (PR 170) (Appx14186-14233).   Commerce further explained that:

> {T}he Alcha Group provided no explanation why the VAT rate for certain purchases during the POR differed from the VAT rate provided in the GOC's response in the investigation.  While the respondent listed the VAT rates they reportedly paid on purchases of primary aluminum, they failed to provide documentation that would support their argument that the VAT rate for imports of

-15-

> primary aluminum was not 17 percent during the POR (*e.g.*, invoices, customs documents, decrees from the GOC, *etc.*).

Id.  Commerce also explained that the 17 percent rate was not selected as an AFA rate, but that, as facts available, Commerce relied on the rate provided by the governing authority, i.e., the GOC, in the underlying investigation, just like it did in the preceding administrative review.  See id.

Alcha argues that because Commerce's use of the 17 percent rate (rather than the 13 percent rate provided by Alcha) negatively affected Alcha, the use of the 17 percent rate was, in effect, based on AFA.  See Alcha Br. at 29 (ECF 29).  In support, Alcha cites Fine Furniture, which states that Commerce is expected to consider evidence placed on the record by respondents for benchmark calculations and that "if an alternative benchmark meeting such criteria were available on the record and did not adversely affect a cooperative party, such a benchmark would be superior to one which does adversely affect a cooperative party."  Id. (citing Fine Furniture (Shanghai) Ltd. v. United States, 865 F. Supp. 2d 1254, 1262 (Ct. Int'l Trade 2012) ("Fine Furniture").  Alcha's argument, however, ignores the rest of the Court's determination in Fine Furniture with respect to this issue, which is highly relevant.  Specifically, as stated by the Court, "{t}he problem for Fine Furniture is that there is no such benchmark on the record in this case."  Fine Furniture, 865 F. Supp. 2d at 1262.  Similarly here, in the underlying administrative proceedings, there was no other usable benchmark on the record.  Commerce sufficiently explained that the 13 percent VAT rate reported by Alcha was unreliable because Alcha failed to provide any supporting documentation for that rate.  See IDM at Comment 2 (PR 170) (Appx14186-14233).

Furthermore, Alcha's untimely inclusion of factual information regarding the 13 percent VAT rate in its memorandum in support of its Rule 56.2 motion for judgment on the agency

record is unacceptable and should be rejected by this Court.  <u>See</u> Alcha Br. at 30 (ECF 29).  As the Defendant explains, "Alcha failed to exhaust its current argument that the Chinese government changed its VAT rate to 13 percent, based on newly submitted information from a website."  <u>See</u> Defendant Br. at 42 (ECF No. 31).  Alcha failed to submit this information on the record of the underlying administrative proceeding, "thereby denying Commerce the first opportunity to address that information."  <u>Id.</u> (internal citations omitted).  As the Court has stated, "{i}ssues that are not addressed in an administrative case brief filed with the agency are generally deemed abandoned."  <u>Mid Continent Nail Corp. v. United States</u>, 949 F. Supp. 2d 1247, 1261 n.10 (Ct. Int'l Trade 2013).  Furthermore, the Court has made clear that Commerce must base its decision on the record before it, and not information located outside of the record.  <u>See</u>, <u>e.g.</u>, <u>Hyundai Steel Co. v. United States</u>, 319 F. Supp. 3d 1327, 1342 n.13 (Ct. Int'l Trade 2018) ("Commerce must base its decisions on the record before it in each individual investigation.") (citation omitted).  The information cited by Alcha is information that is not on the record of the underlying proceeding.  The Court should, therefore, reject this "extra-record" information submitted outside the time limits for submission of new factual information.  <u>Id.</u> at 43.

Commerce's decision is consistent with the statute, the agency's regulations, and its administrative practice.  Accordingly, this Court should reject Alcha's arguments and affirm Commerce's use of the 17 percent VAT rate in the benchmark calculations for the government provision of primary aluminum for LTAR.

## VI.   <u>CONCLUSION</u>

For these reasons, Defendant-Intervenors respectfully urge this Court to: (1) find that Commerce's findings in the <u>Final Results</u> with respect to the Export Buyer's Credit Program and the Government Provision of Primary Aluminum for Less Than Adequate Remuneration are

supported by substantial evidence and are otherwise in accordance with law, and (2) sustain the

<u>Final Results</u> in their entirety.

Respectfully submitted,

/s/  John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
MALIHA KHAN
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated: August 21, 2023

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's Order dated January 27, 2023 (ECF No. 26), setting the word limitation to the response brief of Defendant-Intervenors, the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members, Arconic Corporation; Commonwealth Rolled Products Inc.; Constellium Rolled Products Ravenswood, LLC; Jupiter Aluminum Company; JW Aluminum Company; and Novelis Corporation ("Defendant-Intervenors") to 10,000 words, counsel for Defendant-Intervenors certifies that the attached Response Brief contains 5,222 words, including footnotes.  The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,


 /s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
MALIHA KHAN
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated:  August 21, 2023