Slip Op. No. 24-77

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| JIANGSU ALCHA ALUMINUM CO., LTD. and ALCHA INTERNATIONAL HOLDINGS LTD., | |
| *Plaintiffs,* | |
| v. | Before: Stephen Alexander Vaden, Judge |
| UNITED STATES, | |
| *Defendant,* | Court No. 1:22-cv-00290 (SAV) |
| *and* | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, | |
| *Defendant-Intervenors.* | |

## <u>OPINION</u>

[Sustaining Commerce's Final Determination and Denying Plaintiffs' Motion for Judgment on the Agency Record.]

Dated:  July 11, 2024

*Weronika Bukowski*, Crowell & Moring, LLP, of New York, NY, for Plaintiffs Jiangsu Alcha Aluminum Co., Ltd. and Alcha International Holdings Ltd.  With her on the brief was *Daniel J. Cannistra*, of Washington, DC.

*Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, and *David W. Richardson*, Of Counsel, Department of Commerce, Office of Chief Counsel for Trade Enforcement & Compliance.

*Maliha Khan*, Kelley Drye & Warren, LLP, of Washington, DC, for Defendant-Intervenors Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members. With her on the brief was *John M. Herrmann*, *Paul C. Rosenthal*, and *Joshua R. Morey*.

**Vaden, Judge**: This case is about how one party's failure to participate in an administrative review can adversely affect another cooperating party. The Department of Commerce (Commerce) investigated aluminum sheet from China and issued a countervailing duty order. In the second administrative review of that order, Commerce chose Jiangsu Alcha Aluminum Co., Ltd. and its affiliated trading company (collectively, Alcha) as mandatory respondents. Commerce sent questionnaires to Alcha and the Chinese government requesting information about China's Export Buyer's Credit Program and China's provision of primary aluminum for less than adequate remuneration. Alcha answered, but China did not. In its Final Results, Commerce calculated a countervailing duty rate for Alcha including percentages based on Alcha's use of the Export Buyer's Credit Program and purchase of primary aluminum for less than adequate remuneration. Alcha claims that Commerce's findings were not supported by substantial evidence and asks this Court to remand the case back to the agency. This Court finds that Commerce committed no error in concluding that Alcha benefitted from the Export Buyer's Credit Program because neither China nor Alcha put verifiable evidence on the record to support

Alcha's claimed non-use.  The Court also finds that Commerce properly relied on data China had provided in the underlying investigation to calculate the benefit conferred on Alcha from its purchases of primary aluminum.  Although Alcha submitted data about its primary aluminum purchases, Commerce could not rely on it because the data failed to meet regulatory requirements.  Therefore, Commerce's final determination is **SUSTAINED**; and Alcha's Motion for Judgment on the Agency Record is **DENIED**.

## BACKGROUND

In 2018, Commerce conducted a countervailing duty investigation on aluminum sheet from China. *Countervailing Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China:  Final Affirmative Determination*, 83 Fed. Reg. 57,427 (Dep't of Com. Nov. 15, 2018).  It found that both the Export Buyer's Credit Program and the Chinese government's provision of primary aluminum for less than adequate remuneration were countervailable subsidies.  *See generally id.* at 57,429.  In February 2019, Commerce published a corresponding countervailing duty order (Order).  *Common Alloy Aluminum Sheet from the People's Republic of China:  Countervailing Duty Order*, 84 Fed. Reg. 2,157 (Dep't of Com. Feb. 6, 2019).  Two years later, Commerce initiated the Second Administrative Review of that Order.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews* (Notice of Initiation), 86 Fed. Reg. 17,124 (Dep't of Com. Apr. 1, 2021).  The period of review was January 1, 2020 through December 31, 2020. *Id.* at 17,135.

## Commerce's Questionnaires

Commerce selected Jiangsu Alcha Aluminum Co., Ltd. and its affiliated trading company[1] as mandatory respondents for individual examination in the Second Administrative Review.[2]  *Id.*  Commerce sent initial questionnaires to both China and Alcha, requesting information about government subsidies from which Alcha may have benefitted.  China Questionnaire, J.A. at 1,083, ECF No. 36; Alcha Initial Questionnaire, J.A. at 1,132, ECF No. 36.  China did not respond.  Issues and Decisions Memorandum (Dep't of Com. Aug. 31, 2022) (IDM) at 21, J.A. at 14,206, ECF No. 36.  Alcha answered and addressed the two subsidy programs at issue in this case:  (1) China's Export Buyer's Credit Program and (2) China's provision of primary aluminum for less than adequate remuneration.  Initial Questionnaire Resp. at 18–20, 27–29, J.A. at 80,056–58, 80,065–67, ECF No. 37.

First, Alcha denied that it or its sole U.S. customer used the Export Buyer's Credit Program.  *Id.* at 28–29, J.A. at 80,066–67.  The Export Buyer's Credit Program is a loan program intended to support the export of certain Chinese goods and services.  Initial Questionnaire Resp., Ex. 50 (2000 Regulations), J.A. at 81,983, ECF

---

[1] Alcha International Holdings Limited (Alcha International) is an affiliated trading company of Jiangsu Alcha Aluminum Co., Ltd. (Jiangsu Alcha).  Issues and Decisions Memorandum (Dep't of Com. Aug. 31, 2022) (IDM) at 2, J.A. at 14,187, ECF No. 36.  Jiangsu Alcha also cross-owns Baotou Alcha Aluminum Co. Ltd. and Jiangsu Alcha New Energy Materials Co., Ltd.  *Id.* at 2 n.4.  For convenience, the Court will refer to both Plaintiffs — Alcha International and Jiangsu Alcha — as simply "Alcha."

[2] Commerce also selected Yinbang Clad Material Co., Ltd. (Yinbang) as a mandatory respondent.  Notice of Initiation, 86 Fed. Reg. at 17,135.  Yinbang filed suit in this Court, and the Court consolidated its action with Alcha's.  ECF No. 26.  Yinbang later voluntarily dismissed its suit.  *Yinbang Clad Metal Material Co. v. United States*, No. 22-291, ECF No. 28.

No. 37. It allows a non-Chinese borrower who participates in the program to obtain a loan at a preferential interest rate from a Chinese bank. *Id.*, J.A. at 81,984–86. The borrower must then use the loan to buy goods or services from Chinese exporters. *Id.*, J.A. at 81,983–84.

In its initial questionnaire response, Alcha attached a copy of the Export Buyer's Credit Program's regulations issued in 2000. *Id.*, J.A. at 81,982. The 2000 Regulations state that the Export and Import Bank of China is the exclusive issuer of credit to Export Buyer's Credit Program users. *Id.*, J.A. at 81,986 ("China Eximbank shall disburse the loan to the borrower as prescribed in the loan agreement."). The Regulations also set a $2 million minimum threshold for underlying contracts and require the exporter under the commercial contract to buy export credit insurance. *Id.*, J.A. at 81,984.

Alcha proffered evidence to show that it did not benefit from the Export Buyer's Credit Program. It offered its own declaration stating it "did not receive the benefit under the Export Buyer's Credit[] [P]rogram during the [period of review]" and "did not provide any kind of assistance to [its] U.S. customers in obtaining export buyer credits." Initial Questionnaire Resp. at 28–29, J.A. at 80,066–67, ECF No. 37. Alcha also offered its sole customer's uncertified declaration. Alcha stated it asked its "U.S. customer[] whether they had used the Export Buyer[']s Credit [Program] during the [period of review]," and "[t]he customer[] confirmed that they did not." *Id.* at 29, J.A. at 80,067. Alcha also asserted it did not purchase export credit insurance as required by the 2000 Regulations. *Id.*

Second, Alcha claimed that the value added tax rate for its purchases of primary aluminum was thirteen percent.[3] *See id.* at 18–19, J.A. at 80,056–57; Initial Questionnaire Resp., Exs. 39–40, J.A. at 81,881–04, ECF No. 37. A value added tax is "a consumption tax placed on a product whenever value is added at each stage of the supply chain, from production to the point of sale." *Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, 44 CIT __, 435 F. Supp. 3d 1273, 1274 n.1 (2020). Commerce accounts for this tax when calculating the benefit conferred on a respondent that purchases goods from a foreign government for less than adequate remuneration. *See* 19 C.F.R. § 351.511(a)(2)(iv) (directing Commerce to "adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product").

Alcha stated that it and one of its affiliates purchased primary aluminum from China during the period of review. Initial Questionnaire Resp. at 18, J.A. at 80,056, ECF No. 37. It attached two spreadsheets to its initial response and explained that the spreadsheets depict all the primary aluminum purchases Alcha and its affiliate made during the period. *Id.* at 18–19, J.A. at 80,056–57 (citing Exs. 39–40, J.A. at 81,881–904, ECF No. 37). Alcha recorded a value added tax rate of thirteen percent

---

[3] The parties bracketed the spreadsheets providing the thirteen percent value added tax rate in the confidential joint appendix. *See* Initial Questionnaire Resp., Exs. 39–40, J.A. at 81,881–904, ECF No. 37. However, the parties waived any confidentiality claim by referring to the thirteen percent rate in their public briefs and in open court. *Compare CVB, Inc. v. United States*, 48 CIT __, 681 F. Supp. 3d 1314, 1317–19 (2024) (refusing to redact information for similar reasons), *with* Fed. Cir. R. 25.1(c) ("Material will lose its status … if and when it … has appeared in a filing without being marked confidential."), Pls.' Br. at 27, ECF No. 29, Def's Resp. at 40, ECF No. 31, Def.-Int.'s Br. at 14, ECF No. 32, *and* Oral Arg. Tr. at 40:25–41:1, ECF No. 42 (all referring to the thirteen percent figure in public court filings or a public court proceeding).

for each purchase. *See, e.g.*, Initial Questionnaire Resp., Exs. 39–40, J.A. at 81,881–904, ECF No. 37. It further stated that it was "not aware of any trade publications which specify the prices of the input within China and on the world market." Initial Questionnaire Resp. at 19, J.A. at 80,057, ECF No. 37.

Commerce sent several supplemental questionnaires to Alcha, which it answered. *See, e.g.*, Second Suppl. Questionnaire Resp., J.A. at 82,154, ECF No. 37; Sixth Suppl. Questionnaire Resp., J.A. at 83,450, ECF No. 37. Those questionnaires did not ask about the Export Buyer's Credit Program or the value added tax rate for primary aluminum, and Alcha provided no further information about either before Commerce published its Final Results.

## The Final Results

On March 4, 2022, Commerce published its Preliminary Results. *Common Alloy Aluminum Sheet from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review*, 87 Fed. Reg. 12,429 (Dep't of Com. Mar. 4, 2020). Commerce then published its Final Results on September 6, 2022, *Common Alloy Aluminum Sheet from the People's Republic of China: Final Results of Countervailing Duty Administrative Review*, 87 Fed. Reg. 54,462 (Sept. 6, 2022), along with its accompanying Issues and Decisions Memorandum, J.A. at 14,186–233, ECF No. 36. It assessed a total subsidy rate of 17.8 percent to Alcha. Final Results, 87 Fed. Reg. at 54,463.

The total subsidy rate included a 2.57 percent rate based on Commerce's conclusion that Alcha benefitted from the Export Buyer's Credit Program. *See* IDM

at 11, J.A. at 14,196, ECF No. 36.  Commerce explained that necessary information was missing from the record because of China's nonparticipation, and Commerce was therefore unable to verify whether Alcha used the program.  *Id.* at 21, J.A. at 14,206. The agency found it appropriate to apply facts available with an adverse inference against China for failing to cooperate to the best of its ability.  *Id.* at 29, J.A. at 14,214.

Commerce concluded that the 2000 Regulations Alcha provided were outdated because China previously indicated that the Export Buyer's Credit Program's operations changed in 2013.  *Id.* at 19, J.A. at 14,204.  In an unrelated investigation, China revealed that Export and Import Bank's 2013 internal guidelines were a key document governing the Export Buyer's Credit Program.  *Id.* at 19–20, J.A. at 14,204– 05.  China refused to provide a copy of the new guidelines in that investigation claiming they were "internal to the bank," but its questionnaire responses indicated that the 2013 guidelines made important changes to how the program operates.  *Id.* Commerce believes that the 2013 guidelines may have eliminated the $2 million contract minimum and allowed for disbursement of funds through third-party banks. *Id.*

Here, China once again failed to provide the 2013 guidelines; and Alcha only submitted the 2000 Regulations.  Commerce explained that, without the 2013 guidelines and China's answers to its questions regarding third-party bank involvement, it could not verify the customer's non-use declaration.  *Id.* at 24–27, J.A. at 14,209–12.  If it attempted verification, Commerce reasoned, it would have no way of knowing for what banks to look in the customer's records because the Export

Buyer's Credit Program loans might not come from the Export and Import Bank. *Id.* at 24, J.A. at 14,209. Even if it did know for what banks to look, verification would be "meaningless" because Commerce did not know what underlying documentation to request absent more guidance from China regarding the loan's expected paper trail. *Id.* at 27, J.A. at 14,212. Commerce also observed that the customer declaration Alcha submitted was uncertified, making it "especially true" that Commerce could not complete a meaningful verification. *Id.* at 28–29, J.A. at 14,213–14 ("The narrative response [Alcha] provided … falls short of the type of certifications … provided by U.S. customers in other proceedings involving this program."). Based on these findings, Commerce concluded that (1) China failed to act to the best of its ability and created a gap in the record through its nonparticipation, (2) the gap could not be filled by the customer's uncertified declaration, and (3) it was appropriate to rely on facts available with an adverse inference. *Id.* at 29, J.A. at 14,214.

Commerce also assessed a 7.81 percent rate for China's provision of primary aluminum for less than adequate remuneration. *Id.* at 10, J.A. at 14,195. It used a value added tax rate of seventeen percent to make its calculation. *Id.* at 33–34, J.A. at 14,218–19. Commerce explained that China provided the seventeen percent tax rate in the underlying investigation and Alcha "ha[d] not provided any evidence to demonstrate that [China] has changed the … rate …." *Id.* at 33, J.A. at 14,218. Commerce acknowledged that Alcha reported paying a lower rate. *Id.* However, the only support Alcha offered to back that claim was its internal spreadsheets, which

Commerce deemed insufficient to refute the rate the Chinese government had previously provided. *Id.* at 33–34, J.A. at 14,218–19.

Commerce also relied on 19 C.F.R. § 351.511(a)(2)(iv), which says that Commerce "will adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product." *Id.* at 34, J.A. at 14,219. Under the regulation, the comparison price must be based on what a respondent would have paid for imported primary aluminum; and Alcha's suggested thirteen percent rate did not comply with the regulation because it was not based on imports. *Id.* Finally, Commerce denied that its use of the seventeen percent rate was an application of facts available with an adverse inference, reasoning that the rate was information on the record and Alcha's alternative rate was unsupported. *Id.* at 33, J.A. at 14,218.

### The Present Dispute

Alcha filed its Complaint against the United States on November 7, 2022. Compl., ECF No. 9. It raises two issues. First, it claims Commerce's finding that Alcha benefitted from the Export Buyer's Credit Program is not supported by substantial evidence. *Id.* ¶¶ 13–14. Second, it alleges Commerce improperly applied facts available with an adverse inference to find Alcha purchased primary aluminum at a value added tax rate of seventeen percent. *Id.* ¶¶ 16–17. The Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members (the Association) intervened as Defendant-Intervenors to support Commerce's determination. Order Granting Intervention, ECF No. 17.

### A.

Alcha filed a Motion for Judgment on the Agency Record pursuant to USCIT Rule 56.2, reiterating its two claims.  Pls.' Mem. in Supp. of Mot. for J. on Agency R. (Pls.' Br.), ECF No. 29.  Alcha makes three arguments to support its non-use claim regarding the Export Buyer's Credit Program.  First, it argues that the Tariff Act of 1930 requires Commerce to affirmatively determine whether a financial contribution was provided to Alcha *before* it can find Alcha benefitted from the program.  *Id.* at 13–16 (citing 19 U.S.C. § 1677(5)(B)).  Because the record does not contain positive evidence proving participation, Alcha argues Commerce's finding of a benefit is not supported by substantial evidence.  *Id.* at 14.  Alcha asserts that Commerce owed it a "meaningful opportunity" to verify its non-use claims, which Commerce could have provided by issuing supplemental questionnaires about the Export Buyer's Credit Program or attempting to verify the information Alcha did submit.  *Id.* at 15–16 (citing *Yama Ribbons and Bows Co. v. United States* (*Yama I*), 43 CIT __, 419 F. Supp. 3d 1341, 1356 (2019)); Pls.' Reply at 4, ECF No. 33.  Moreover, Alcha argues that Commerce's treatment of the Export Buyer's Credit Program is unfair because Commerce permits respondents denying participation in other contexts to simply "state that they did not use the program." Pls.' Br. at 14–15, ECF No. 29.

Second, Alcha argues that this Court has repeatedly rejected the reasoning Commerce supplied in its Issues and Decisions Memorandum, and nothing in this case justifies a different outcome.  *Id.* at 16–25.  Alcha characterizes Commerce's analysis as a conflation of the operation and use of the Export Buyer's Credit Program

that ignores the relevant question of whether record evidence shows that Alcha benefitted from the program. *Id.* at 18–19; Pls.' Reply at 2–3, ECF No. 33. Plaintiff outlines this Court's prior cases dealing with the program, opining that the Court has sometimes found reasoning similar to that offered here was unsupported by substantial evidence because it focused on the innerworkings of the program instead of the actual evidence submitted. Pls.' Br. at 19–24, ECF No. 29. Alcha does acknowledge that this case is "somewhat different" than others because China "did not respond … at all" to Commerce's request for information. *Id.* at 17. Nonetheless, it claims Commerce erred by applying facts available with an adverse inference instead of using the evidence of non-use Alcha submitted. *Id.* at 19 (citing *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372 (Fed. Cir. 2014)) (affirming Commerce's findings where it "did not apply adverse inferences to substitute for any information that was actually submitted by the cooperating respondents").

Third, Alcha argues that Commerce's practice of requiring a respondent to provide non-use certifications from all its customers before Commerce will send supplemental questionnaires or attempt verification is unsupported by substantial evidence. *Id.* at 25–27; Pls.' Reply at 4–6, ECF No. 33. Alcha claims a respondent could "eliminate[] any gap in the record" by providing other relevant information even if it does not submit a certification from every one of its customers. Pls.' Br. at 27, ECF No. 29 (quoting *Risen Energy Co. v. United States*, 47 CIT __, No. 20-3912, 2023 Ct. Int'l Trade LEXIS 52, at *11 (Apr. 11, 2023)). Therefore, Alcha reasons,

Commerce's practice improperly requires certifications by ignoring other information a respondent could provide.  *Id.*

Alcha also argues that Commerce's selection of a seventeen percent value added tax rate to calculate the benchmark for its purchases of primary aluminum was an improper use of selecting facts available with an adverse inference.  *Id.* at 27–30.  Alcha cites case law that directs Commerce to use information "available on the record" that "d[oes] not adversely affect a cooperative party" when possible.  *Id.* at 29 (quoting *Fine Furniture (Shanghai) Ltd. v. United States*, 36 CIT 1206, 1212 (2012) *aff'd*, 748 F.3d 1365, 1372 (Fed. Cir. 2014)).  It claims that Commerce erred by ignoring the thirteen percent rate Alcha put on the record and selecting a higher, non-neutral rate from the underlying investigation instead.  *Id.* at 28–29; Pls.' Reply at 6–7, ECF No. 33.  Even if Commerce's rate selection was neutral, Alcha argues that Commerce should have given it the opportunity to supplement the record so that Commerce could make the most accurate finding.  Pls.' Br. at 29–30, ECF No. 29 (explaining that the applicable value added tax rate would have been "easily verifiable" because China's schedule for these rates is public).

## B.

The Government responds that substantial evidence supports Commerce's determination.  First, regarding the Export Buyer's Credit Program, the Government acknowledges that Commerce is "expected to consider" evidence a cooperating party has submitted that would fill the gap created by a non-cooperating party.  Def.'s Resp. to Mot. for J. on Agency R. (Def.'s Resp.) at 21, ECF No. 31 (quoting *GPX Int'l Tire*

*Corp. v. United States*, 37 CIT 19, 58–59 (2013)).   Nonetheless, it says Commerce is

not obligated to verify information "so incomplete as to be unreliable."   *Id.* (quoting

*Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1089 (Fed. Cir.

2021)).   The Government claims Alcha submitted exactly the kind of information the

Federal Circuit described as unverifiable because "[a]bsent the information withheld

by …China, Commerce 'would be unable to confirm usage or claimed non-use by

examining books and records which can be reconciled to audited financial statements

or other documents ….'"   *Id.* at 22 (quoting IDM at 25, J.A. at 14,210, ECF No. 36).

The Government cites for support Commerce's finding that it does not know for what

banks to look in the customer's records or what documentation to request without

more guidance from China.   *Id.* at 21–22 (citing to IDM at 25, J.A. at 14,210, ECF No.

36).   Because only China could provide the necessary information and China chose

not to participate, the Government argues that Commerce had no obligation to

attempt verification of Alcha's incomplete information.   *Id.* at 19–22, ECF No. 31.

The Government also rejects Alcha's argument that Commerce improperly

conflated operation of the Export Buyer's Credit Program with use of the program.

Instead, the Government says Commerce "explained why an understanding of the

program['s] operation is necessary to *verify* Alcha's blanket and unsupported claims

of non-use."   *Id.* at 29.   The agency described how not knowing the relevant bank

names, the expected paper trail, and a general roadmap for the loan disbursements

would impede its verification process.   *Id.* at 27–30.   Therefore, Commerce's purpose

for seeking that information was "to confirm non-use," not merely to understand the
program's operations. *Id.* at 29.

Turning to this Court's caselaw, the Government argues that Commerce
complied with past CIT opinions concerning the Export Buyer's Credit Program. The
Government cites this Court's opinion in *Cooper (Kunshan) Tire Co. v. United States*
(*Cooper Tire II*) establishing a three-part test as a framework. *Id.* at 23–38 (citing 46
CIT __, 610 F. Supp. 3d 1287 (2022)). It claims that Commerce properly (1) identified
the gap in the record by explaining what information is missing, (2) explained why
the missing information was necessary to verify claims of non-use, and (3) showed
that only the missing information could fill the gap. *Id.* at 23–25 (citing *Cooper Tire
II*, 46 CIT __, 610 F. Supp. 3d at 1304). The Government says Commerce identified
the information China failed to provide — details about the program's operation, a
sample application and description of the expected paper trail, and the program's
governing laws and regulations. *Id.* at 25 (citing IDM at 19–26, J.A. at 14,204–11,
ECF No. 36); *see also* Def.-Int.'s Resp. to Mot. for J. on Agency R. (Def.-Int.'s Br.) at
9–13, ECF No. 32. Commerce then explained that it needed to know from which
banks the funds would be coming and what documentation to request to verify non-
use. Def.'s Resp. at 27–30, ECF No. 31 (citing IDM at 20, 22–27, J.A. at 14,205,
14,207–12, ECF No. 36). It finally showed why only the Chinese government could
explain the internal operations of the Export Buyer's Credit Program and provide the
requested information. *Id.* at 33–34 (citing IDM at 25, J.A. at 14,210, ECF No. 36)

(emphasizing that Alcha's customer — who is not a party to this case — receives the loan, not Alcha).

Next, the Government argues that Commerce's decision to use the seventeen percent value added tax rate for Alcha's primary aluminum purchases is supported by substantial evidence. The Government asserts that Commerce did not apply an adverse inference by selecting the seventeen percent rate. *Id.* at 40–41. Instead, Commerce chose the seventeen percent rate — the last official government rate placed on the record — from neutral facts otherwise available. *Id.* at 41. The applicable regulation requires Commerce to construct a benchmark price that reflects "the price that a firm actually paid or would pay if it *imported* the product." *Id.* (quoting 19 C.F.R. § 351.511(a)(2)(iv)). Commerce could not use Alcha's alternative rate, the Government explains, because that rate was based exclusively on Alcha's domestic purchases of primary aluminum. *Id.* at 41–42.

The Court held oral argument on March 22, 2024. ECF No. 40. There, Alcha's counsel conceded that the thirteen percent value added tax rate Alcha put on the record covered domestic purchases of primary aluminum, not imports. Oral Arg. Tr. at 40:7–14, ECF No. 42 (The Court: "[W]hat did your client actually provide [Commerce] with regard to its invoices, books, and records? Were there any imports in there or not?" Alcha's Counsel: "… I don't believe so." The Court: "You don't believe there were any imports in there?" Alcha's Counsel: "Yes."). Alcha also admitted that its customer's uncertified denial and the twenty-four-year-old regulations are the only record evidence supporting its claim not to have used the

Export Buyer's Credit Program. *Id.* at 9:13–10:6 (in response to the Court's questioning, confirming this to be the case). Plaintiffs' Motion is now ripe for decision.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c), which grants the Court exclusive jurisdiction over final countervailing duty determinations. The Court must set aside any of Commerce's "determination[s], finding[s], or conclusion[s]" found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i). "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New Am. Keg v. United States*, No. 20-00008, 45 CIT __, 2021 Ct. Intl. Trade LEXIS 34 at *15 (Mar. 23, 2021). Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966)).

When reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); s*ee also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described

"substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

The parties ask this Court to answer two questions. First, the Court considers whether Commerce acted unlawfully when it found that Alcha benefitted from the Export Buyer's Credit Program despite Alcha's claim to the contrary. Second, the Court considers whether Commerce properly relied on data China provided in the underlying investigation to calculate the benefit conferred on Alcha from its purchases of primary aluminum. For the reasons explained below, the Court finds that Commerce supported its determinations on both issues with substantial evidence.

## I.     The Export Buyer's Credit Program

The parties dispute whether Commerce supported its finding that Alcha benefitted from the Export Buyer's Credit Program with substantial evidence. Alcha claims Commerce owed it a meaningful opportunity to verify its non-use claims. Pls.' Br. at 14–16, ECF No. 29. In drawing an adverse inference against China, it asserts that Commerce improperly harmed Alcha, a cooperating party, and ignored information Alcha submitted. *Id.* at 19. It also argues that this Court's caselaw supports its position because the Court has required Commerce to attempt verification where respondents did not provide non-use certifications from all their

customers.  *Id.* at 27.  The Government responds that it had no duty to attempt verification because the information Alcha submitted was "unverifiable and incomplete."  Def.'s Resp. at 21, ECF No. 31 (citing IDM at 15–29, J.A. at 14,200–14, ECF No. 36).  It relies on caselaw from the Federal Circuit to reject Alcha's "collateral impact" claims.  *Id.* at 18.  Further, the Government claims that nearly all the caselaw Alcha cites from this Court is distinguishable because (1) the respondents in those cases provided certifications from their customers or (2) China participated.  *Id.* at 22–23, 30–32.

Alcha also argues that Commerce repeats a blunder it has made in several previous CIT cases by conflating operation of the Export Buyer's Credit program with use of the program.  Pls.' Br. at 16–25, ECF No. 29; Pls.' Reply at 2–3, ECF No. 33. Alcha points out that this Court has previously remanded cases where Commerce improperly focused on the innerworkings of the program instead of the actual evidence submitted.  Pls.' Br. at 19–24, ECF No. 29.  The Government replies that Commerce needed to understand the program's operation so that it could know what information was required for a complete verification.  Def.'s Resp. at 27–30, ECF No. 31.

Finally, Alcha claims that Commerce cannot require respondents who deny use of the Export Buyer's Credit program to provide more proof than respondents denying use of other programs.  Pls.' Br. at 14–15, ECF No. 29.  The Government responds that Commerce's differential treatment is appropriate.  Def.'s Resp. at 36–37, ECF No. 31.  It explains that, unlike other programs, the Export Buyer's Credit Program

provides loans to a respondent's customer, meaning the respondent would likely not possess the sort of information Commerce needs to complete verification. *Id.*

## A.

China's Export Buyer's Credit program is by no means a new issue for this Court. Since 2012, many trees have given their lives debating whether Commerce properly supported its findings concerning the program or should have attempted verification. *See Fine Furniture*, 36 CIT at 1206. For those cases where parties provided non-use certifications and China confirmed non-use, the Court has ordered Commerce to attempt verification. *See, e.g.*, *Guizhou Tyre Co. v. United States*, 43 CIT __, 415 F. Supp. 3d 1335, 1340–44 (2019) (ordering Commerce "to attempt verification using all reasonable tools at its disposal" where respondent submitted non-use certifications and China confirmed that respondent's customers had not used the program); *Clearon Corp. v. United States*, 43 CIT __, 359 F. Supp. 3d 1344, 1359–60 (2019) (ordering Commerce to attempt verification where respondent submitted non-use certifications from its customers and China confirmed the non-use claims); *Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 46 CIT __, 557 F. Supp. 3d 1327, 1330–31, 1337 (2022) (ordering Commerce to "attempt to verify the non-use certifications" where customers submitted them and China confirmed that none of the customers used the program); *Risen Energy*, 47 CIT __, 2023 Ct. Intl. Trade LEXIS 52, at *12–14 (ordering Commerce to attempt verification where China participated and respondent provided non-use certifications and financial records

from half of its U.S. customers — that half making up about 95% of respondent's sales).

The Court has also required Commerce to make a new determination where the respondent failed to submit certified declarations of non-use, but China participated. *See Yama I*, 43 CIT __, 419 F. Supp. 3d at 1349–50, 1356. In *Yama I*, the respondent provided an uncertified non-use declaration on behalf of its customers. *Id.* at 1349. China claimed the Export and Import Bank "searched in its own systems [for] each of [the] customers identified" and found "that none of the customers had balances for export buyer's credits during the [period of review]." *Id.* at 1349. The Court found that Commerce erred in finding the respondent had used the program because there was record evidence to the contrary and ordered Commerce to make a new determination without resorting to adverse inferences. *Id.* at 1356. However, when the respondent and China both fall short, the Court has not required Commerce to attempt verification. *See Cooper Tire II*, 46 CIT __, 610 F. Supp. 3d at 1316–18 (sustaining Commerce's determination where respondents did not provide certifications or "actually state[] that their customers did not use the [Export Buyer's Credit Program]" and China did not provide the requested information); *see also Cooper (Kunshan) Tire Co. v. United States* (*Cooper Tire I*), 45 CIT __, 539 F. Supp. 3d 1316, 1328–31 (2021) (describing the facts of the case in greater detail).

The Federal Circuit has clarified verification's purpose. Commerce may use the verification process to check the accuracy of information the parties put on the record. *Hyundai,* 15 F.4th at 1089 ("Commerce's objective" is "to verify the accuracy

and completeness of submitted factual information under 19 C.F.R. § 351.307(d) ….").
It should *not* use verification as a fact-finding tool for discovering additional facts the
parties failed to put on the record. *Id.* at 1089–90. In other words, Commerce is not
required to spend its time attempting to check the accuracy of incomplete or
unverifiable information. *Id.* at 1089 ("Where necessary information is absent,
Commerce need not conduct a verification in an attempt to obtain the missing
information."). Verification is not the equivalent of discovery in civil cases. The
parties bear the burden to build an adequate record before the agency and suffer the
consequences should they fail to do so. *Qingdao Sea-Line Trading Co. v. United
States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

## B.

Alcha finds itself in a difficult position. China refused to participate in these
proceedings. Alcha did not place any certified statements on the record regarding its
sole customer's alleged non-use of the program. These facts distinguish Alcha's case
from the Court's prior cases and leave Alcha with little record evidence on which to
hang its hat. Considering that lack of verifiable evidence, the Court finds that
Commerce's determination concerning the Export Buyer's Credit Program is
supported by substantial evidence.

Because China refused to participate in the review, it is appropriate to draw
an adverse inference against China. When Commerce is missing information about
a subsidy like the Export Buyer's Credit Program, the countervailing duty statute

provides a two-part process to fill the gap.  19 U.S.C. § 1677e(a).  That statute enables

Commerce to use "facts otherwise available" in place of the missing information if:

> (1) necessary information is not available on the record, or
> (2) an interested party or any other person —
>> (A) withholds information that has been requested by [Commerce],
>> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested …
>> (C) significantly impedes a proceeding under this subtitle, or
>> (D) provides such information but the information cannot be verified[.]

*Id.*

Commerce may draw an adverse inference from those facts otherwise available

if "an interested party has failed to cooperate by not acting to the best of its ability to

comply with a request for information from [Commerce] …."  *Id.* § 1677e(b)(1).

Although they are often lumped together, § 1677e(a) and § 1677e(b) are separate

determinations that require distinct analyses.  *Shanghai Tainai Bearing Co. v.

United States*, 47 CIT __, 658 F. Supp. 3d 1269, 1282 (2023).  "Commerce first must

determine that it is missing necessary information; and, if it wishes to fill the

resulting gap with facts that reflect an adverse inference against an interested party,

Commerce must secondarily determine that the party has failed to cooperate by not

acting to the best of its ability."  *Id.* (citing *Zhejiang DunAn Hetian Metal Co. v.

United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011)).  For the purposes of these

determinations, a foreign government is considered an "interested party."  *See* 19

U.S.C. § 1677(9)(B) (defining "interested party" to include "the government of a

country in which such merchandise is produced or manufactured or from which such merchandise is exported").

Here, Commerce appropriately drew an adverse inference against China because China refused to answer any questions or otherwise participate in the investigation. Commerce satisfied the first part of the statute by identifying what necessary information is missing. *See* 19 U.S.C. § 1677e(a). It explained that it needed the names of the banks disbursing loans under the Export Buyer's Credit Program, the typical paper trail that a loan generates, and a general roadmap of loan disbursements to complete verification. IDM at 24–27, J.A. at 14,209–12, ECF No. 36. China did not provide this information, nor was it otherwise on the record. Whether because (i) necessary information was missing, § 1677e(a)(1); (ii) China withheld information Commerce requested, § 1677e(a)(2)(A); or (iii) China significantly impeded the review, § 1677e(a)(2)(C), the test was easily satisfied. The Court therefore finds that Commerce could legally use the facts otherwise available.

Commerce also satisfied the second part of the test because it has shown that China failed to act "to the best of its ability." *Shanghai Tainai*, 47 CIT __, 658 F. Supp. 3d at 1282 (citing *Zhejiang DunAn*, 652 F.3d at 1346). By failing to respond in any way to Commerce's inquiries, there can be no doubt China failed to put forth its "maximum effort" to comply. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) ("Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide

Commerce with full and complete answers ….").  Commerce was therefore free to draw an adverse inference against China.

The collateral harm to Alcha — a cooperating party — does not prevent Commerce from drawing an adverse inference.  The Federal Circuit has held that the "collateral impact on a cooperating party does not render the application of adverse inferences in a [countervailing duty] investigation improper."  *See Fine Furniture*, 748 F.3d at 1372 (citing *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010)).  *Fine Furniture* involved a similar situation also involving the government of China.  There, Fine Furniture complained that it was being impermissibly harmed by the collateral impact of drawing an adverse inference against the uncooperative Chinese government.  *Id.* at 1371.  The Federal Circuit rejected this argument, holding that "a remedy that collaterally reaches [the cooperating respondent] has the potential to encourage … China to cooperate so as not to hurt its overall industry." *Id.* at 1373.  The possibility of encouraging Chinese cooperation in future proceedings was enough to justify the collateral impact on the cooperating party.  "Although it is unfortunate that cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions, this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent."  *Id.* at 1373; *see also KYD*, 607 F.3d at 768 (explaining that Commerce's application of an adverse inference was "likely to have the effect of … inducing cooperation from" the non-cooperating party).  This holding is not without limits.  The Federal Circuit took notice that Commerce "did not apply

adverse inferences to substitute for any information that was actually submitted by the cooperating respondents" in that case. *Fine Furniture*, 748 F.3d at 1372.

  *Fine Furniture* governs here, and Commerce's actions fall within the bounds of its limitations.  Commerce did not "substitute for any information" Alcha "actually submitted" because the information Alcha submitted was not verifiable.  *Id.*; *see* 19 U.S.C. § 1677e(a)(2)(D) (providing for use of facts available when "information cannot be verified"); IDM at 28–29, J.A. at 14,213–14, ECF No. 36 ("Commerce is unable to verify in a meaningful manner the little information on the record indicating non-use ….").  Furthermore, the negative impact on China's aluminum sheet industry could encourage China to cooperate in the future.  *Fine Furniture*, 748 F.3d at 1372–73.  The Federal Circuit's holdings bind this Court and dispense with Alcha's claim that the collateral harm to it prevents Commerce from drawing an adverse inference against China.

  Common sense and civil trial practice also support this conclusion.  As our Court noted in another countervailing duty case where China refused to provide information, "[A] party with a motive to provide information favorable to it may be presumed to possess information adverse to it when it fails to produce the information …."  *GPX Int'l Tire*, 37 CIT at 58.  The use of an adverse inference to punish noncooperation is not unique to countervailing duty cases.  It is a general rule of evidence that a jury may draw an adverse inference against a party that fails to produce evidence.  *See* 2 McCormick on Evidence § 264 (8th ed. 2022) ("When it would be natural under the circumstances for a party to … produce documents or other

objects in his or her possession as evidence and the party fails to do so, tradition has allowed the adversary to use this failure as the basis for invoking an adverse inference."); *Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007) ("The general rules of evidence law create an adverse inference when evidence has been destroyed …."). The normal operation of the Federal Rules of Civil Procedure refutes the notion that Alcha is a victim of any unfairness. *Cf.* Fed. R. Civ. P. 37(e)(2)(B) (permitting a judge to "instruct the jury that it may or must presume the information was unfavorable to the party" failing to produce it).

Alcha further doomed its argument by failing to place on the record a certified statement of non-use from its sole U.S. customer. It therefore may not take advantage of rulings from this Court involving cases where such certified statements were filed. It must instead accept the record that it had the burden to develop. *See Nan Ya Plastics Corp. v. United State*s, 810 F.3d 1333, 1337–38 (Fed. Cir. 2016) (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)) ("[T]he burden of creating an adequate record lies with interested parties and not with Commerce."). Alcha submitted its sole U.S. customer's uncertified declaration of non-use and no evidence of its customer's books and records to support that bare assertion. Initial Questionnaire Resp. at 28–29, J.A. at 80,066–67, ECF No. 37. Paired with China's failure to participate, that record left Commerce with nothing to verify. *See Hyundai*, 15 F.4th at 1089 (holding that Commerce is not required to verify information "so incomplete as to be unreliable").

Finally, it makes no difference that Commerce requires less proof from respondents claiming non-use of other subsidy programs.  As the Government explains, a loan under the Export Buyer's Credit Program is not issued to the respondent but to the respondent's customer.  IDM at 21–22, J.A. at 14,206–07, ECF No. 36.  It follows that Commerce would either need the customer's data to verify non-use or an indication of the customer's willingness to participate in the administrative review via a certified declaration.  Where the customer refuses to take the minimal step to certify its non-use, the customer signals that it is unlikely to participate in the formal verification process.  *Cf. Both-Well (Taizhou)*, 46 CIT __, 557 F. Supp. 3d at 1335 (noting that "non-use certifications themselves suggest that the customers must have information that could be used to verify the non-use certifications.").  Commerce cannot be faulted for taking this signal at face value.

Whatever may be required of Commerce when a respondent provides customers' non-use certifications or the Chinese government responds to questionnaires, those cases offer Alcha no help.  Faced with a record containing only a bare assertion of non-use and no information from China, Commerce correctly resorted to using the facts otherwise available and to drawing an adverse inference when doing so.  Its determination on that basis is supported by substantial evidence, in compliance with the law, and **SUSTAINED**.

## II.    Less Than Adequate Remuneration for Primary Aluminum

The Court also sustains Commerce's use of a seventeen percent value added tax rate to calculate the benefit conferred on Alcha through its purchases of primary

aluminum from China. The regulation, 19 C.F.R. § 351.511(a)(2)(iv), requires Commerce to establish the value added tax rate based on what the respondent would have paid if it imported the aluminum. Here, Alcha submitted a rate based on its purchases of domestically produced aluminum, not imported aluminum. Alcha's suggested rate therefore does not meet the regulation's requirements, and Commerce properly used the seventeen percent rate for imported aluminum that China provided in the underlying investigation.

## A.

When a foreign government provides goods to a domestic company for less than adequate remuneration, Commerce may find that the provision of those goods is countervailable. 19 C.F.R. § 351.511(a)(1). Commerce will examine whether the foreign government provides the goods to the company at a price that falls below the market price in the relevant country. Sometimes, Commerce is unable to determine the relevant market price because "actual transactions" in that country are unavailable. *Id.* § 351.511(a)(2)(i). In such circumstances, Commerce will instead set a comparison price or benchmark based on a world market price that reasonably would be available to purchasers in the country at issue. *Id.* § 351.511(a)(2)(ii).

Commerce must adjust its benchmark to reflect what the foreign company "actually paid or would pay if it imported the product." *Id.* § 351.511(a)(2)(iv). Those adjustments should account for the "delivery charges and import duties" an importer would have paid such as a value added tax. *Id.* A value added tax is "a consumption tax placed on a product whenever value is added at each stage of the supply chain,

from production to the point of sale." *Jiangsu Zhongji*, 44 CIT __, 435 F. Supp. 3d at

1274 n.1. As with any other necessary information, Commerce may draw from the

facts otherwise available to fill gaps left by the parties. *See* 19 U.S.C. § 1677e(a)(1)

(allowing use of facts available if "necessary information is not available on the

record").

## B.

In the original investigation, China submitted evidence that the value added

tax rate for primary aluminum was seventeen percent. IDM at 33, J.A. at 14,218,

ECF No. 36. No party disputes that the seventeen percent tax rate is on the record

of this review. Pls.' Br. at 27–30, ECF. No. 29; Def.'s Resp. at 10–11, ECF No. 31;

Def.-Int.'s Br. at 15–17, ECF No. 32. In response to Commerce's initial questionnaire,

Alcha provided spreadsheets documenting its primary aluminum purchases during

the period of review. Initial Questionnaire Resp., Exs. 39–40, J.A. at 81,881–904,

ECF No. 37. The spreadsheets showed Alcha paid a thirteen percent value added tax

rate on those purchases. *Id.* Commerce did not attempt to verify the thirteen percent

rate. Instead, Commerce used the higher seventeen percent rate that China

previously provided to adjust its benchmark under 19 C.F.R. § 351.511(a)(2)(iv). IDM

at 34, J.A. at 14,219, ECF No. 36. Commerce then calculated the benefit Alcha

received by comparing the price Alcha paid to the benchmark. *Id.*

Alcha argues that Commerce was obligated to attempt verification of the

thirteen percent rate rather than rely on the seventeen percent rate China earlier

provided. Pls.' Br. at 29, ECF No 29. Commerce responds that it was under no such

obligation because the thirteen percent rate Alcha submitted was based on domestic purchases, not imports as the regulation requires. *Compare* Pls.' Br. at 29–30, ECF No. 29 (arguing that Commerce should have attempted verification of the thirteen percent rate), *with* 19 C.F.R. § 351.511(a)(2)(iv) (mandating Commerce use the price Alcha "would pay if it imported the product"). The parties also disagree over whether Commerce applied an adverse inference under 19 U.S.C. § 1677e(a)(2). Alcha claims that Commerce drew an adverse inference by selecting the "substantially higher" seventeen percent rate when more accurate data was on the record. Pls.' Br. at 29, ECF No 29. Commerce disagrees, saying it only neutrally selected from the facts otherwise available, which was permissible because Commerce could not use the other data on the record. Def.'s Resp. at 41, ECF No. 31. Alcha responds that Commerce should have given it an opportunity to supplement the record with information proving the thirteen percent rate was accurate. Pls.' Br. at 29–30, ECF No. 29 (explaining that the applicable value added tax rate would have been "easily verifiable" because China's schedule for these rates is public).

## C.

Alcha's counsel conceded at oral argument that the thirteen percent rate it provided was for goods it purchased domestically. Oral Arg. Tr. at 40:7–14, ECF No. 42 (The Court: "[W]hat did your client actually provide [Commerce] with regard to its invoices, books, and records? Were there any imports in there or not?" Alcha's Counsel: "… I don't believe so." The Court: "You don't believe there were any imports in there?" Alcha's Counsel: "Yes."). This ends the matter. The regulation requires

Commerce to "adjust the comparison price to reflect the price that a firm actually paid or would pay if it *imported* the product." 19 C.F.R. § 351.511(a)(2)(iv) (emphasis added). Thus, Commerce correctly declined to use Alcha's proffered rate because it did not reflect Alcha's purchase of imported goods. The only information on the record reflecting China's value added tax rate for imported aluminum was that provided by the Chinese government in an earlier investigation. Commerce cannot be faulted for failing to consider information that does not meet the regulation's requirements. It was Alcha's responsibility to build the record. *See Nan Ya Plastics*, 810 F.3d at 1337–38 (quoting *QVD Food*, 658 F.3d at 1324) ("'[T]he burden of creating an adequate record lies with interested parties and not with Commerce.'"). Because Alcha failed to place information on the record reflecting the tax rates for imported materials, it bears the cost of its failure.

Alcha's adverse inference argument fails for the same reason. Commerce may select from the facts otherwise available on the record when the parties fail to provide information necessary to calculate the benchmark. *See* 19 U.S.C. § 1677e(a)(1). Commerce needed the value added tax rate for imports of primary aluminum during the period of review. *See* 19 C.F.R. § 351.511(a)(2)(iv) (requiring Commerce to adjust the benchmark for "delivery charges and import duties"). With no responsive information from Alcha, Commerce looked at the record and neutrally selected the only rate that met the regulation's import requirement. It drew no adverse inference. Commerce's decision to use the only tax rate on the record that met the regulation's

requirement to be based on the cost to import primary aluminum is supported by substantial evidence and therefore **SUSTAINED**.

## CONCLUSION

In every trade matter before Commerce, the record created by the parties determines the outcome. Alcha's complaints all stem from information missing from the record. As the party charged with building that record, it must reap what it failed to sow. Commerce's Final Results are therefore **SUSTAINED**.

Stephen Alexander Vaden, Judge

Dated:    July 11, 2024
          New York, New York